JUDGE STANTON

**09 CV 1871**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

AMERICAN INTERNATIONAL GROUP, )
INC. and Subsidiaries, )
                    )
        Plaintiff, )
                    )     No. _____
                    )
    vs.              )
                    )
UNITED STATES OF AMERICA, )
        Defendant. )

RECEIVED FEB 2 - 2009 U.S.D.C. S.D. N.Y. CASHIERS

### COMPLAINT

Plaintiff American International Group, Inc. ("AIG"), on behalf of itself and its consolidated subsidiaries, alleges and states the following:

1.     This is an action arising under the Internal Revenue Code of 1986, **as amended** and codified in Title 26 of the United States Code, for recovery of $306,102,672 in federal income taxes, penalties, interest and additions to tax erroneously and illegally assessed against and collected from Plaintiff by Defendant for Plaintiff's taxable year ended December 31, 1997, plus interest thereon as provided by law.

### Jurisdiction and Venue

2.     Jurisdiction is conferred upon this Court by 28 U.S.C. § 1346(a)(1) and 26 U.S.C. § 7422.

3.     Venue for this action properly lies in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1402(a)(2).

## The Parties

4.      Plaintiff AIG is a corporation organized and existing under the laws of the State of Delaware.  Plaintiff is a holding company which, through its subsidiaries, is engaged in a broad range of financial services and insurance and insurance-related activities in the United States and abroad. AIG's primary activities include both general insurance and life insurance and retirement services operations, as well as financial services and asset management.   At all relevant times, Plaintiff's principal place of business has been located at 70 Pine Street, New York, New York.  Plaintiff's Employer Identification Number is 13-2592361.

5.      Plaintiff AIG is the common parent of an affiliated group of corporations that files a consolidated federal income tax return.   These corporations are collectively referred to hereinafter as the "AIG Consolidated Group."

6.      For the taxable year ended December 31, 1997, AIG timely filed a consolidated federal income tax return (the "1997 Consolidated Federal Income Tax Return"), and each affiliate of AIG that joined in that return is identified in the Form 851 Affiliations Schedule filed with the 1997 Consolidated Federal Income Tax Return. The Affiliations Schedule sets forth the names, addresses and Employer Identification Numbers of the corporations that were members of the AIG Consolidated Group during any part of the taxable year ended December 31, 1997.  A copy of the Affiliation Schedule for the taxable year ended December 31, 1997 is attached hereto as Exhibit A and is incorporated herein by reference.

7.      Defendant is the United States of America.

## Background

### A.   Cross-Border Transactions

8.      AIG Financial Products Corp. ("AIG-FP") is a Delaware corporation and at all times relevant to this Complaint was a wholly-owned subsidiary of AIG.  AIG-FP was a member of the AIG Consolidated Group, which filed the 1997 Consolidated Federal Income Tax Return. AIG-FP engages in a broad range of financial services activities as part of Plaintiff's financial services business.  In the regular course of its general business activities, AIG-FP seeks to make a profit by borrowing funds at economically favorable rates, preferably below the London Interbank Offered Rate ("LIBOR"), and by investing the funds at economically favorable rates, preferably above LIBOR.  As part of their regular business activities, AIG-FP and its affiliates often invest in privately placed preferred shares expecting to realize profits from those investments.   AIG-FP engaged in the transactions described in paragraphs 9-154 below to achieve one or more of those benefits and thereby generate a profit for the company.

### (1).   Lumagrove Transaction

9.      During the time period relevant to this case, Lumagrove Finance Company Limited ("Lumagrove") was an exempted company incorporated with limited liability under the laws of the Cayman Islands.

10.     Lumagrove constituted an association taxable as a corporation for U.S. federal income tax purposes.

11.     At all relevant times, Lumagrove had authorized and outstanding three classes of stock:   1,000 Series A common shares, 400 Series B common shares, and 1,600 Series C common shares.

12.     At all relevant times, for U.S. federal income tax purposes, all of the authorized and outstanding Series A and Series B shares of Lumagrove were owned by AIG-FP Pinestead Holdings Corp. ("Pinestead"), a U.S. corporation and wholly-owned subsidiary of AIG-FP. Pinestead was a member of the AIG Consolidated Group, which filed the 1997 Consolidated Federal Income Tax Return.

13.     Pinestead paid a total of $479,295,493.52 in exchange for Lumagrove's Series A and Series B shares.

14.     At all relevant times, due to its ownership of Lumagrove's Series A and Series B shares, Pinestead owned at least 10 percent of the voting stock of Lumagrove. Pinestead was thus, at all relevant times, a "United States shareholder" within the meaning of 26 U.S.C. § 951(b) with respect to Lumagrove.

15.     At all relevant times, due to Pinestead's ownership of Lumagrove's Series A and Series B shares, Lumagrove was a "controlled foreign corporation" within the meaning of 26 U.S.C. § 957(a).

16.     In connection with its investment in Lumagrove, Pinestead entered a financing transaction on or about August 27, 1997 in which a subsidiary of The Governor and Company of the Bank of Ireland (the "Bank of Ireland") provided IR£ 200,000,000 (approximately $295,000,000) in low-cost financing to Pinestead and acquired nominal legal title to the Lumagrove Series B shares as collateral for that financing. However, Pinestead retained equitable title and beneficial ownership of the Lumagrove Series B shares for federal income tax purposes.

17.     Plaintiff engaged in this financing transaction with the Bank of Ireland in the ordinary course of its business and reasonably expected to and did make a profit from the transaction.

18.     Lumagrove used the proceeds received from Pinestead to acquire a portfolio of income producing securities.

19.     For U.S. federal income tax purposes, the income earned by Lumagrove with respect to its portfolio constituted Subpart F income within the meaning of 26 U.S.C. § 952. Pursuant to 26 U.S.C. § 951(a), Plaintiff was required to include in its gross income its pro rata share of Lumagrove's Subpart F income. For the 1997 tax year, Plaintiff included $6,810,567 in gross income as its pro rata share of Lumagrove's Subpart F income.

20.     For Irish tax purposes, because Lumagrove was managed and controlled in Ireland, Lumagrove was a tax resident of Ireland. Lumagrove was thus legally liable for Irish corporation tax with respect to all of the income derived from its portfolio. With respect to the 1997 taxable year, Lumagrove paid the equivalent of $3,830,944 in Irish corporation tax.

21.     The Irish corporation tax paid by Lumagrove on its portfolio income is a creditable foreign income tax within the meaning of 26 U.S.C. § 901, the Treasury regulations promulgated thereunder, and Article XIII(1) of the 1949 Convention Between the Government of the United States of America and the Government of Ireland For the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income.

22.     Pursuant to 26 U.S.C. §§ 902 and 960, Plaintiff is deemed to have paid all of the Irish corporation tax paid by Lumagrove because its Subpart F inclusion for 1997 was equal to 100% of Lumagrove's current earnings and profits.

23.    Pursuant to 26 U.S.C. § 901, a taxpayer is entitled to a foreign tax credit for foreign taxes deemed to have been paid pursuant to 26 U.S.C. §§ 902 and 960.  Plaintiff is therefore entitled to a foreign tax credit against its U.S. federal income tax liability for 1997 in the amount of $3,830,944, as a result of Lumagrove's payment of Irish tax in that amount.  Accordingly, Plaintiff claimed a foreign tax credit in such amount on its 1997 Consolidated Federal Income Tax Return (the "Lumagrove Foreign Tax Credit").  This credit was attributable to taxes imposed on "financial services income" for purposes of the separate limitation categories under 26 U.S.C. § 904(d), and Plaintiff had sufficient excess limitation capacity in the "financial services income" category to use the Lumagrove Foreign Tax Credit in full in 1997.

24.    On or about March 20, 2008, the IRS issued a Statutory Notice of Deficiency, which disallowed AIG's claim for the Lumagrove Foreign Tax Credit.

25.    The IRS did not at any time through the date of this complaint issue a Notice of Proposed Adjustment relating to its disallowance of the Lumagrove Foreign Tax Credit.

26.    The IRS did not at any time through the date of this complaint issue a revenue agent's report or 30-day letter relating to its disallowance of the Lumagrove Foreign Tax Credit.

27.    As of the date of this complaint, the IRS has provided no support for the assertions or determinations set forth in the Statutory Notice of Deficiency relating to its disallowance of the Lumagrove Foreign Tax Credit.

**(2).    Palmgrove Transaction**

28.    During the time period relevant to this case, Palmgrove Finance Company Limited ("Palmgrove") was an exempted company incorporated with limited liability under the laws of the Cayman Islands.

29.     Palmgrove constituted an association taxable as a corporation for U.S. federal income tax purposes.

30.     At all relevant times, Palmgrove had authorized and outstanding three classes of stock:  1,000 Series A common shares, 400 Series B common shares, and 1,600 Series C common shares.

31.     At all relevant times, for U.S. federal income tax purposes, all of the authorized and outstanding Series A and Series B common shares of Palmgrove were owned by Pinestead.

32.     Pinestead paid a total of $229,090,013.52 in exchange for Palmgrove's Series A and Series B shares.

33.     At all relevant times, due to its ownership of Palmgrove's Series A and Series B shares, Pinestead owned at least 10 percent of the voting stock of Palmgrove.  Pinestead was thus, at all relevant times, a "United States shareholder" within the meaning of 26 U.S.C. § 951(b) with respect to Palmgrove.

34.     At all relevant times, due to Pinestead's ownership of Palmgrove's Series A and Series B shares, Palmgrove was a "controlled foreign corporation" within the meaning of 26 U.S.C. § 957(a).

35.     In connection with its investment in Palmgrove, Pinestead entered a financing transaction on or about October 20, 1997, in which a subsidiary of Irish Permanent PLC provided IR£ 100,000,000 (approximately $147,800,000) in low-cost financing to Pinestead and acquired nominal legal title to the Palmgrove Series B shares as collateral for that financing. However, Pinestead retained equitable title and beneficial ownership of the Palmgrove Series B shares for federal income tax purposes.

36.   Plaintiff engaged in this financing transaction with Irish Permanent PLC in the ordinary course of its business and reasonably expected to and did make a profit from the transaction.

37.   Palmgrove used the proceeds received from Pinestead to acquire a portfolio of income producing securities.

38.   For U.S. federal income tax purposes, the income earned by Palmgrove with respect to its portfolio constituted Subpart F income within the meaning of 26 U.S.C. § 952. Pursuant to 26 U.S.C. § 951(a), Plaintiff was required to include in its gross income its pro rata share of Palmgrove's Subpart F income. For the 1997 tax year, Plaintiff included $1,680,907 in gross income as its pro rata share of Palmgrove's Subpart F income.

39.   For Irish tax purposes, because Palmgrove was managed and controlled in Ireland, Palmgrove was a tax resident of Ireland. Palmgrove was thus legally liable for Irish corporation tax with respect to all of the income derived from its portfolio. With respect to the 1997 taxable year, Palmgrove paid the equivalent of $945,510 in Irish corporation tax.

40.   The Irish corporation tax paid by Palmgrove on its portfolio income is a creditable foreign income tax within the meaning of 26 U.S.C. § 901, the Treasury regulations promulgated thereunder, and Article XIII(1) of the 1949 Convention Between the Government of the United States of America and the Government of Ireland For the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income.

41.   Pursuant to 26 U.S.C. §§ 902 and 960, Plaintiff is deemed to have paid all of the Irish corporation tax paid by Palmgrove because its Subpart F inclusion for 1997 was equal to 100% of Palmgrove's current earnings and profits.

42.    Pursuant to 26 U.S.C. § 901, a taxpayer is entitled to a foreign tax credit for foreign taxes deemed to have been paid pursuant to 26 U.S.C. §§ 902 and 960.  Plaintiff is therefore entitled to a foreign tax credit against its U.S. federal income tax liability for 1997 in the amount of $945,510, as a result of Palmgrove's payment of Irish tax in that amount. Accordingly, Plaintiff claimed a foreign tax credit in such amount on its 1997 Consolidated Federal Income Tax Return (the "Palmgrove Foreign Tax Credit"). This credit was attributable to taxes imposed on "financial services income" for purposes of the separate limitation categories under 26 U.S.C. § 904(d), and Plaintiff had sufficient excess limitation capacity in the "financial services income" category to use the Palmgrove Foreign Tax Credit in full in 1997.

43.    On or about March 20, 2008, the IRS issued a Statutory Notice of Deficiency, which disallowed AIG's claim for the Palmgrove Foreign Tax Credit.

44.    The IRS did not at any time through the date of this complaint issue a Notice of Proposed Adjustment relating to its disallowance of the Palmgrove Foreign Tax Credit.

45.    The IRS did not at any time through the date of this complaint issue a revenue agent's report or 30-day letter relating to its disallowance of the Palmgrove Foreign Tax Credit.

46.    As of the date of this complaint, the IRS has provided no support for the assertions or determinations set forth in the Statutory Notice of Deficiency relating to its disallowance of the Palmgrove Foreign Tax Credit.

(3).    **Maitengrove Transaction**

47.    During the time period relevant to this case, Maitengrove Finance Corp. ("Maitengrove") was an exempted company incorporated with limited liability under the laws of the Cayman Islands.

48. Maitengrove constituted an association taxable as a corporation for U.S. federal income tax purposes.

49. At all relevant times, Maitengrove had authorized and outstanding three classes of stock: 1,000 Series A common shares, 400 Series B common shares, and 1,600 Series C common shares.

50. At all relevant times, for U.S. federal income tax purposes, all of the authorized and outstanding Series A and Series B common shares of Maitengrove were owned by Pinestead.

51. Pinestead paid a total of $257,136,000 in exchange for Maitengrove's Series A and Series B shares.

52. At all relevant times, due to its ownership of Maitengrove's Series A and Series B shares, Pinestead owned at least 10 percent of the voting stock of Maitengrove. Pinestead was thus, at all relevant times, a "United States shareholder" within the meaning of 26 U.S.C. § 951(b) with respect to Maitengrove.

53. At all relevant times, due to Pinestead's ownership of Maitengrove's Series A and Series B shares, Maitengrove was a "controlled foreign corporation" within the meaning of 26 U.S.C. § 957(a).

54. In connection with its investment in Maitengrove, Pinestead entered a financing transaction on or about February 28, 1997, in which a subsidiary of the Bank of Ireland provided IR£ 100,000,000 (approximately $160,000,000) in low-cost financing to Pinestead and acquired nominal legal title to the Maitengrove Series B shares as collateral for that financing. However, Pinestead retained equitable title and beneficial ownership of the Maitengrove Series B shares for federal income tax purposes.

55.    Plaintiff engaged in this financing transaction with the Bank of Ireland in the ordinary course of its business and reasonably expected to and did make a profit from the transaction.

56.    Maitengrove used the proceeds received from Pinestead to acquire a portfolio of income producing securities.

57.    For U.S. federal income tax purposes, the income earned by Maitengrove with respect to its portfolio constituted Subpart F income within the meaning of 26 U.S.C. § 952. Pursuant to 26 U.S.C. § 951(a), Plaintiff was required to include in its gross income its pro rata share of Maitengrove's Subpart F income.  For the 1997 tax year, Plaintiff included $8,420,587 in gross income as its pro rata share of Maitengrove's Subpart F income.

58.    For Irish tax purposes, because Maitengrove was managed and controlled in Ireland, Maitengrove was a tax resident of Ireland.  Maitengrove was thus legally liable for Irish corporation tax with respect to all of the income derived from its portfolio.  With respect to the 1997 taxable year, Maitengrove paid the equivalent of $4,784,663 in Irish corporation tax.

59.    The Irish corporation tax paid by Maitengrove on its portfolio income is a creditable foreign income tax within the meaning of 26 U.S.C. § 901, the Treasury regulations promulgated thereunder, and Article XIII(1) of the 1949 Convention Between the Government of the United States of America and the Government of Ireland For the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income.

60.    Pursuant to 26 U.S.C. §§ 902 and 960, Plaintiff is deemed to have paid all of the Irish corporation tax paid by Maitengrove because its Subpart F inclusion for 1997 was equal to 100% of Maitengrove's current earnings and profits.

61.     Pursuant to 26 U.S.C. § 901, a taxpayer is entitled to a foreign tax credit for foreign taxes deemed to have been paid pursuant to 26 U.S.C. §§ 902 and 960.  Plaintiff is therefore entitled to a foreign tax credit against its U.S. federal income tax liability for 1997 in the amount of $4,784,663, as a result of Maitengrove's payment of Irish tax in that amount.  Accordingly, Plaintiff claimed a foreign tax credit in such amount on its 1997 Consolidated Federal Income Tax Return (the "Maitengrove Foreign Tax Credit").  This credit was attributable to taxes imposed on "financial services income" for purposes of the separate limitation categories under 26 U.S.C. § 904(d), and Plaintiff had sufficient excess limitation capacity in the "financial services income" category to use the Maitengrove Foreign Tax Credit in full in 1997.

62.     On or about March 20, 2008, the IRS issued a Statutory Notice of Deficiency, which disallowed AIG's claim for the Maitengrove Foreign Tax Credit.

63.     The IRS did not at any time through the date of this complaint issue a Notice of Proposed Adjustment relating to its disallowance of the Maitengrove Foreign Tax Credit.

64.     The IRS did not at any time through the date of this complaint issue a revenue agent's report or 30-day letter relating to its disallowance of the Maitengrove Foreign Tax Credit.

65.     As of the date of this complaint, the IRS has provided no support for the assertions or determinations set forth in the Statutory Notice of Deficiency relating to its disallowance of the Maitengrove Foreign Tax Credit.

    **(4).**   **AIG-FP NZ #1 & #2 Transaction**

66.     On or about December 11, 1996, AIG-FP (NZ) No. 1 Limited ("AIG-FP NZ #1") was incorporated under the laws of New Zealand.

67.     AIG-FP NZ #1 constituted an association taxable as a corporation for U.S. federal income tax purposes.

68.     At all relevant times, AIG-FP NZ #1 had authorized and outstanding three classes of stock:  1,000 Class A shares, 500 Class B shares, and 3,250 Class C shares.

69.     At all relevant times, for U.S. federal income tax purposes, all of the authorized and outstanding Class A, B, and C shares of AIG-FP NZ #1 were owned by Pinestead.

70.     Pinestead paid a total of NZD 825,001,000 in exchange for the Class A, B, and C shares of AIG-FP NZ #1.

71.     In connection with its investment in AIG-FP NZ #1, Pinestead entered a financing transaction on or about December 19, 1996, in which a subsidiary of the Bank of New Zealand provided NZD 500,000,000 in low-cost financing to Pinestead and acquired nominal legal title to the AIG-FP NZ #1 Class B shares as collateral for that financing.  However, Pinestead retained equitable title and beneficial ownership of the AIG-FP NZ #1 Class B shares for federal income tax purposes.

72.     Plaintiff engaged in this financing transaction with the Bank of New Zealand in the ordinary course of its business and reasonably expected to and did make a profit from the transaction.

73.     AIG-FP NZ #1 loaned the proceeds received from Pinestead to a Cayman affiliate (the "Cayman Loans") of AIG-FP.  The proceeds were ultimately used to acquire a portfolio of income producing securities.

74.     On or about December 11, 1996, AIG-FP (NZ) No. 2 Limited ("AIG-FP NZ #2") was incorporated under the laws of New Zealand.  AIG-FP NZ #2 constituted an association taxable as a corporation for U.S. federal income tax purposes.

75.     On or about December 19, 1997, AIG-FP NZ #1 amalgamated with AIG-FP NZ #2. In the amalgamation, Pinestead received shares of AIG-FP NZ #2 in exchange for its shares of AIG-FP NZ #1. At all relevant times, for U.S. federal income tax purposes, all of the authorized and outstanding shares of AIG-FP NZ #2 were owned by Pinestead.

76.     At all relevant times, due to its ownership of all of the shares of AIG-FP NZ #1 and AIG-FP NZ #2, Pinestead owned at least 10 percent of the voting stock of AIG-FP NZ #1 and AIG-FP NZ #2. Pinestead was thus, at all relevant times, a "United States shareholder" within the meaning of 26 U.S.C. § 951(b) with respect to AIG-FP NZ #1 and AIG-FP NZ #2.

77.     At all relevant times, due to Pinestead's ownership of all of the shares of AIG-FP NZ #1 and AIG-FP NZ #2, AIG-FP NZ #1 and AIG-FP NZ #2 were "controlled foreign corporations" within the meaning of 26 U.S.C. § 957(a).

78.     For U.S. federal income tax purposes, the income earned by AIG-FP NZ #1 and AIG-FP NZ #2 was Subpart F income within the meaning of 26 U.S.C. § 952. Pursuant to 26 U.S.C. § 951(a), Plaintiff was required to include in its gross income its pro rata share of the Subpart F income of AIG-FP NZ #1 and AIG-FP NZ #2. For the 1997 tax year, Plaintiff included $28,073,828 in gross income as its pro rata share of AIG-FP NZ #1's Subpart F income. For the 1997 tax year, Plaintiff included $916,048 in gross income as its pro rata share of AIG-FP NZ #2's Subpart F income.

79.     For New Zealand tax purposes, because AIG-FP NZ #1 and AIG-FP NZ #2 were managed and controlled in New Zealand, AIG-FP NZ #1 and AIG-FP NZ #2 were tax residents of New Zealand. AIG-FP NZ #1 and AIG-FP NZ #2 were thus legally liable for New Zealand income tax with respect to all of the income derived from the Cayman Loans. With respect to the 1997 taxable year, AIG-FP NZ #1 paid the equivalent of $13,827,414 in New Zealand

income tax.  With respect to the 1997 taxable year, AIG-FP NZ #2 paid the equivalent of $451,188 in New Zealand income tax.

80.    The New Zealand income tax paid by AIG-FP NZ #1 and AIG-FP NZ #2 on the income they derived from the Cayman Loans is a creditable foreign income tax within the meaning of 26 U.S.C. § 901, the Treasury regulations promulgated thereunder, and Article 22(1) of the 1982 Convention Between the United States of America and New Zealand for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion With Respect to Taxes on Income.

81.    Pursuant to 26 U.S.C. §§ 902 and 960, Plaintiff is deemed to have paid all of the New Zealand income tax paid by AIG-FP NZ #1 and AIG-FP NZ #2, because its Subpart F inclusions for 1997 for AIG-FP NZ #1 and AIG-FP NZ #2 were equal to 100% of their current earnings and profits.

82.    Pursuant to 26 U.S.C. § 901, a taxpayer is entitled to a foreign tax credit for foreign taxes deemed to have been paid pursuant to 26 U.S.C. §§ 902 and 960.  Plaintiff is therefore entitled to foreign tax credits against its U.S. federal income tax liability for 1997 in the amount of $13,827,414, as a result of AIG-FP NZ #1's payment of New Zealand income tax in that amount, and in the amount of $451,188, as a result of AIG-FP NZ #2's payment of New Zealand income tax in that amount.  Accordingly, Plaintiff claimed foreign tax credits in the amount of $13,827,414 (the "AIG-FP NZ #1 Foreign Tax Credit") and $451,188 (the "AIG-FP NZ #2 Foreign Tax Credit") on its 1997 Consolidated Federal Income Tax Return.  These credits were attributable to taxes imposed on "financial services income" for purposes of the separate limitation categories under 26 U.S.C. § 904(d), and Plaintiff had sufficient excess limitation

capacity in the "financial services income" category to use both the AIG-FP NZ #1 Foreign Tax Credit and the AIG-FP NZ #2 Foreign Tax Credit in full in 1997.

83.     On or about March 20, 2008, the IRS issued a Statutory Notice of Deficiency, which disallowed AIG's claim for the AIG-FP NZ #1 Foreign Tax Credit and the AIG-FP NZ #2 Foreign Tax Credit.

84.     The IRS did not at any time through the date of this complaint issue a Notice of Proposed Adjustment relating to its disallowance of the AIG-FP NZ #1 Foreign Tax Credit or the AIG-FP NZ #2 Foreign Tax Credit.

85.     The IRS did not at any time through the date of this complaint issue a revenue agent's report or 30-day letter relating to its disallowance of the AIG-FP NZ #1 Foreign Tax Credit or the AIG-FP NZ #2 Foreign Tax Credit.

86.     As of the date of this complaint, the IRS has provided no support for the assertions or determinations set forth in the Statutory Notice of Deficiency relating to its disallowance of the AIG-FP NZ #1 Foreign Tax Credit or the AIG-FP NZ #2 Foreign Tax Credit.

### (5).     Laperouse Transaction

87.     On or about January 10, 1993, Financiere Laperouse SCA ("Laperouse") was formed under the laws of France.

88.     Laperouse constituted an association taxable as a corporation for U.S. federal income tax purposes.

89.     At all relevant times, Laperouse had authorized and outstanding two classes of stock:  30,000,000 Class A shares and 8,850,000 Class B shares.

90.     At all relevant times, AIG-FP owned 8,849,975 of the authorized and outstanding Class B shares of Laperouse, and AIG Financial Products (Australia) Ltd. ("AIG-FP Australia"), a United States corporation and wholly-owned subsidiary of AIG-FP, owned the remaining 25 Class B shares.

91.     At all relevant times, for U.S. federal income tax purposes, all of the authorized and outstanding Class A shares of Laperouse were owned by AIG-FP General Partners 1A, a general partnership organized under the laws of the State of Connecticut.  AIG-FP and AIG-FP Australia each owned a 50 percent interest in AIG-FP General Partners 1A.

92.     AIG-FP General Partners 1A paid a total of FFR (French Francs) 3,000,000,000 in exchange for its Class A shares, AIG-FP paid a total of FFR 884,997,500 in exchange for its Class B shares, and AIG-FP Australia paid a total of FFR 2,500 in exchange for its Class B shares.

93.     At all relevant times, due to their ownership of all of Laperouse's shares, AIG-FP, AIG-FP Australia, and AIG-FP General Partners 1A each owned at least 10 percent of the voting stock of Laperouse.  AIG-FP, AIG-FP Australia, and AIG-FP General Partners 1A were thus, at all relevant times, "United States shareholders" within the meaning of 26 U.S.C. § 951(b) with respect to Laperouse.

94.     At all relevant times, because all of Laperouse's shares were owned by AIG-FP, AIG-FP Australia, and AIG-FP General Partners 1A, Laperouse was a "controlled foreign corporation" within the meaning of 26 U.S.C. § 957(a).

95.     In connection with its investment in Laperouse, AIG-FP and its affiliates entered a financing transaction on or about September 30, 1993, in which a French bank, Caisse Nationale de Crédit Agricole, provided FFR 3,000,000,000 in low-cost financing to AIG-FP

General Partners 1A and acquired nominal legal title to the Laperouse Class A shares as collateral for the financing.  However, AIG-FP General Partners 1A retained equitable title and beneficial ownership of the Laperouse Class A shares for federal income tax purposes.

96.    Plaintiff engaged in this financing transaction with Caisse Nationale de Credit Agricole Bank in the ordinary course of its business and reasonably expected to and did make a profit from the transaction.

97.    Laperouse used the proceeds received from AIG-FP General Partners 1A, AIG-FP and AIG-FP Australia to acquire a portfolio of income producing securities.

98.    For U.S. federal income tax purposes, the income earned by Laperouse with respect to its portfolio constituted Subpart F income within the meaning of 26 U.S.C. § 952. Pursuant to 26 U.S.C. § 951(a), Plaintiff was required to include in its gross income its pro rata share of Laperouse's Subpart F income.  For the 1997 tax year, Plaintiff included $24,876,728 in gross income as its pro rata share of Laperouse's Subpart F income.

99.    For French tax purposes, because Laperouse was managed and controlled in France, Laperouse was a tax resident of France.  Laperouse was thus legally liable for French corporate income tax with respect to all of the income derived from its portfolio.  With respect to the 1997 taxable year, Laperouse paid the equivalent of $17,769,336 in French corporate income tax.

100.    The French corporate income tax paid by Laperouse on its portfolio income is a creditable foreign income tax within the meaning of 26 U.S.C. § 901, the Treasury regulations promulgated thereunder, and Article 24(1) of the 1994 Convention Between the Government of the United States of America and the Government of the French Republic for the Avoidance of

Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and Capital.

101.    Pursuant to 26 U.S.C. §§ 902 and 960, Plaintiff is deemed to have paid all of the French corporate income tax paid by Laperouse in 1997 because its Subpart F inclusion was equal to 100% of Laperouse's current earnings and profits.

102.    Pursuant to 26 U.S.C. § 901, a taxpayer is entitled to a foreign tax credit for foreign taxes deemed to have been paid pursuant to 26 U.S.C. §§ 902 and 960.  Plaintiff is therefore entitled to a foreign tax credit against its U.S. federal income tax liability for 1997 in the amount of $17,769,336, as a result of Laperouse's payment of French corporate income tax in that amount.  Accordingly, Plaintiff claimed a foreign tax credit in such amount on its 1997 Consolidated Federal Income Tax Return (the "Laperouse Foreign Tax Credit").  This credit was attributable to taxes imposed on "financial services income" for purposes of the separate limitation categories under 26 U.S.C. § 904(d), and Plaintiff had sufficient excess limitation capacity in the "financial services income" category to use the Laperouse Foreign Tax Credit in full in 1997.

103.    On or about March 20, 2008, the IRS issued a Statutory Notice of Deficiency, which disallowed AIG's claim for the Laperouse Foreign Tax Credit.

104.    The IRS did not at any time through the date of this complaint issue a Notice of Proposed Adjustment relating to its disallowance of the Laperouse Foreign Tax Credit.

105.    The IRS did not at any time through the date of this complaint issue a revenue agent's report or 30-day letter relating to its disallowance of the Laperouse Foreign Tax Credit.

106.   As of the date of this complaint, the IRS has provided no support for the assertions or determinations set forth in the Statutory Notice of Deficiency relating to its disallowance of the Laperouse Foreign Tax Credit.

### (6).   Vespucci Transaction

107.   On or about December 14, 1995, Financiere Vespucci SCA ("Vespucci") was formed under the laws of France.

108.   Vespucci constituted an association taxable as a corporation for U.S. federal income tax purposes.

109.   At all relevant times, Vespucci had authorized and outstanding three classes of stock:  6,000,000 Class A shares, 3,730,586 Class B shares, and 1 Class C share.

110.   At all relevant times, AIG-FP Capital Preservation Corp. ("AIG Capital Preservation"), a U.S. corporation and wholly-owned subsidiary of AIG-FP, owned 1,865,293 of the authorized and outstanding Class B shares of Vespucci and AIG-FP Investments Corp. ("AIG Investments"), a U.S. corporation and wholly-owned subsidiary of AIG-FP, owned the remaining 1,865,293 Class B shares.

111.   AIG Capital Preservation and AIG Investments were both members of the AIG Consolidated Group, which filed the 1997 Consolidated Federal Income Tax Return.

112.   At all relevant times, for U.S. federal income tax purposes, all of the authorized and outstanding Class A shares were owned by AIG-FP Cabral SNC ("AIG Cabral"), a company formed under the laws of France.

113.   AIG Cabral is treated as a partnership for U.S. federal income tax purposes.  At all relevant times, AIG Capital Preservation and AIG Investments each owned a 50 percent partnership interest in AIG Cabral.  For purposes of Subpart F of the Internal Revenue Code,

AIG Capital Preservation and AIG Investments are each treated as owning 50% of the Class A shares of Vespucci, pursuant to 26 U.S.C. § 958(a)(2).

114.    AIG Cabral paid a total of FFR 600,000,000 in exchange for its Class A shares, AIG Capital Preservation paid a total of FFR 186,529,300 in exchange for its Class B shares, and AIG Investments paid a total of FFR 186,529,300 in exchange for its Class B shares.

115.    At all relevant times, due to their direct and indirect ownership of Vespucci's Class A and Class B shares, AIG Capital Preservation and AIG Investments each owned at least 10 percent of the voting stock of Vespucci.  AIG Capital Preservation and AIG Investments were thus, at all relevant times, "United States shareholders" within the meaning of 26 U.S.C. § 951(b) with respect to Vespucci.

116.    At all relevant times, because Vespucci's Class A and Class B shares were owned by AIG Capital Preservation and AIG Investments, Vespucci was a "controlled foreign corporation" within the meaning of 26 U.S.C. § 957(a).

117.    In connection with its investment in Vespucci, AIG Cabral entered a financing transaction on or about December 18, 1995, in which Banca Commerciale Italiana SpA provided ITL (Italian Lira) 193,970,997,738 in low-cost financing to AIG Cabral and acquired nominal legal title to the Vespucci Class A shares as collateral for the financing.  However, AIG Cabral retained equitable title and beneficial ownership of the Vespucci Class A shares for federal income tax purposes.

118.    Plaintiff engaged in this financing transaction with Banca Commerciale Italiana SpA in the ordinary course of its business and reasonably expected to and did make a profit from the transaction.

119.    Vespucci used the proceeds received from AIG Cabral, AIG Capital Preservation and AIG Investments to acquire a portfolio of income producing securities.

120.    For U.S. federal income tax purposes, the income earned by Vespucci with respect to its portfolio constituted Subpart F income within the meaning of 26 U.S.C. § 952. Pursuant to 26 U.S.C. § 951(a), Plaintiff was required to include in its gross income its pro rata share of Vespucci's Subpart F income.  For the 1997 tax year, Plaintiff included $9,215,472 in gross income as its pro rata share of Vespucci's Subpart F income.

121.    For French tax purposes, because Vespucci was managed and controlled in France, Vespucci was a tax resident of France.  Vespucci was thus legally liable for French corporate income tax with respect to all of the income derived from its portfolio.  With respect to the 1997 taxable year, Vespucci paid the equivalent of $6,582,571 in French corporate income tax.

122.    The French corporate income tax paid by Vespucci on its portfolio income is a creditable foreign income tax within the meaning of 26 U.S.C. § 901, the Treasury regulations promulgated thereunder, and Article 24(1) of the 1994 Convention Between the Government of the United States of America and the Government of the French Republic for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and Capital.

123.    Pursuant to 26 U.S.C. §§ 902 and 960, Plaintiff is deemed to have paid all of the French corporate income tax paid by Vespucci in 1997 because its Subpart F inclusion was equal to 100% of Vespucci's current earnings and profits.

124.    Pursuant to 26 U.S.C. § 901, a taxpayer is entitled to a foreign tax credit for foreign taxes deemed to have been paid pursuant to 26 U.S.C. §§ 902 and 960.  Plaintiff is

therefore entitled to a foreign tax credit against its U.S. federal income tax liability for 1997 in the amount of $6,582,571, as a result of Vespucci's payment of French corporate income tax in that amount. Accordingly, Plaintiff claimed a foreign tax credit in such amount on its 1997 Consolidated Federal Income Tax Return (the "Vespucci Foreign Tax Credit"). This credit was attributable to taxes imposed on "financial services income" for purposes of the separate limitation categories under 26 U.S.C. § 904(d), and Plaintiff had sufficient excess limitation capacity in the "financial services income" category to use the Vespucci Foreign Tax Credit in full in 1997.

125.    On or about March 20, 2008, the IRS issued a Statutory Notice of Deficiency, which disallowed AIG's claim for the Vespucci Foreign Tax Credit.

126.    The IRS did not at any time through the date of this complaint issue a Notice of Proposed Adjustment relating to its disallowance of the Vespucci Foreign Tax Credit.

127.    The IRS did not at any time through the date of this complaint issue a revenue agent's report or 30-day letter relating to its disallowance of the Vespucci Foreign Tax Credit.

128.    As of the date of this complaint, the IRS has provided no support for the assertions or determinations set forth in the Statutory Notice of Deficiency relating to its disallowance of the Vespucci Foreign Tax Credit.

(7).    **Foppingadreef Transaction**

129.    On or about March 26, 1996, Foppingadreef Investments (No. 2) N.V. ("Foppingadreef") was formed under the laws of the Netherlands Antilles, registering its principal place of business and seat of management in Amsterdam, the Netherlands.

130.    Foppingadreef constituted an association taxable as a corporation for U.S. federal income tax purposes.

131.   At all relevant times, Foppingadreef had authorized and outstanding three classes of stock:  13,000 Class A common shares, 3,250 Class B preference shares, and 4 Class D priority shares.  All such shares constituted equity interests in Foppingadreef for federal income tax purposes.

132.   The Class A shares, as a class, entitled their holder to receive 3 percent of the free cash flow of Foppingadreef for years ending prior to January 1, 2002, and represented the residual interest in Foppingadreef (after the liquidation preference paid to other shares) in subsequent years. Each Class A share entitled its holder to cast one vote at any general meeting of shareholders.  The Class A shares were acquired by ABN AMRO Bank N.V. ("ABN") on or about March 27, 1996.

133.   The Class B preference shares, as a class, entitled their holder to receive 97 percent of the free cash flow of Foppingadreef for years ending prior to January 1, 2002, and to receive a yield determined by a remarketing process in subsequent years.  Each Class B share entitled its holder to cast one vote at any general meeting of shareholders.  The Class B shares were acquired by NF Two Corp. ("NF Two"), a U.S. corporation and wholly-owned subsidiary of AIG-FP, on or about March 25, 1996.  NF Two was a member of the AIG Consolidated Group, which filed the 1997 Consolidated Federal Income Tax Return.

134.   The Class D shares had a liquidation preference of Dutch Guilder ("NLG") 1,000 per share and a dividend of NLG 50 per year.  Each Class D share entitled its holder to cast one vote at any general meeting of shareholders.  The Class D shares were acquired by NF Two on or about March 25, 1996.

135.   At all relevant times, Foppingadreef also had authorized but unissued 3,250 Class C shares of stock.  Each Class C share entitled its holder to cast four votes at any general meeting

of shareholders.  For the first seven fiscal years after issue, the Class C shares would carry the right to a cumulative dividend at a fixed rate determined at a general meeting of shareholders.  In subsequent fiscal years, the Class C shares would carry the right to a variable cumulative dividend at a floating rate.

136.  On or about March 27, 1996, Foppingadreef issued to NF Two 3,250 warrants (the "Warrants"), each of which entitled its holder to subscribe to one of Foppingadreef's Class C shares at a price of NLG 100,000.  Pursuant to 26 U.S.C. §§ 318(a)(4) and 958(a)(2), the Class C shares issuable upon exercise of the Warrants were treated as owned by the holder of the Warrants.

137.  Plaintiff made its investment in Foppingadreef through NF Two in the ordinary course of its business and reasonably expected to and did make a profit from that investment.

138.  With the proceeds of the issuance of the Class A, B and D shares, Foppingadreef acquired three senior unsecured promissory notes (the "Notes") whose aggregate principal amount was NLG 1.625 billion.

139.  On or about August 2, 1996, NF Two sold 1,625 Class B shares, 1,625 Warrants and 2 Class D Shares to BankAmerica International Financial Corporation ("Bank of America"), which is a United States entity.  At all relevant times, NF Two held the remaining 1,625 Class B shares, 1,625 Warrants and 2 Class D shares.

140.  At all relevant times, due to its ownership of 1,625 Class B shares and 1,625 Warrants, NF Two owned at least 10 percent of the voting stock of Foppingadreef.  NF Two was thus, at all relevant times, a "United States shareholder" within the meaning of 26 U.S.C. § 951(b) with respect to Foppingadreef.

141.    At all relevant times, due to its ownership of 1,625 Class B shares and 1,625 Warrants, Bank of America owned at least 10 percent of the voting stock of Foppingadreef. Bank of America was thus, at all relevant times, a "United States shareholder" with respect to Foppingadreef within the meaning of 26 U.S.C. § 951(b).

142.    At all relevant times, the Class C shares issuable upon the exercise of the Warrants, in combination with the outstanding Class B shares, constituted more than 50 percent of the total value and voting power of Foppingadreef (computed as if such Class C shares were outstanding).   As a result of the status of NF Two and Bank of America as United States shareholders and their collective ownership of greater than 50 percent of the stock of Foppingadreef, by voting power and value, Foppingadreef was, at all relevant times, a "controlled foreign corporation" within the meaning of 26 U.S.C. § 957(a).

143.    All of the income derived by Foppingadreef with respect to the Notes was income realized from foreign sources and constituted Subpart F income within the meaning of 26 U.S.C. § 952.  Pursuant to 26 U.S.C. § 951(a), NF Two's pro rata share of Foppingadreef's Subpart F income was includible in Plaintiff's gross income in determining Plaintiff's U.S. federal income tax liability.

144.    For the 1997 tax year, NF Two's pro rata share of Foppingadreef's Subpart F income was $4,553,908, which was included in Plaintiff's gross income for 1997, pursuant to 26 U.S.C. § 951(a).

145.    At all relevant times, because Foppingadreef had its principal place of business and corporate "seat" in the Netherlands, it was a resident of the Netherlands for purposes of Dutch tax law.  Foppingadreef was thus legally liable for Netherlands income tax with respect to its income on the Notes.

146.    Foppingadreef paid NLG 53,027,000 in Netherlands income tax with respect to its 1997 taxable year.

147.    Pursuant to 26 U.S.C. §§ 902 and 960, NF Two is deemed to have paid the portion of Netherlands income tax paid by Foppingadreef that was attributable to NF Two's Subpart F inclusion.

148.    Foppingadreef distributed substantially all of its 1997 earnings and profits to its shareholders.  As holder of 50 percent of the Class B shares, NF Two was entitled to receive 48.5 percent of Foppingadreef's 1997 earnings and profits and actually received a distribution of $4,243,806 in 1997, less a 5% Dutch withholding tax of $212,190.

149.    The Netherlands income tax paid by Foppingadreef in 1997 and the tax withheld by Foppingadreef on the distribution are creditable foreign income taxes within the meaning of 26 U.S.C. § 901, the Treasury regulations promulgated thereunder, and Article 25(4) of the 1992 Convention Between the United States of America and the Kingdom of the Netherlands for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion With Respect to Taxes on Income.

150.    Pursuant to 26 U.S.C. § 901, Plaintiff is entitled to a foreign tax credit against its U.S. federal income tax liability for 1997 in the amount of $13,496,381, as a result of Foppingadreef's payment of Netherlands income tax.  Accordingly, Plaintiff claimed a foreign tax credit in such amount on its 1997 Consolidated Federal Income Tax Return (the "Foppingadreef Foreign Tax Credit").  Pursuant to 26 U.S.C. § 901, Plaintiff is also entitled to an additional foreign tax credit against its U.S. federal income tax liability for 1997 in the amount of $212,190, as a result of the Netherlands withholding tax imposed on the distribution from Foppingadreef (the "Foppingadreef Withholding Tax Credit").  These credits were attributable to

taxes imposed on "financial services income" for purposes of the separate limitation categories under 26 U.S.C. § 904(d), and Plaintiff had sufficient excess limitation capacity in the "financial services income" category to use the Foppingadreef Foreign Tax Credit in full in 1997.

151.   On or about March 9, 2004, the IRS issued a 30-day letter with regard to the transaction along with several other adjustments.   AIG protested the 30-day letter to the Administrative Appeals Division of the IRS and resolved the Foppingadreef transaction with a full concession by the IRS.

152.   Subsequent to that resolution, however, the IRS withdrew its concession and on or about March 20, 2008, the IRS issued a Statutory Notice of Deficiency, which disallowed AIG's claim for the Foppingadreef Foreign Tax Credit.

153.   In its Statutory Notice of Deficiency, the IRS raised several additional, alternative arguments, including the argument that Foppingadreef was not a controlled foreign corporation and that Plaintiff should have included certain contingent interest in its 1997 earnings and profits for purposes of determining the amount of its foreign tax credit.  These alternative arguments are incorrect.  However, if any of these arguments were accepted, Plaintiff would still be entitled to the full Foppingadreef Withholding Tax Credit and at least a portion of the Foppingadreef Foreign Tax Credit, and would be entitled to a partial refund of taxes paid as a result.

***

154.   Plaintiff is entitled to the full amount of the foreign tax credits described in paragraphs 23, 42, 61, 82, 102, 124, and 150 totaling $61,900,197 (the "Disallowed Foreign Tax Credits").  Because the IRS erroneously denied the Disallowed Foreign Tax Credits, Plaintiff is entitled to a refund for its 1997 taxable year as described in Count One of this Complaint below.

**B.**     **1997 Restatement Claims**

155.     In early 2005, following inquiries by certain governmental agencies, AIG initiated an internal review of its books and records in connection with preparation of its 2004 Annual Report on Form 10-K.  As a result of that review, AIG concluded that the accounting by prior management for certain transactions and relationships was incorrect and needed to be restated or adjusted.  Accordingly, in 2005, AIG issued restated financial statements for the years 2000 through 2003, and for the first three quarters of 2004.  It subsequently identified certain additional adjustments, which were corrected in a second restatement of its financial statements. Collectively, these financial statement restatements will be referred to as the "Restatements."

156.     A number of the items and transactions AIG identified during the course of the review conducted in connection with the Restatements also affect its tax reporting.  As a result, on or about April 4, 2008, AIG filed amended tax returns and claims for refund for its 1997 through 1999 tax years on Form 1120X (as well as claims for earlier years) and corresponding requests for audit adjustments for its 2000 through 2006 tax years (the "Restatement Refund Claim").  The Restatement Refund Claim is attached hereto as Exhibit B and includes AIG's amended return for the 1997 tax year and associated claim for refund (the "1997 Restatement Refund Claim").  The contents of the Restatement Refund Claim, including the 1997 Restatement Refund Claim, are incorporated herein by reference.

157.     With respect to the 1997 tax year, AIG identified the following items and transactions for which a change or adjustment was warranted from the way in which the item or transaction was originally reported by prior management on the company's 1997 Consolidated Federal Income Tax Return:

158.   i. Union Excess.   During the 1997 through 2006 tax years, AIG and its subsidiaries participated in transactions involving Union Excess Reinsurance Company Ltd. ("Union Excess"), which AIG's prior management had treated as reinsurance for regulatory and financial accounting purposes, as well as for Federal income tax purposes.

159.   During the course of the review conducted in connection with the Restatements, AIG determined that the reporting by prior management of the Union Excess transactions for financial and tax purposes was based on incomplete information and was incorrect. In particular, the company determined that a small group of former executives at AIG (the "Former Executives") had exercised control over the Union Excess transactions in a way that prevented significant losses or gains to Union Excess. As a result, substantially all of the risks and rewards of the underlying reinsurance inured to AIG and the transactions should therefore not have been treated as insurance or reinsurance.

160.   As a result of the findings of its internal review, AIG restated its financial statements to reflect the proper treatment of its transactions with Union Excess as deposit arrangements rather than reinsurance. Likewise, for Federal income tax purposes, the Union Excess transactions do not qualify as insurance because the control exercised by the Former Executives had the effect of preventing any genuine risk transfer and prevented the arrangements from reflecting common notions of insurance.

161.   The net tax effect of recharacterizing the Union Excess transactions as deposit arrangements instead of reinsurance transactions is to reduce AIG's taxable income by $28,000,000 from the amount originally reported on Plaintiff's 1997 Consolidated Federal Income Tax Return. Plaintiff is entitled to a refund based on that difference in treatment of the Union Excess transactions.

162.    ii.    SICO.    During the time periods relevant to this case, Starr International Company, Inc. ("SICO") was a Panamanian company headquartered in Bermuda. All of SICO's voting shareholders and directors were either current or former officers, directors, or managers of AIG. During the time periods relevant to this case, SICO held a substantial number of AIG shares, which were set aside for the benefit of certain employees of Plaintiff (the "SICO Participants") pursuant to the compensation plan discussed below.

163.    For several decades, including during the 1997 tax year at issue in this case, SICO provided incentive compensation to the SICO Participants under a series of Deferred Compensation Profit Participation Plans (the "DCPPPs"). Under the DCPPP in effect during the relevant periods, SICO provided cash payments and restricted and unrestricted shares of AIG stock to the AIG employees who were SICO Participants. Payments under the DCPPPs served to compensate the AIG employees for services they rendered to AIG and to discourage turnover.

164.    Section 83(a) of the Internal Revenue Code requires that property transferred in connection with the performance of services be included in the recipient's taxable income. Section 83(h) further provides that a deduction is allowed to the person for whom the services were performed in an amount equal to the amount included in the gross income of the individual who performed the services. Treasury Regulation § 1.83-6(d) specifies that a corporation is to deduct compensation paid to its employees for services rendered to it even though the compensation is paid by a shareholder of the corporation rather than the corporation itself:

> If a shareholder of a corporation transfers property to an employee of such corporation ... in consideration of services performed for the corporation, the transaction shall be considered to be a contribution of such property to the capital of such corporation by the shareholder, and immediately thereafter a transfer of such property by the corporation to the employee ....

165.    Pursuant to 26 U.S.C. §§ 83 and 162, the payments of cash and stock made to AIG employees under the DCPPP, as well as the employer's portion of related social security and medicare taxes, are deductible by AIG, because the payments were made in consideration of the employee's services to AIG.  For the 1997 tax year, the amount of these deductible payments is $33,294,586.

166.    Certain SICO Participants in the DCPPPs were employed by controlled foreign corporation ("CFC") subsidiaries of AIG.  To the extent DCPPP payments were made to such SICO Participants in connection with services performed on behalf of the CFC, such amounts are not deductible by AIG, but instead are appropriately characterized as expenses of the CFC that reduce the CFC's earnings and profits for U.S. tax purposes and correspondingly reduce AIG's Subpart F income.  For the 1997 tax year, the total amount of such payments (and the corresponding reduction in AIG's Subpart F income) was $110,160.

167.    The net effect of the additional deductions for compensation to AIG employees described in paragraph 165 and the reduction in AIG's Subpart F income described in paragraph 166 is to reduce Plaintiff's taxable income.  Plaintiff is entitled to a refund in federal income tax based on the additional deduction and reduction in Subpart F income.

168.    iii. CV Starr.  CV Starr & Company, Inc. ("CV Starr") is a Delaware corporation incorporated in 1950.  In 1970, CV Starr transferred substantially all of its assets to AIG in exchange for AIG stock.  During the relevant tax years at issue in this case, CV Starr held approximately 1 to 2% of AIG's stock.  In exchange for fees set at cost, AIG performed many of CV Starr's administrative functions and leased office space to CV Starr.

169.    For a number of years, including the tax years at issue in this case, CV Starr issued its own stock to a limited number of senior AIG executives (the "CV Starr Participants")

under a compensation program referred to herein as the "CV Starr Stock Plan." The CV Starr Participants were selected at the invitation of CV Starr's Board of Directors, which was comprised solely of AIG executives. Although nominally employees of both AIG and CV Starr, most CV Starr Participants performed no services of any kind for CV Starr. A small number of CV Starr Participants (ten in total) performed some minimal services for CV Starr, but such services were minute in comparison to the CV Starr Participant's time devoted to AIG. In every case, the CV Starr Participants' meaningful employment was with AIG.

170.   Pursuant to the CV Starr Stock Plan, CV Starr Participants were given the opportunity to purchase common shares of CV Starr at book value. The right of any participant to enjoy appreciation in the value of such stock, however, was contingent on continued employment. Shares were subject to a variety of restrictions on transfer and, subject to certain immaterial exceptions, CV Starr had the right to redeem shares at cost if the CV Starr Participant ceased to be employed by CV Starr and AIG before reaching a certain age and retiring.

171.   CV Starr periodically issued new preferred shares to CV Starr Participants as dividends on the common shares. It also paid quarterly and annual cash dividends on both its common and preferred shares. During 1997, it paid $7,246,942 in cash dividends to CV Starr Participants. A substantial portion of these payments – $2,737,356 – represents incentive compensation tied to the CV Starr Participant's continued employment with AIG, which is deductible by AIG pursuant to 26 U.S.C. §§ 83 and 162 and Treas. Reg. § 1.83-6(d).

172.   During the tax years 1997-2004, CV Starr also made salary and bonus payments in cash to certain CV Starr Participants. The vast majority of such payments are properly allocable to services the CV Starr Participants performed for AIG, because the majority of CV Starr Participants performed no services of any kind for CV Starr and the remaining CV Starr

Participants performed only minimal services for CV Starr.   The CV Starr Participants' meaningful employment was instead with AIG.   During 1997, CV Starr paid $3,181,403 in cash salary and bonus payments to CV Starr Participants.

173.   Pursuant to 26 U.S.C. §§ 83 and 162 and Treas. Reg. § 1.83-6(d), AIG is entitled to a deduction for the payments described in paragraphs 171-172 that is allocable to the AIG-related U.S. employment of the CV Starr Participants (plus employment taxes paid), less any adjustment required pursuant to 26 U.S.C. § 162(m).   For the 1997 tax year, the total amount of such deductible payments is $3,710,496.

174.   Certain Participants in the CV Starr Stock Plan were employed by controlled foreign corporation ("CFC") subsidiaries of AIG.   To the extent payments were made to such CV Starr Participants in connection with services they performed on behalf of the CFC, such amounts are not deductible by AIG, but are instead appropriately characterized as expenses of the CFC that reduce the CFC's earnings and profits for U.S. tax purposes and correspondingly reduce AIG's Subpart F income.   For the 1997 tax year, the total amount of such payments (and the corresponding reduction in AIG's Subpart F income) was $3,047.

175.   The net effect of the additional deductions for compensation to AIG employees described in paragraph 173 and the reduction in AIG's Subpart F income described in paragraph 174 is to reduce Plaintiff's taxable income.   Plaintiff is entitled to a refund in federal income tax based on the additional deduction and reduction in Subpart F income.

176.   iv.  Reinsurance Receivables.  During its internal review, AIG identified certain reinsurance and other receivables that had been misstated by prior management for financial accounting purposes.   As a result of these findings, AIG made appropriate adjustments in

connection with its financial Restatements.  Corresponding adjustments are also required for Federal Income Tax purposes.

177.    Pursuant to 26 U.S.C. § 832(b)(5), an insurance company is entitled to a deduction for losses incurred during the taxable year that reflects the estimated increase or decrease in reinsurance recoverables for the taxable year.  On Plaintiff's 1997 Consolidated Federal Income Tax Return, Plaintiff's deduction for losses incurred was erroneously reduced to reflect $4,700,000 in reinsurance recoverables that, in fact, were unlikely to be collected. Pursuant to 26 U.S.C. § 832(b)(5), AIG is entitled to an additional deduction for losses incurred of $4,700,000.   Plaintiff is entitled to a refund in federal income tax based on the difference.

***

178.    The aggregate effect of the adjustments arising from Plaintiffs' 1997 Restatement Refund Claim is to reduce Plaintiff's taxable income for the 1997 tax year by $53,523,565. Plaintiff is entitled to a refund based on this difference as described in Count One of this Complaint below.

**C.    2002 Net Operating Loss Carrybacks and 2000 Capital Loss Carryback (Protective Claims)**

(1).    Background.

179.    In connection with its 2002 tax year, AIG reported a net non-life operating loss of $134,278,131 (the "2002 Initial Net Non-Life Operating Loss").  See Paragraph 184, infra. Pursuant to 26 U.S.C. § 172, AIG is entitled to carry back this 2002 Initial Net Non-Life Operating Loss as a net operating loss deduction for its 1997 taxable year.

180.    On or about April 4, 2008, AIG filed with the IRS proposed audit adjustments for its 2002 tax year, and a corresponding  claim for refund for the difference in the amount of tax owed (the "2002 Restatement Refund Claim").  The  2002 Restatement Refund Claim was filed

as part of AIG's Restatement Refund Claim, which is attached as Exhibit B.  The contents of the Restatement Refund Claim, including the 2002 Restatement Refund Claim, are incorporated herein by reference.   The 2002 Restatement Refund Claim arose from AIG's accounting Restatements, which gave rise to the analogous adjustments described above for AIG's 1997 tax year.  As a consequence of the 2002 Restatement-related adjustments, AIG's taxable income for the 2002 tax year was reduced by $270,178,069, resulting in an additional net operating loss for 2002 in that amount (the "2002 Restatement-Related Net Operating Loss").  See Paragraphs 185-219, infra.  Pursuant to 26 U.S.C. § 172, AIG is entitled to carry back this 2002 Restatement-Related Net Operating Loss as an additional net operating loss deduction for its 1997 tax year.

181.    In connection with its 2000 tax year, AIG incurred a net life capital loss.  See Paragraph 220, infra.  Pursuant to 26 U.S.C. § 1212, AIG is entitled to carry back $6,816,405 of this capital loss to its 1997 tax year.

182.    According to 26 U.S.C. § 6511(d)(2), the time for filing a claim for refund relating to a carryback adjustment is based on the limitations period applicable to the taxable year giving rise to the net operating or capital loss, rather than the year to which the loss is carried back.  Section 6511(d)(2) also provides an exception to the usual rules of res judicata. Section 6511(d)(2) allows a taxpayer to bring a claim for refund arising from a carryback adjustment, even though the tax year for which the carryback adjustment is sought has already been the subject of a prior proceeding in United States tax court or federal district court.

183.    Because Plaintiff's 2000 and 2002 tax years are the subject of a pending IRS audit and because the provisions of 26 U.S.C. § 6511(d)(2) allow Plaintiff to bring a subsequent claim for refund for its 1997 tax year arising from losses carried back from 2000 and 2002, it is premature to litigate claims related to carrybacks from the 2000 and 2002 tax years.  However, in

an abundance of caution and to avoid any claim of waiver with respect to Plaintiffs' entitlement to a carryback deduction in its 1997 tax year, Plaintiff is asserting claims relating to its 2002 net non-life operating losses and 2000 net life capital loss carrybacks in this Complaint for its 1997 tax year on a protective basis. The appropriate course of action is for these 2000 and 2002 carryback claims to be severed for later disposition by agreement of the parties or by order of the Court in the absence of an agreement.

(2). 2002 Initial Net Non-Life Operating Loss

184.    In connection with its 1997 tax year, Plaintiff claimed a net non-life operating loss deduction, pursuant to 26 U.S.C. § 172, arising from the carryback of a net non-life operating loss that Plaintiff sustained in its 2002 tax year. On March 20, 2008, the IRS issued a Statutory Notice of Deficiency in which it disallowed the net non-life operating loss deduction in the amount of $134,278,131 even though the IRS has not yet completed its examination of Plaintiff's 2002 tax year. The IRS has erred in its position on this adjustment, and AIG is entitled to the 2002 Initial Net Non-Life Operating Loss in the amount of $134,278,131 carried back to its 1997 year.

(3). 2002 Restatement-Related Net Operating Loss

185.    The factual circumstances giving rise to the Restatement-related adjustments identified in paragraphs 155-178 for Plaintiff's 1997 tax year also gave rise to analogous adjustments in later years. Plaintiff has filed corresponding claims for refund for these years, which are currently pending before the IRS.

186.    For the 2002 tax year, AIG's taxable income should be reduced by a total of $270,178,069 as a result of Restatement-related adjustments, which are described in further

detail below.  Pursuant to 26 U.S.C. § 172, AIG is entitled to an additional net operating loss carryback deduction equal to $270,178,069 for its 1997 tax year.

187.   The Restatement-related adjustments giving rise to AIG's additional $270,178,069 net operating loss for its 2002 taxable year are as follows:

188.   i.  Union Excess.  During the 2002 taxable year, Plaintiff entered reinsurance transactions with Union Excess, which for the reasons described in paragraph 158-161 of this Complaint, should not be treated as insurance transactions for financial accounting or federal income tax purposes.  The net tax effect of recharacterizing the Union Excess transactions as non-insurance transactions is to reduce Plaintiff's taxable income by $20,000,000 in 2002.

189.   ii.  AIG Re.  During the 2002 tax year, AIG Re was a business unit within AIG. AIG Re served as a reinsurance broker between third parties and AIG's insurance companies, including transactions in which AIG's insurance companies acted as the reinsurer (the "AIG Re Brokered Reinsurance Transactions").

190.   During the course of the company's internal review conducted in connection with the Restatements, AIG determined that it had incorrectly treated certain of the AIG Re Brokered Reinsurance Transactions as reinsurance for regulatory and financial accounting purposes.  In particular, the company determined that neither AIG nor AIG Re had performed formal risk transfer evaluations in connection with these transactions and that the risks associated with the transactions were limited through complex structures, such as loss corridors, aggregate limits, profit commissions, sliding scale ceding commissions, interest credits, sub-limits on specific benefits, and contractual termination provisions.

191.    As a result, AIG determined that these transactions did not result in sufficient risk transfer to qualify as insurance for financial accounting purposes.  Consequently, AIG restated its financial statements to reflect the proper treatment of these transactions.

192.    Likewise, because the various arrangements described above precluded sufficient risk transfer to AIG, these transactions do not qualify as reinsurance for federal income tax purposes, as originally reported on Plaintiff's 2002 Consolidated Federal Income Tax Return. The net tax effect of recharacterizing these transactions as non-insurance transactions is to reduce AIG's taxable income by $27,034,161 from the amount originally reported on Plaintiff's 2002 Consolidated Federal Income Tax Return.

193.    iii. Lexington.  During the 2002 tax year and continuing through the present time, AIG has conducted its domestic property and casualty insurance business through various insurance subsidiaries, including Lexington Insurance Company ("Lexington").

194.    Lexington writes insurance policies for risks that conventional insurance companies do not readily provide insurance coverage for, either because of complexity or because the coverage does not lend itself to conventional contracts.  Lexington is the leading U.S.-based excess and surplus lines carrier, specializing in property, casualty, healthcare and program risks.

195.    During the course of the company's internal review conducted in connection with the Restatements, AIG evaluated whether certain arrangements entered into by Lexington had sufficient risk transfer to qualify as insurance.  The internal review revealed that certain segments of Lexington's business, such as its Healthcare Professional Liability business, was essentially a guaranteed cost underwriting facility in which the premiums on the underlying

policies were equal to or greater than the liability limit of the policies (the "Lexington Guaranteed Cost Transactions").

196.    Because the Lexington Guaranteed Cost Transactions do not result in sufficient risk transfer to Lexington and AIG, they do not qualify as insurance for federal income tax purposes, as originally reported on Plaintiff's 2002 Consolidated Federal Income Tax Return. The net tax effect of recharacterizing the Lexington Guaranteed Cost Transactions as non-insurance transactions is to reduce AIG's taxable income by $4,374,639 from the amount originally reported on Plaintiff's 2002 Consolidated Federal Income Tax Return.

197.    iv.  SICO.  During the 2002 taxable year, SICO paid compensation to AIG employees under the DCPPP in effect at the time.  For the reasons set forth in paragraphs 162-167 of this Complaint, such payments (as well as the employer's portion of related social security and medicare taxes) are deductible by AIG pursuant to 26 U.S.C. §§ 83 and 162.  For the 2002 tax year, the amount of deductible payments is $55,189,473.

198.    For the 2002 tax year, SICO paid compensation to AIG employees employed by CFC subsidiaries of AIG.  The amount of such compensation results in a reduction in the CFC's earnings and profits for U.S. tax purposes and a corresponding reduction in AIG's Subpart F income.  For 2002, the amount of such reduction is $222,893.

199.    The net tax effect of the additional deductions for compensation to AIG employees described in paragraph 197 and the reduction in AIG's Subpart F income described in paragraph 198 is to reduce Plaintiff's taxable income.  Plaintiff is entitled to a refund in federal income tax based on the additional deduction and reduction in Subpart F income.

200.    v.  CV Starr.  During the 2002 tax year, CV Starr paid compensation to AIG employees under the CV Starr Stock Plan described in paragraphs 168-175 of this Complaint.

201.    During 2002, CV Starr paid $12,551,356 in cash dividends to CV Starr Participants, $4,745,556 of which is compensation tied to the CV Starr Participant's continued employment with AIG that is deductible by AIG pursuant to 26 U.S.C. §§ 83 and 162 and Treas. Reg. § 1.83-6(d).

202.    During the 2002 tax year, CV Starr also made salary and bonus payments in cash which are properly allocable to services the CV Starr Participants performed for AIG. During 2002, CV Starr paid $4,104,317 in cash salary and bonus payments to CV Starr Participants.

203.    During the 2002 tax year, two CV Starr Participants reached the age of 65, at which time their interest in the CV Starr stock became substantially vested within the meaning of Treasury Regulation § 1.83-3(b). The excess of the value of the participant's shares at vesting over the amount paid for such shares represented compensation to these CV Starr Participants, which Plaintiff is entitled to deduct pursuant to 26 U.S.C. §§ 83 and 162, and Treas. Reg. § 1.83-6(d). For the 2002 tax year, the amount of such excess that is deductible by Plaintiff is $7,023,438.

204.    During the 2002 tax year, CV Starr repurchased stock from two additional CV Starr Participants who possessed Class B shares. The excess of the purchase price over the amount the participants paid for such shares represented compensation to these CV Starr Participants, which Plaintiff is entitled to deduct pursuant to 26 U.S.C. §§ 83 and 162, and Treas. Reg. § 1.83-6(d). For the 2002 tax year, the amount of such excess that is deductible by Plaintiff is $867,492.

205.    Pursuant to 26 U.S.C. §§ 83 and 162 and Treas. Reg. § 1.83-6(d), AIG is entitled to a deduction for the portion of the payments described in paragraphs 201-204 allocable to the AIG-related U.S. employment of the CV Starr Participant (plus employment taxes paid), less any

adjustment required pursuant to 26 U.S.C. § 162(m).  For the 2002 tax year, the total amount of

such deductible payments is $14,489,375.

206.    For the 2002 tax year, CV Starr paid compensation to AIG employees employed

by CFC subsidiaries of AIG.  The amount of such compensation results in a reduction in the

CFC's earnings and profits for U.S. tax purposes and a corresponding reduction in AIG's

Subpart F income.  For 2002, the amount of such reduction is $14,510.

207.    The net tax effect of the additional deductions for compensation to AIG

employees described in paragraph 201-205 and the reduction in AIG's Subpart F income

described in paragraph 206 is to reduce Plaintiff's taxable income.  Plaintiff is entitled to a

refund in federal income tax based on the additional deduction and reduction in Subpart F

income.

208.    vi. Life Settlements.  Since 2001, AIG has operated, through various subsidiaries

and trusts, a business that will be referred to herein as its "Life Settlement Program."  A life

settlement transaction involves the purchase of a life insurance contract from a policy holder who

no longer needs or wants the insurance coverage provided by an existing policy.  The purchaser

of the policy makes an up-front, negotiated payment to the holder of the policy and continues to

pay premium amounts to keep the policy in force.  When the insured dies, the purchaser of the

policy receives the net death benefit under the policy.

209.    AIG conducted its Life Settlement Program through Coventry Life Settlements

Trust ("Coventry Trust") which was formed to purchase and hold the life insurance policies.

Coventry Trust financed its purchase of the policies with the proceeds of loans from American

Home Assurance Company ("AHAC"), a New York corporation that is a wholly-owned indirect

subsidiary of AIG.

210.    In October 2001, Coventry Trust entered into an agreement with another wholly-owned indirect subsidiary of AIG, American International Specialty Lines Insurance Company ("AISLIC"), under which AISLIC indemnified Coventry Trust for the trust's liabilities to AHAC on its loans, and agreed to pay the purchase price for the acquired policies as well as subsequent premiums to keep the policies in force.   In return, Coventry Trust agreed to pay all amounts it received under the life insurance policies (including any death benefit) to AISLIC.   As a result, AISLIC bore all of the financial risk of the life settlements operations (including the risk that the purchase price for the policies would exceed the death benefits ultimately paid under the policies).

211.    Subsequently, in 2002, AISLIC ceded a portion of the risks it bore under its agreement with Coventry Trust to another wholly-owned indirect subsidiary of AIG, National Union Fire Insurance Company of Pittsburgh, NA ("National Union") and to an unrelated company, Hannover Reassurance (Ireland) Limited ("Hannover Re").     Following these arrangements, the allocation of risk under the agreement was AISLIC (1%),   National Union (74%) and Hannover Re (25%).

212.    For both financial accounting and income tax purposes, AIG accounted for its life settlement transactions as insurance transactions.   That is, AIG reported the net death benefit receivable by AISLIC (or National Union) as premium income in the year in which the policy was purchased, and AIG reported the costs borne to acquire the policy and keep it in place as paid or incurred losses.   This accounting resulted in upfront recognition of expected profits from the purchase of each life insurance policy.

213.    In connection with the internal review conducted by AIG in connection with its accounting Restatements, AIG determined that its accounting of the life settlement transactions

for financial purposes was incorrect. It determined that the transactions should have been treated as investment transactions rather than as insurance. Accordingly, for purposes of its restated financial statements, AIG revised its accounting so that the difference between the death benefit received by AIG at the insured's death and the cost of the related policy is reflected as income at the time of the insured's death, rather than as premium income when the life insurance policy was acquired.

214.    Analogous adjustments are also warranted for federal income tax purposes. Specifically, the amount of AIG's premium income should be reduced by the amount erroneously included in income in the year a policy was acquired (i.e., potential death benefits), and its deductions for losses incurred should be reduced by the amounts erroneously treated as incurred losses (i.e., the acquisition cost and premiums paid to keep the policies in force). During the 2002 tax year, these adjustments result in a reduction of taxable income of $111,280,000.

215.    Pursuant to 26 U.S.C. §§ 101(a)(2), 1001, AIG must recognize income or loss when the life insurance policies are sold or otherwise disposed of, or when death benefits are received. AIG's tax basis in the property is equal to its initial cost, adjusted as provided in 26 U.S.C. § 1016, by any additional amounts paid to keep the policies in place. During the 2002 tax year, AIG's gain on such contracts was $1,085,000.

216.    On its 2002 Consolidated Federal Income Tax Return, AIG reported $9,883,000 in interest income, representing amounts paid to AHAC under its loans to Coventry Trust. Such inter-company interest payments are not recognizable in 2002. Instead, they are recognizable in the year in which the death benefits are paid. As a result, the $9,883,000 reported as interest income in 2002 should be excluded from income.

217.   As a result of the necessary adjustments pertaining to AIG's Life Settlements Program AIG's taxable income for its 2002 tax year should be reduced by $116,864,000.

218.   vi.   Reinsurance Receivables.   On its 2002 Consolidated Federal Income Tax Return, Plaintiff's deduction for losses incurred was erroneously reduced by $86,700,000 as a result of certain reinsurance recoverables.   This reduction was erroneous because it was unlikely that these reinsurance recoverables would be collected.   Pursuant to 26 U.S.C. § 832(b)(5), AIG is therefore entitled to an additional deduction of $86,700,000 for losses incurred.

****

219.   The aggregate effect of the adjustments arising from Plaintiff's 2002 Restatement Refund Claim is to reduce Plaintiff's taxable income for the 2002 tax year by $270,178,069. Because these adjustments have the effect of increasing Plaintiff's net operating loss for 2002 by that amount, Plaintiff is entitled to a net operating loss deduction in its 1997 tax year of $270,178,069, pursuant to 26 U.S.C. § 172 (in addition to the net non-life operating loss deduction of $134,278,131 described in paragraph 184).

(4). 2000 Life Capital Loss Carryback

220.   In 2000, Plaintiff incurred a net life capital loss in the amount of $6,816,405, which was attributable to capital losses at Plaintiff's life insurance subsidiaries, AIG Life Insurance Company (in the amount of $1,718,986) and American International Life Assurance Company NY (in the amount of $5,097,419).   Plaintiff is entitled to carryback such $6,816,405 net life capital loss to its 1997 taxable year.

**D.   Penalties and Additions To Tax**

221.   On or about March 20, 2008, the IRS sent Plaintiff a Statutory Notice of Deficiency in which it erroneously denied the foreign tax credits claimed by Plaintiff as

described in paragraphs to 9-154 above, and the net non-life operating loss carryback deduction described in paragraph 184 above.   In total, the Statutory Notice of Deficiency claimed an additional income tax of $110,159,184 for 1997.   The IRS also claimed interest and penalties and additions to tax in the amount of $12,632,368, pursuant to 26 U.S.C. § 6662(a).

222.   The penalties and additions to tax asserted in the Statutory Notice of Deficiency are invalid because Plaintiff's tax positions, as set out above, are legally and factually correct. The asserted penalties and additions to tax are also invalid because Plaintiff's tax positions are supported by substantial authority and were adequately disclosed, because Plaintiff had reasonable cause for the positions it took in light of applicable statutes, regulations, rulings, and case law, and because Plaintiff acted in good faith.   Indeed, during the course of the IRS' audit, the IRS initially conceded that Plaintiff's position was correct.

E.   **Status of Claims**

223.   On July 8, 2008, the IRS assessed the additional amounts claimed due based upon the adjustments contained in the Statutory Notice of Deficiency.   In that assessment, the IRS included an additional amount for interest allegedly accruing from the date that the tax became due to the date of the assessment.   The interest assessment is invalid because Plaintiff's tax positions, as set out above, are legally and factually correct.   In addition, the additional interest allegedly accruing from the date that the tax became due to the date of the assessment was erroneously calculated by the IRS.   Plaintiff nonetheless paid all of the additional amounts the IRS claimed to be owed, including penalties and interest (plus additional interest through the payment date), on or about August 1, 2008.

224.   On or about August 25, 2008, Plaintiff duly filed a claim for refund demanding a refund of the amounts, including penalties and interest, erroneously assessed by the IRS (the

"1997 Deficiency-Related Refund Claim"). The 1997 Deficiency-Related Refund Claim is attached hereto as Exhibit D, and each of the statements and contentions set forth in that refund claim is hereby incorporated by reference.

225. More than six months have passed since Plaintiff filed the 1997 Deficiency-Related Refund Claim and the 1997 Restatement Refund Claim, and the IRS has not rendered a decision thereon within that time.

226. Although payment of the refunds claimed in Plaintiff's 1997 Deficiency-Related Refund Claim and its 1997 Restatement Refund Claim has been demanded, no part of the tax paid and claimed herein has been credited, remitted, refunded or repaid to Plaintiff or to anyone on its account.

227. Plaintiff has made no transfer or assignment of the claims for relief herein presented or any part thereof and is the sole and absolute owner of the claims. No other suit or process by Plaintiff is pending on the claims set forth in this complaint in any other court.

### Count One (AIG Taxable Year Ended December 31, 1997)

228. Plaintiff incorporates and realleges as if fully stated herein each of the allegations of paragraphs 1 through 227 .

229. On or about September 11, 1998, Plaintiff filed with the IRS its 1997 Consolidated Federal Income tax return for the AIG Consolidated Group for the taxable year ended December 31, 1997. Plaintiff paid $345,598,004 in federal income taxes in connection with that taxable year.

230. The IRS caused an examination to be made of Plaintiff's 1997 Consolidated Federal Income Tax Return. On or about March 20, 2008, the IRS sent Plaintiff a Statutory Notice of Deficiency in which it erroneously denied the foreign tax credits claimed by Plaintiff

as described in paragraphs 9 to 154 above, and the net non-life operating loss carryback deduction described in paragraph 184 above. In total, the Statutory Notice of Deficiency claimed an additional income tax of $110,159,184 for 1997. The IRS also claimed interest and a penalty of $12,632,368, pursuant to 26 U.S.C. § 6662(a). Plaintiff paid the additional amounts the IRS claimed to be owed on or about August 1, 2008.

231.   On or about April 4, 2008, Plaintiff filed with the IRS its 1997 Restatement Refund Claim claiming a refund of $76,969,309 for the taxable year ended December 31, 1997. The 1997 Restatement Refund Claim results from the various adjustments that are required to be made to Plaintiff's consolidated 1997 Federal Income Tax Return as described in paragraphs 155-178 and 219-220 of this Complaint. The 1997 Restatement Refund Claim is attached hereto as Exhibit B, and each of the statements and contentions set forth in that refund claim is hereby incorporated by reference.

232.   On or about August 25, 2008, Plaintiff filed with the IRS its 1997 Deficiency-Related Refund Claim claiming an additional refund for the taxable year ended December 31, 1997. The 1997 Deficiency-Related Refund Claim resulted from the erroneous adjustments made by the IRS in connection with its March 20, 2008 Statutory Notice of Deficiency, namely its incorrect decision to deny the foreign tax credits to which Plaintiff is entitled as a result of the cross-border transactions described in paragraphs 9 to 154 above, its incorrect decision to deny the net non-life operating loss carryback deduction described in paragraph 184 above, and its erroneous assessment of related interest and penalties.

233.   More than six months have passed since Plaintiff filed the 1997 Deficiency-Related Refund Claim and the 1997 Restatement Refund Claim that are the subject of Count One of this Complaint, and the IRS has not rendered a decision thereon within that time.

234.    For the reasons set forth above, Plaintiff is entitled to a refund of the taxes, interest, and penalties paid in a total amount of $306,102,672, plus interest as allowed by law.

### Count Two (AIG Taxable Year Ended December 31, 1997) – Alternative Claim

235.    The allegations set forth in paragraphs 1 through 234 are incorporated by reference.

236.    On its 1997 Consolidated Federal Income Tax Return, Plaintiff correctly reported its dividend gross-up income from the Cross-Border Transactions described in paragraphs 9 to 154, pursuant to 26 U.S.C. § 78 in the amount of the foreign tax credits claimed.

237.    In its Statutory Notice of Deficiency the IRS incorrectly disallowed the foreign tax credits claimed for the Cross-Border Transactions and then further erred by inconsistently failing to reduce the dividend gross-up income reported by Plaintiff by the amount of the foreign tax credits disallowed.

238.    As set forth in Count One above, Plaintiff is entitled to the full amount of the Disallowed Foreign Tax Credits.  In the alternative, however, if the Court concludes that all or some portion of the Disallowed Foreign Tax Credits were properly disallowed, Plaintiff's income must be correspondingly decreased, pursuant to 26 U.S.C. § 78, to reflect the amount of the foreign tax credit disallowed.

239.    Consequently, and in the alternative, Plaintiff is entitled to a refund of up to $25,908,963 if it is determined that the Disallowed Foreign Tax Credits were properly disallowed either in whole or in part.

### Count Three – Interest

240.    Plaintiff hereby incorporates and repeats and realleges as if fully stated herein each of the allegations of paragraphs 1 through 239.

A. **Deficiency Interest**

241.   In connection with the adjustments claimed by the IRS in its Statutory Notice of Deficiency, described in paragraph 230 above, the IRS assessed deficiency interest against Plaintiff as of July 8, 2008.

242.   On or about August 1, 2008, Plaintiff paid the deficiency interest claimed by the IRS, plus an additional amount to cover interest due through the August 1, 2008, payment date (the "1997 Deficiency Interest").

243.   On or about August 25, 2008, Plaintiff filed with the IRS its 1997 Deficiency-Related Refund Claim in which it made a claim for refund of the 1997 Deficiency Interest.  More than six months have passed since Plaintiff filed the 1997 Deficiency-Related Refund Claim and the IRS has not rendered a decision thereon within that time.

(i)  Primary Claim

244.   The IRS's assessment of deficiency interest is invalid because, for the reasons discussed above, the adjustments and additions to tax on which such interest was imposed are incorrect.  Plaintiff is therefore entitled to a refund of the entire amount of 1997 Deficiency Interest it paid on or about August 1, 2008.

(ii)  Alternative Claim

245.   In the alternative, if some of the adjustments and additions to tax assessed by the IRS are determined to be correct, Plaintiff would still be entitled to a partial refund of the 1997 Deficiency Interest, in an amount equal to the 1997 Deficiency Interest it paid less the correct amount of deficiency interest, if any.  The correct amount of deficiency interest should be computed with interest netting as provided in 26 U.S.C. § 6621(d).

**B.**     <u>Refund Interest</u>

246.     Plaintiff is also entitled to interest on the amount of tax and deficiency interest that was wrongfully assessed against it, as provided by law.

WHEREFORE, Plaintiff requests the following relief on its claims in this case:

(1)     On the claims for relief in Count One of the Complaint, judgment in favor of Plaintiff AIG against Defendant, the United States of America, in the amount of $306,102,672, or such greater amount as the Court determines to be legally refundable, plus interest thereon as provided by law;

(2)     In the alternative, on the claims for relief in Count Two of the Complaint, judgment in favor of Plaintiff AIG against Defendant, the United States of America, in the amount of $25,908,963, or such greater amount as the Court determines to be legally refundable, plus interest thereon as provided by law;

(3) Plaintiff's costs of this action, and such other and further relief as the Court deems appropriate.

Dated this 26th day of February 2009.

_____
Lewis S. Wiener (LW 1990)
SUTHERLAND ASBILL & BRENNAN LLP
1114 Avenue of the Americas, 40th Floor
New York, NY 10036
Phone: 212.389.5000
Fax: 212.389.5099

Counsel for Plaintiff
American International Group, Inc.

Of Counsel
Kent L. Jones
Jerome B. Libin
Jeffrey N. Starkey
SUTHERLAND ASBILL & BRENNAN LLP
1275 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Phone: 202.383.0100
Fax: 202.637.3593

Thomas A. Cullinan
Daniel H. Schlueter
Julie P. Bowling
SUTHERLAND ASBILL & BRENNAN LLP
999 Peachtree Street, N.E.
Atlanta, Georgia 30309
Phone: 404.853-8000
Fax: 404.853.8806