**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - -x

AMERICAN INTERNATIONAL GROUP, :
INC., AND SUBSIDIARIES,                  :          ECF CASE
                                                          :
              Plaintiff,                          :
                                                          :
                   v.                               :
                                                          :
UNITED STATES OF AMERICA,           :
                                                          :          09 Civ. 1871 (LLS)
              Defendant.                       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - -x


**PLAINTIFF'S MEMORANDUM OF LAW**
**IN SUPPORT OF ITS RENEWED MOTION FOR PARTIAL SUMMARY JUDGMENT**


SUTHERLAND ASBILL & BRENNAN LLP
1275 Pennsylvania Avenue, N.W.
Washington, DC 20004

999 Peachtree Street, N.E.
Atlanta, Georgia 30309

*Attorneys for Plaintiff American International Group, Inc.*

## <u>TABLE OF CONTENTS</u>

I.     Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1

II.    Basic Summary of the Borrowing Transactions. . . . . . . . . . . . . . . . . . . . . .     2

III.   AIG Is Entitled to Summary Judgment on Its Claim for Foreign
       Tax Credits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     4

       A.     The Economic Substance Doctrine Does Not Properly Apply To The
              Transactions Involved In This Case. . . . . . . . . . . . . . . . . . . . . . . . . . .     5

              1.     AIG's Claim for Credits Is Fully Consistent with the Language
                     and Purpose of the Statute. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     5

              2.     The Government's Arguments to the Contrary Are an Attempt
                     to Sidestep and Override Specific Provisions of the Statute and
                     Regulations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     9

       B.     Even if the Economic Substance Doctrine Were Applicable,
              the Transactions Satisfy the Doctrine as a Matter of Law. . . . . . . . . . .    13

              1.     The Transactions Are Objectively Profitable under the Test
                     Set Forth in *Compaq* and *IES* . . . . . . . . . . . . . . . . . . . . . . . . . . .    13

              2.     AIG's Business Purpose For The Transactions In Question
                     Does Not Present a Material Question of Fact To Be Resolved
                     By A Jury. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    16

IV.    Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    20

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*ACM Partnership v. Commissioner*, 157 F.3d 231 (3d Cir. 1998) .......................................... 17-18

*Biddle v. Commissioner*, 302 U.S. 573 (1938) ...........................................................................10

*Compaq Computer Corp. v. Commissioner*, 277 F.3d 778 (5th Cir. 2001)...................... 15-16, 18

*Countryside Ltd. P'ship v. Commissioner*, 95 T.C.M. (CCH) 1006 (2008), 2008 WL 41414.................................................................................................................................16, 19

*DeMartino v. Commissioner*, 862 F.2d 400 (2d Cir. 1988)................................................. 13-14

*Estelle Morris Trusts v. Commissioner*, 51 T.C. 20 (1968) .........................................................13

*Ferguson v. Commissioner*, 29 F.3d 98 (2d Cir. 1994) ...............................................................14

*Gardner v. Commissioner*, 954 F.2d 836 (2d Cir. 1992) .............................................................14

*Gilbert v. Commissioner*, 248 F.2d 399 (2d Cir. 1957) ..............................................................17

*Gilman v. Commissioner*, 933 F.2d 143 (2d Cir. 1991)..........................................................14, 16

*Goldstein v. Commissioner*, 364 F.2d 734 (2d Cir. 1966) ..........................................................14

*Gregory v. Helvering*, 293 U.S. 465 (1935) .......................................................................5, 9, 17

*Guardian Industries Corp. v. United States*, 477 F.3d 1368 (Fed. Cir. 2007) ............................11

*Helvering v. Gregory*, 69 F.2d 809 (2d Cir. 1934) .....................................................................19

*Hewlett-Packard Co. v. Commissioner*, T.C. Memo. 2012-135 (May 14, 2012)....................... 1-2

*IES Industries v. United States*, 253 F.3d 350 (8th Cir. 2001) ................................................ 15-16

*Jacobson v. Commissioner*, 915 F.2d 832 (2d Cir. 1990)...........................................................14

*Kraft Foods Co. v. Commissioner*, 232 F.2d 118 (2d Cir. 1956).................................................17

*Kraft Gen. Foods v. Iowa Dep't of Rev. & Fin.*, 505 U.S. 71 (1992) .............................................7

*Leader Fed. Sav. & Loan Ass'n v. Commissioner*, 57 T.C.M. (CCH) 846 (1989).......................16

*Loewi v. Ryan*, 229 F.2d 627 (2d Cir. 1956)................................................................................17

*Nassau Lens Co. v. Commissioner*, 308 F.2d 39 (2d Cir. 1962)................................................. 5-6

*Nebraska Dep't of Rev. v. Loewenstein*, 513 U.S. 123 (1994) .........................................................3

*Nicole Rose Corp. v. Commissioner*, 320 F.3d 282 (2d Cir. 2003) ...............................................14

*Northern Indiana Public Serv. Co. v. Commissioner*, 115 F.3d 506 (7th Cir. 1997) ..................19

*Priester Machinery Co. v. United States*, 296 F. Supp. 604 (W.D. Tenn. 1969) .........................16

*Rosenfeld v. Commissioner*, 706 F.2d 1277 (2d Cir. 1983).............................................................17

*Sacks v. Commissioner*, 69 F.3d 982 (9th Cir. 1995) ...................................................................13

*San Antonio Sav. Ass'n v. Commissioner*, 55 T.C.M. (CCH) 813 (1988) ...................................16

*United Parcel Service of America, Inc. v. Commissioner*, 254 F.3d 1014 (11th Cir. 2001) .........19

*United States v. Goodyear Tire & Rubber Co.*, 493 U.S. 132 (1989) ...........................................7

*United States v. Ingredient Tech. Corp.*, 698 F.2d 88 (2d Cir. 1983)...........................................17

*Wachovia Bank & Trust Co. v. United States*, 499 F. Supp. 615 (M.D.N.C. 1980).....................16

## STATUTES

26 U.S.C. § 61.....................................................................................................................................6

26 U.S.C. § 78.....................................................................................................................................9

26 U.S.C. § 901.................................................................................................................................10

26 U.S.C. § 901(a) .........................................................................................................................4, 7

26 U.S.C. § 901(b)(1) .....................................................................................................................4, 7

26 U.S.C. § 902(a) .........................................................................................................................4, 9

26 U.S.C. § 903.................................................................................................................................10

26 U.S.C. § 904.................................................................................................................................11

26 U.S.C. § 951(a) .............................................................................................................................9

26 U.S.C. § 952(c)(1)(A) ..................................................................................................................9

26 U.S.C. § 960(a)(1).....................................................................................................................4, 9

## REGULATIONS

Treas. Reg. § 1.901-2........................................................................................................................4

Treas. Reg. § 1.901-2(f)(1) .................................................................................10

Treas. Reg. § 1.901-2(f)(2)(i) .............................................................................10

Treas. Reg. § 1.904-6(a)(1)(iv) ...........................................................................11

Treas. Reg. § 1.905-2(a)(2) ...................................................................................7

Rev. Rul. 74-27, 1974-1 C.B. 24 ..........................................................................3

Rev. Rul. 77-59, 1977-1 C.B. 196 ........................................................................3

Rev. Rul. 79-108, 1979-1 C.B. 75 ........................................................................3

**MISCELLANEOUS**

H.R. Rep. No. 65-767 (1918)..................................................................................7

H.R. Rep. No. 83-1337 (1954) ........................................................................ 15-16

I.R.S. Tech. Adv. Mem. 9748005 (Nov. 28, 1997) ............................................12

Staff of Jt. Comm. on Tax'n, Technical Explanation of the Revenue Provisions
   of the "Reconciliation Act of 2010," JCX-18-10 (Mar. 21, 2010), *available at*
   http://www.jct.gov/publications.html?func=startdown&id=3673 ...........................6

Sheryl Stratton, *Tax Arbitrage Not Inherently 'Evil,' Treasury Official Says*, 2006 TNT
   9-3 (Jan. 13, 2006) ..........................................................................................12

B. John Williams, Jr., IRS Chief Counsel, *Selected International Tax Issues*, 2003 TNT
   54-47 (Mar. 20, 2003)......................................................................................12

## I.      Introduction

On July 30, 2010, AIG moved for summary judgment on its claim for foreign tax credits relating to the six cross-border borrowing transactions that are at issue in this case.[1]  On March 29, 2011, in light of the government's claim that it had not conducted adequate discovery on certain related domestic borrowing transactions discussed in AIG's briefs, the Court denied AIG's initial motion without prejudice and invited AIG to renew its motion after the government completed the additional discovery it had requested.  (Dkt. No. 85.)  Subsequently, on September 30, 2011, the Court directed the government to complete all fact discovery before AIG renewed its motion.

The government has now completed its fact discovery.  As discussed below, the legal principles discussed in AIG's first motion for summary judgment continue to govern with the same force and effect.  There are no material disputed facts and this case is ripe for resolution. AIG is therefore renewing its first motion for summary judgment with respect to the six cross-border borrowing transactions, and, in support of this motion, AIG hereby relies and incorporates in this brief the same papers that it filed in support of that motion.[2]  (*See* Dkt. Nos. 76-77 and 82-

---

[1]      The six cross-border borrowing transactions are: (1) the Laperouse transaction with Credit Agricole; (2) the Vespucci transaction with Banca Commerciale Italiana; (3) the NZ Issuer transaction with the Bank of New Zealand; (4) the Maitengrove transaction with the Bank of Ireland; (5) the Lumagrove transaction with the Bank of Ireland; and (6) the Palmgrove transaction with Irish Permanent.  (*See* Amended Complaint, Dkt. No. 94, ¶¶ 9-128.)

[2]      In its first motion, AIG also moved for summary judgment with respect to a seventh transaction – the Foppingadreef transaction.  The Foppingadreef transaction was not a borrowing transaction.  Instead, it was an investment transaction in which AIG invested money in a Dutch entity known as Foppingadreef.  (*See* Dkt. No. 94, ¶¶ 129-153.)   AIG has not included the Foppingadreef transaction in this renewed motion because the government raises a separate argument – applicable only to Foppingadreef – that AIG is not entitled to the tax credits claimed because AIG-FP's interest in Foppingadreef should be recharacterized as debt rather than equity. That "debt/equity" argument raises issues specific to the Foppingadreef transaction, some of

83.)   The purpose of this supplemental memorandum is to summarize the legal principles discussed in our prior papers that require judgment in favor of AIG in light of the now-complete discovery record.

## II.   Basic Summary of the Borrowing Transactions

The relevant facts are undisputed.  The foreign tax credits at issue on this motion were claimed by AIG in connection with six cross-border financing transactions entered into between 1993 and 1997 by AIG Financial Products Corp. ("AIG-FP"), a wholly-owned subsidiary of AIG.  The details of the six transactions are described in AIG's prior briefs and in its statement of undisputed facts, the relevant portions of which are not disputed by the government.  (*See* Dkt. No. 76 at 4-8; Dkt. No. 77, ¶¶ 5-104.)

In broad summary, the six transactions, which are referred to as preferred repurchase transactions, all had the same structure.  In each transaction, AIG-FP sold preferred stock in a foreign affiliate to a third-party foreign bank and simultaneously undertook a binding contractual obligation to repurchase the preferred stock from the counterparty bank after an agreed term of years for the same price that the bank originally paid for the stock.  (*See* Dkt. No. 79, *hereinafter* "Gov't Fact Resp.," ¶¶ 13-20, 27-37, 44-54, 63-69, 77-84, 91-98.)  In this way, the transactions

---

which were discussed in the Tax Court's recent decision in *Hewlett-Packard Co. v. Commissioner*, T.C. Memo. 2012-135 (May 14, 2012), which upheld the government's debt/equity argument in the context of a similar transaction involving different facts.  If this Court grants summary judgment with respect to the six borrowing transactions, the result will greatly narrow the issues to be resolved with respect to the Foppingadreef transaction.  Absent a consensual resolution of what would then be a very limited set of remaining issues, AIG would expect to bring a subsequent summary judgment motion as to the unique issues raised by the Foppingadreef transaction.

In addition, consistent with its first motion, AIG is not moving for summary judgment on the unrelated "restatement refund" claims that the Court previously severed and stayed.  This motion is therefore styled as a renewed motion for partial summary judgment in this case.

allowed AIG-FP to borrow funds from the foreign banks for a fixed period, after which time it was obligated to repay the funds to the banks. During the term of each transaction, AIG-FP invested the borrowed funds in portfolios of income-producing securities expected to produce yields above LIBOR.

As a result of the six transactions at issue, AIG-FP was able to borrow a total of $1.6 billion from foreign banks at favorable interest rates, typically 150 to 200 basis points below LIBOR. These favorable interest rates were made possible in part because of the favorable tax treatment accorded the foreign counterparty under foreign law. Unlike U.S. tax law, which treats an agreement to sell and repurchase stock as a loan of the purchase price secured by the stock with the dividends on the stock treated as interest payments,[3] the home country law of the foreign banks treated the banks as the owners of the preferred stock notwithstanding AIG-FP's obligation to repurchase the stock. Under foreign law, the dividend payments made by the relevant AIG-FP affiliates to the foreign banks were thus regarded as dividends that were either exempt from foreign tax or subject to tax at a much-reduced rate. This favorable tax treatment of the foreign counterparties enabled them to lend funds to AIG-FP at a lower rate than would have been charged if the payments made to them during the course of the transaction had been subject to full income tax in the banks' home countries. From AIG's perspective, the benefit of the preferred repurchase transactions was that they allowed AIG-FP to borrow funds at favorable interest rates, typically 150 to 200 basis points below LIBOR, which AIG was able to invest in

---

[3]     *See* Rev. Rul. 79-108, 1979-1 C.B. 75 (similar arrangement involving treasury notes treated as a loan collateralized by the notes); Rev. Rul. 77-59, 1977-1 C.B. 196 (same); Rev. Rul. 74-27, 1974-1 C.B. 24 (treating the borrower in a sale/repurchase transaction as receiving the tax-free coupon payments on the underlying municipal bonds and the lender as receiving taxable income from the borrower); *see also Nebraska Dep't of Rev. v. Loewenstein*, 513 U.S. 123, 130-31 (1994) (treating sale and repurchase agreements involving federal securities as secured loans).

portfolios of securities that produced above-LIBOR yields.

### III.   AIG Is Entitled to Summary Judgment on Its Claim for Foreign Tax Credits

Because the transactions at issue here were conducted through foreign rather than domestic subsidiaries of AIG-FP, the income that AIG and its affiliates earned from investing the borrowed funds was subject to income tax *both* in the foreign country in which the foreign subsidiary was resident *and* in the United States.[4]   *See* Gov't Fact Resp., ¶¶ 25-26; 42-43; 61-62; 75-76; 89-90; 103-104.   As a result, AIG claimed foreign tax credits in connection with the transactions under the Internal Revenue Code's provisions governing such credits.   *See* 26 U.S.C. §§ 901(a), 902(a), 960(a)(1).

The statutes and regulations contain a number of tests that must be satisfied in order for a tax payment to be claimed as a foreign tax credit.   The payment must, for example, qualify as a payment of a "tax" on "income," and the tax must actually have been paid or accrued.   *See* 26 U.S.C. § 901(b)(1); Treas. Reg. § 1.901-2.   As we explained in our prior briefs, the government makes no claim in this case that AIG has failed to meet the detailed requirements of those provisions.   (*See* Dkt. No. 76 at 11-13; Dkt. No. 82 at 11-12.)   In particular, there is no dispute that the credits at issue in this case are attributable to foreign income taxes that were actually imposed by a foreign tax authority in compliance with foreign law and were actually paid by the

---

[4]      As the Court is aware, and as AIG pointed out in its initial summary judgment papers, during the same time period, AIG entered into substantively identical preferred repurchase transactions in which it borrowed funds from foreign counterparties using domestic (U.S.), rather than foreign AIG-FP affiliates.   (Dkt. No. 76 at 20-21.)   Because these transactions were entered into by domestic AIG affiliates, there was no foreign taxation and no corresponding claim by AIG for a foreign tax credit.   Facts relating to these domestic transactions (while helpful to the explanation of AIG's business purpose in such borrowings) are therefore not necessary to resolve the present motion in favor of AIG.   Pursuant to this Court's Order at the hearing held in chambers on July 20, 2012, AIG thus does not address the domestic transactions in the instant briefing.

relevant AIG subsidiary.

Having conceded that AIG meets the statutory and regulatory requirements for the credit, the government is reduced to arguing that the credits should be disallowed because the transactions purportedly lack "economic substance." There are two reasons, however, why the government's economic substance argument does not preclude AIG from claiming the credits at issue here.  First, as a matter of law, the economic substance doctrine does not apply to the transactions at issue here.  (*See infra* Part III.A.)  Second, even if that doctrine were applicable, AIG is still entitled to summary judgment because its transactions had economic substance under the governing decisions of the Supreme Court and the Second Circuit.  (*See infra* Part III.B.)

**A.    The Economic Substance Doctrine Does Not Properly Apply To The Transactions Involved In This Case.**

1.    AIG's Claim for Credits Is Fully Consistent with the Language and Purpose of the Statute.

The economic substance doctrine is a tool of statutory construction, used to determine whether the tax results of a particular transaction are consistent with the congressional purpose of the underlying statutory provisions.  As this Court noted in its March 29, 2011 Order, the proper analysis is set forth in *Gregory v. Helvering*, 293 U.S. 465, 469 (1935), which states that "the question for determination is whether what was done … was the thing which the statute intended."  (*See* Dkt. No. 85 at 1.)  Because the doctrine is designed to effectuate legislative intent, it is appropriate to apply it only when its requirements may be derived from the congressional purpose underlying the tax provisions at issue.

For this reason, it has long been recognized that the doctrine does not apply to all transactions or all taxpayer choices.  As the Second Circuit stated in *Nassau Lens Co. v. Commissioner*, 308 F.2d 39 (2d Cir. 1962): "In the long run, the judicial gloss imposed upon the

Code must be derived from the congressional purpose underlying the provisions involved in each case." *Id*. at 45-46.  Thus, when the economic substance doctrine was formally codified in 2010 for transactions entered after that date, the statute imposed a threshold requirement that the doctrine be determined to be "relevant," and the legislative history of the codification confirms that this was simply meant to codify existing law, *i.e*., even prior to codification, the doctrine did not apply to every type of transaction.  *See* STAFF OF JT. COMM. ON TAX'N, TECHNICAL EXPLANATION OF THE REVENUE PROVISIONS OF THE "RECONCILIATION ACT OF 2010," JCX-18-10, at 152 (Mar. 21, 2010) (hereinafter "Joint Committee Report"), *available at* http://www.jct.gov/publications.html?func=startdown&id=3673 ("The determination of whether the economic substance doctrine is relevant to a transaction is made in the same manner as if the provision had never been enacted.  Thus, the provision does not change present law standards in determining when to utilize an economic substance analysis.").

As we have explained in our initial briefs, because AIG's transactions comport with the letter and purpose of the statutory foreign tax credit provisions, the economic substance doctrine simply does not apply in this case.  (*See* Dkt. No. 76 at 16-32; Dkt. No. 82 at 12-20.)  *See* Joint Committee Report at 152 n.344 ("If the realization of the tax benefits of a transaction is consistent with the Congressional purpose or plan that the tax benefits were designed by Congress to effectuate, it is not intended that such tax benefits be disallowed.").

The reason that Congress enacted the foreign tax credit is well established.  The United States (unlike many other countries) taxes its residents and corporations on their worldwide income, regardless whether that income is earned in the United States or in a foreign jurisdiction. *See* 26 U.S.C. § 61.  Absent some form of relief, U.S. citizens and companies doing business abroad would be subjected to taxation twice on the income they earn overseas – once by the

foreign country in which the income was earned and a second time by the United States.  A U.S. company in the business of manufacturing products and selling them abroad, for example, would be subject to a 70% tax if the United States imposed tax at 35% (the current corporate rate) and the foreign country in which the products were sold imposed tax at that same rate.

When the foreign tax credit was first enacted in 1918, Congress expressly recognized that this double taxation by U.S. and foreign governments would impose a "very severe burden" on U.S. companies.  *See* H.R. REP. NO. 65-767, at 11 (1918).  The credit was thus enacted to alleviate the effect of double taxation by allowing taxpayers to credit their payments of foreign income tax against their U.S. income tax liability.  *See Kraft Gen. Foods v. Iowa Dep't of Rev. & Fin.*, 505 U.S. 71, 73 (1992) ("[T]he foreign tax credit is intended to mitigate multiple taxation of corporate earnings."); *United States v. Goodyear Tire & Rubber Co.*, 493 U.S. 132, 139 (1989) ("credit was intended to protect a domestic parent from double taxation").

This legislative purpose is manifest from the statutory test that Congress prescribed for claiming a foreign tax credit.  As previously mentioned, foreign tax credits can be claimed only when a genuine liability to a foreign tax authority has actually arisen and has actually been accrued or discharged by a payment of tax.  *See* 26 U.S.C. § 901(a), (b)(1); Treas. Reg. § 1.905-2(a)(2).  Subject to a number of specific statutory limitations, all of which AIG complied with, the rule is straightforward:  U.S. companies that have incurred and paid a foreign income tax are allowed a credit for those foreign taxes against the income tax imposed by the United States. The statutory text precisely defines the requirements for claiming the credit in a manner that fully implements the purpose of those statutory provisions.

For two principal reasons, AIG's claim for foreign tax credits is fully consistent with the statutory test and legislative purpose reflected in the foreign tax credit provisions.  First, there is

no dispute that the credits at issue in this case are attributable to foreign income taxes that were actually imposed by a foreign tax authority and actually paid by the AIG group.  (*See* Dkt. No. 76 at 11-13; Dkt. No. 82 at 11-12.)  Second, there is no dispute that AIG reported the income from these same transactions for U.S. tax purposes, measured in accordance with the applicable provisions of federal tax law.  Denial of the credits would thus result in the imposition of both U.S. and foreign tax on these foreign transactions in the exact manner that the foreign tax credit was designed to prevent.  The amount of income and expense reported by AIG on its 1997 U.S. income tax return for each of the six borrowing transactions is undisputed for purposes of this motion and is shown in the table below:

| **Figure 1:  Income and Interest Expense Reported on AIG's U.S. 1997 Income Tax Return for the Six Borrowing Transactions** | | | |
|---|---|---|---|
| **(1)**<br><br>**Transaction** | **(2)**<br><br>**Total Gross Income** | **(3)**<br><br>**Interest Expense** | **(4)**<br><br>**Net Taxable Income** |
| Laperouse | 42,646,064 | 23,165,617 | 19,480,447 |
| Vespucci | 15,798,043 | 8,509,043 | 7,289,000 |
| NZ Issuer | 43,268,472 | 24,701,584 | 18,566,888 |
| Maitengrove | 13,205,250 | 7,767,892 | 5,437,358 |
| Lumagrove | 10,641,511 | 6,125,265 | 4,516,246 |
| Palmgrove | 2,626,417 | 1,601,925 | 1,024,492 |
| TOTAL | $ 128,185,757 | $ 71,871,326 | $ 56,314,431 |

(Gov't Fact Resp., ¶¶ 26, 43, 62, 76, 90, 104.)

As the table shows, AIG reported more than $128 million in gross income from the transactions (column 2).[5]  It is undisputed that this very same income had <u>already</u> been subject to

---

[5]   As explained in greater detail in AIG's prior briefs (*see* Dkt. No. 76 at 12 n.15), the technical rules of the code required AIG to report its income from the transactions in two parts.  First, AIG was required to include in its income the current year earnings of each financing

tax by the foreign country in which it was earned.  Even after accounting for the interest expense deduction which AIG incurred as a result of the transactions (column 3), AIG had over $56 million in net taxable income for U.S. purposes as a result of the transactions (column 4).  It is undisputed that the United States imposed tax on that taxable income at the standard U.S. corporate income tax rate, which at the time was 35%.  Under the government's position in this case, however, which would deny the foreign tax credits that the statute provides, AIG would be subjected to tax twice on the same income -- once in the foreign country and once again in the United States -- in direct contradiction of the fundamental purpose of the foreign tax credit.

The government's argument thus fails at the outset under the basic test articulated by *Gregory v. Helvering*, 293 U.S. at 469, for there is no plausible basis for disputing that the mitigation of double taxation is precisely "the thing which the statute intended."  When, as here, application of the code provisions accomplishes exactly "the thing which the statute intended," use of a judicial doctrine to depart from the statutory text is plainly inappropriate.  *See id*.  As we have summarized here and have discussed at length in our opening and reply briefs filed on the prior motion, AIG is therefore entitled to summary judgment for this reason alone.

2.  The Government's Arguments to the Contrary Are an Attempt to Sidestep and Override Specific Provisions of the Statute and Regulations.

In arguing to the contrary, the government has never sought to explain how double taxation of AIG's income from the transactions is consistent with congressional intent.  Instead, its arguments under the guise of economic substance simply seek to create new limitations that

---

subsidiary, which represented portfolio income less expenses and foreign taxes.  26 U.S.C. §§ 951(a) (requiring Subpart F inclusion); 952(c)(1)(A) (limiting Subpart F income to current year earnings and profits).  Second, AIG was required to include in its income the foreign taxes paid by the subsidiary that were deemed paid by AIG-FP.  26 U.S.C. §§ 78; 960(a)(1); 902(a). The amount shown in column (2) above is the sum of these two items.

are not present in the statute and which, if adopted, would run expressly contrary to the statutory and regulatory regime.  As we discuss below, these objections fall into three categories: (a) the economic burden of the tax, (b) the existence of "excess credits," and (c) the differing treatment of the transactions under foreign and U.S. law.

    a.  <u>Economic Burden</u>.  From the beginning of the case, the government has argued that the transactions are objectionable and the credits are improper because AIG purportedly did not bear the "economic burden" of the taxes imposed by the foreign countries.[6]  Even if that claim were true (and it is not), it has been well-settled for at least 70 years that the question of who bears the "economic burden" of a foreign tax is irrelevant in determining eligibility for the credit. *See Biddle v. Comm'r*, 302 U.S. 573 (1938).  The "technical taxpayer" test, which is now embodied in the IRS' own regulations, expressly provides that tax "is considered paid for purposes of sections 901 and 903 [by] the person on whom foreign law imposes legal liability for such tax…."  Treas. Reg. § 1.901-2(f)(1).[7]  Because it is undisputed that foreign law imposed legal liability for the taxes on AIG's foreign affiliates, there is no question that AIG is the party legally entitled to claim credits for the foreign tax payments.  The government's attempt to create a different rule under the guise of economic substance runs expressly contrary to, and would simply defeat, the statutory and regulatory scheme.

    b.  <u>"Excess" Credits</u>.  The government next argues that the transactions are objectionable

---

[6]    *See* Dkt. No. 30 at 1 (arguing that transactions should be disregarded because credits are "based on foreign tax payments for which AIG did not bear the economic burden"); Dkt. No. 78 at 5 (arguing that counterparties "funded" the foreign taxes); *id.* at 27 (claiming that the foreign taxes were the "foreign counterparties' tax liabilities").

[7]    The regulation goes on to provide that a foreign tax is considered paid by the technical taxpayer "even if another party … agrees … to assume the taxpayer's foreign tax liability."  *See* Treas. Reg. § 1.901-2(f)(2)(i).

because they "generate" "excess" foreign tax credits, which the government defines as foreign taxes that are in "excess" of the U.S. tax imposed on the transactions.  The reason that different amounts of tax are imposed by foreign governments and by the U.S. is that the foreign jurisdiction imposes tax on the AIG affiliate's total portfolio income from the transactions without deduction for any interest expense component, whereas the United States allows the AIG consolidated group an interest deduction for the transactions.

This argument, however, cannot possibly serve as a reason to deny the credits claimed by AIG, because both Congress and the IRS have long recognized that differences in how U.S. and foreign law measure the income attributable to a transaction have no bearing on the creditability of the foreign taxes paid on such income.  (*See* Dkt. No. 76 at 22, citing, *inter alia*, 26 U.S.C. § 904; Treas. Reg. § 1.904-6(a)(1)(iv); *Guardian Indus. Corp. v. United States*, 477 F.3d 1368, 1375 (Fed. Cir. 2007) ("[T]he credit could be available even if there were no United States tax on the income giving rise to the credit.").)  The foreign tax credit regime has long incorporated detailed and specific rules that allow for the averaging (or "cross-crediting") of credits in such situations.  (*See* Dkt. No. 76 at 21-29.)  Section 904, for example, allows averaging of high-taxed and low-taxed income so long as the income falls within the same general type or category, typically referred to as "income baskets."  (*See id*.)  By attacking the transactions for "generating" "excess credits," notwithstanding AIG's full compliance with section 904, the IRS is simply expressing a willful disagreement with the carefully constructed statutory scheme that Congress enacted.

c.  <u>Tax Arbitrage</u>.  Finally, in its summary judgment response, the government repeatedly complained that the transactions were structured to be treated differently under U.S. and foreign tax law.  (*E.g.,* Dkt. No. 78 at 21.)  That is, it complains that under the repurchase structure, the

transactions were treated as loans for U.S. purposes (thus giving rise to a U.S. interest deduction) and as an equity investment for foreign-law purposes (thus allowing the foreign counterparty to receive dividends tax-free). The government, however, cites no authority for the proposition that parties may not take foreign and U.S. tax law differences into account when structuring their transactions in order to minimize worldwide tax liability. In fact, it is common for parties to do so, and the IRS has recognized on numerous occasions that there is nothing wrong with that. *See, e.g.*, I.R.S. Tech. Adv. Mem. 9748005 (Nov. 28, 1997) (approving "double dip" lease deliberately structured to allow the lessor to be treated as the owner of an asset for its home country's laws and the lessee to be treated as the owner for purposes of its laws, thus entitling both parties to the lease to claim the tax benefits of ownership under each country's respective laws).[8]

When it is not litigating these issues in Court, the government itself has acknowledged these points. For example, in 2006, the Department of Treasury International Tax Counsel noted that "[t]here's nothing inherently wrong with cross-border tax arbitrage. It is a natural byproduct of the global economy interacting with disparate tax systems. The question is not whether there is a foreign tax benefit, but how the U.S. rules apply." Sheryl Stratton, *Tax Arbitrage Not Inherently 'Evil,' Treasury Official Says*, 2006 TNT 9-3 (Jan. 13, 2006) (statement of Treasury International Tax Counsel Hal Hicks). *See also* B. John Williams, Jr., IRS Chief Counsel, *Selected International Tax Issue*s at 9-10, 2003 TNT 54-47 (Mar. 20, 2003) (noting that "inconsistent treatment of tax items" is to be expected between U.S. and foreign tax systems and that "unless the law requires otherwise, we will determine the appropriate tax treatment of an item based solely on the application of U.S. law"). Indeed, the government's own Rule 30(b)(6)

---

[8]        Additional examples are noted in AIG's reply brief. *See* Dkt. No. 82 at 18 n.8.

witness in this case acknowledged that cross-border tax arbitrage is "just a fact of life, if you will, in transactions.  There are differences in the way the United States tax laws treat an aspect of a transaction and the way that foreign tax laws treat an aspect of a transaction."  Deposition of Jeffrey P. Cowan, 7/19/2012, at 29:22-30:1.[9]

In sum, none of the features of these transactions that the government singles out as objectionable conflicts with the underlying purpose of the foreign tax credit.  To the contrary, the features of these transactions that the government now attempts to derogate have long been expressly considered and their consequences expressly incorporated by Congress into the statutory scheme.  The economic substance doctrine is designed to effectuate, not thwart, congressional intent, and therefore cannot be applied to supplant or displace these statutory rules. *See Sacks v. Comm'r*, 69 F.3d 982, 992 (9th Cir. 1995)*; Estelle Morris Trusts v. Comm'r*, 51 T.C. 20, 43 (1968).

**B.    Even if the Economic Substance Doctrine Were Applicable, the Transactions Satisfy the Doctrine as a Matter of Law.**

1.    The Transactions Are Objectively Profitable under the Test Set Forth in *Compaq* and *IES*.

Even if the economic substance doctrine were applied to the transactions at issue on this motion, summary judgment would still be proper because the transactions meet the test of economic substance as a matter of law.  The Second Circuit has articulated the economic substance test in exactly the same manner in every economic substance case it has decided during the past twenty years:  a transaction has economic substance so long as it has "business purpose or economic effect other than the creation of tax deductions."  *DeMartino v. Comm'r*,

---

[9]    Copies of the materials cited in this paragraph are attached as Exhibits 151, 152, and 153 to the Third Declaration of Jeffrey N. Starkey, submitted herewith.

862 F.2d 400, 406 (2d Cir. 1988); Dkt. No. 76 at 32-33.  *See also Nicole Rose Corp. v. Comm'r*, 320 F.3d 282, 284 (2d Cir. 2003) (quoting *DeMartino*); *Ferguson v. Comm'r*, 29 F.3d 98, 101 (2d Cir. 1994) (same); *Gardner v. Comm'r*, 954 F.2d 836, 838 (2d Cir. 1992) (same); *Gilman v. Comm'r*, 933 F.2d 143, 147-48 (2d Cir. 1991) (same); *Jacobson v. Comm'r*, 915 F.2d 832, 837 (2d Cir. 1990) (same).

For economic substance purposes, whether a transaction is expected to have economic effect apart from taxes is determined by computing its "pre-tax" profit.  *See e.g., Gilman v. Comm'r*, 933 F.2d at 146-47 & n.4; *Goldstein v. Comm'r*, 364 F.2d 734, 739-40 (2d Cir. 1966). In its prior brief on summary judgment, the government argued that the transactions' profitability is a "disputed" fact, but that is flatly incorrect.  The issue that divides the parties is not a factual one.  The amounts paid under the transactions are set forth in precise and detailed fashion in the undisputed transaction documents.  To avoid any dispute, AIG adopted for purposes of this motion the precise cash flows that are reported by the government's own expert in his declaration.  That declaration shows, without any question, that the transactions would result in millions of dollars in pre-tax profit *so long as* the foreign taxes incurred in the transactions are properly treated as taxes, rather than as pre-tax expenses.  The relevant table, drawn from the government expert's declaration, is reproduced below for the Court's convenience:

| Table 5 - Revision of Government Expert Calculations To Comply With Compaq and IES Decisions | | | | | | |
|---|---|---|---|---|---|---|
| (amounts in $ millions) | | | | | | |
| | Laperouse | Vespucci | NZ Issuer | Maitengrove | Lumagrove | Palmgrove |
| Total Net Income (Per Cragg Table 2) | (17.3) | (27.9) | (26.3) | (4.8) | (8.4) | (2.8) |
| Foreign Tax (Per Cragg Table 2) | 112.6 | 36.6 | 46.2 | 16.4 | 29.8 | 14.5 |
| **Profit Before All Taxes** | 95.3 | 8.7 | 19.9 | 11.6 | 21.4 | 11.7 |

(Declaration of M. Cragg, 4/26/2010, at 11, attached as Exhibit 13 to Dkt. No. 84.)[10]

The only "dispute" that the parties have concerning the proper computation of pre-tax profit is the purely *legal* one of whether the foreign taxes incurred in the transactions are properly treated as taxes, as AIG contends, or are instead "pre-tax" expenses that subtract from pre-tax cash flow, as the government argues.  As AIG has described at length in its prior briefs,[11] this is precisely the same *legal* question that was decided adversely to the government by the Fifth Circuit in *Compaq* and the Eighth Circuit in *IES*.  Those courts properly held, as a matter of law, that pre-tax profitability must be determined before both foreign and U.S. taxes are imposed.  The government's argument to the contrary is simply an effort, as the court in *Compaq* stated, to "stack the deck" against U.S. taxpayers.  *Compaq Computer Corp. v. Comm'r*, 277 F.3d 778, 785 (5th Cir. 2001); *IES Indus. v. United States*, 253 F.3d 350, 354 (8th Cir. 2001).

In its brief responding to AIG's first motion on summary judgment, the government persisted in arguing that *Compaq* and *IES* were "wrongly decided," (Dkt. No. 78 at 32), but those courts' decisions are wholly consistent with the fundamental principles underlying the foreign tax credit.  There is no basis for treating a foreign tax as something other than a tax.  That is particularly so in light of Congress' stated purpose in enacting the foreign tax credit, which in the words of the House Ways and Means Committee, was "designed to produce uniformity of tax burden among United States taxpayers, irrespective of whether they were engaged in business in the United States or engaged in business abroad" by "in effect treat[ing] the taxes imposed by the

---

[10]     As AIG noted in its prior briefs, it is adopting the government expert's numbers solely for purposes of this motion.  Those figures actually *understate* AIG's profit for a variety of reasons. For example, they totally disregard income attributable to AIG's equity investment.

[11]     *See* Dkt. No. 76 at 37-40; Dkt. No. 82 at 20-27.

foreign country *as if they were imposed by the United States*." H.R. REP. NO. 83-1337, at 76 (1954) (emphasis added).

Second Circuit cases applying the pre-tax profit test are also fully consistent with *IES* and *Compaq*. In its opposition, the government claimed that *Gilman v. Commissioner*, 933 F.2d 143 (2d Cir. 1991) supported a different result, but it provides no basis for this assertion. To the contrary, in *Gilman*, the Second Circuit computed pre-tax profitability for economic substance purposes in exactly the same way as the courts did in *Compaq* and *IES* by adding up the positive amounts the taxpayer expected to receive from the transaction at issue and subtracting the amounts the taxpayer was required to pay. *See Gilman*, 933 F.2d at 147 & n.4. Because its analysis under the economic substance doctrine was properly directed to pre-tax profit, the court in *Gilman* disregarded any tax payments or tax deductions associated with the transaction.

> 2. AIG's Business Purpose For The Transactions In Question Does Not Present a Material Question of Fact To Be Resolved By A Jury.

Recognizing that its position on pre-tax profit is directly contrary to the decisions of the Fifth Circuit in *Compaq* and the Eighth Circuit in *IES*, the government has sought to avoid summary judgment in this case by arguing that a taxpayer's purpose for engaging in a transaction is an independent and necessary component of the economic substance inquiry in every case and that this factual issue must be resolved by a jury.[12] The government thus argues that summary judgment cannot be granted because AIG's sole reason or purpose for entering into the

---

[12] We note that if the government were correct it would eliminate the potential for any economic substance case to be resolved on summary judgment -- a position that is flatly contradicted by the numerous cases that have been so resolved. *See, e.g.*, *IES Indus. v. United States*, 253 F.3d 350 (8th Cir. 2001); *Countryside Ltd. P'ship v. Comm'r*, 95 T.C.M. 1006 (2008); *Leader Fed. Sav. & Loan Ass'n v. Comm'r*, 57 T.C.M. 846 (1989); *San Antonio Sav. Ass'n v. Comm'r*, 55 T.C.M. 813 (1988); *Wachovia Bank & Trust Co. v. United States*, 499 F. Supp. 615 (M.D.N.C. 1980); *Priester Mach. Co. v. United States*, 296 F. Supp. 604 (W.D. Tenn. 1969).

transactions was purportedly to generate foreign tax credits.  That argument, however, reflects a fundamental misunderstanding of the economic substance doctrine as applied in this Circuit.  As we explained at length in our initial briefs and summarize here, the government's argument should be rejected for three reasons.  (*See* Dkt. No. 82 at 27-36.)

First, the Supreme Court and the Second Circuit have repeatedly stated that an inquiry into a taxpayer's subjective purpose for entering a transaction is irrelevant once it is shown that a transaction has objective economic effects apart from the reduction of taxes.  *See Gregory v. Helvering*, 293 U.S. at 469 ("if a reorganization in reality was effected … the ulterior purpose mentioned will be disregarded"); *Rosenfeld v. Comm'r*, 706 F.2d 1277, 1282 (2d Cir. 1983) ("[W]e decline appellant's invitation to adopt a business purpose standard of review. Rather, we believe our inquiry should focus on whether there has been a change in the economic interests of the relevant parties."); *United States v. Ingredient Tech. Corp.*, 698 F.2d 88, 94 (2d Cir. 1983) ("[W]e agree with Judge Learned Hand in dissent in *Gilbert v. Commissioner*, 248 F.2d 399, 412 (2d Cir. 1957), that it is immaterial whether we are talking about 'substantial economic reality,' 'substance over form,' 'sham' transactions, or the like; rather the question is whether under the statute and regulations here involved the transaction affects a beneficial interest other than the reduction of taxes."); *Kraft Foods Co. v. Comm'r*, 232 F.2d 118, 128 (2d Cir. 1956) ("The inquiry is not what the purpose of the taxpayer is, but whether what is claimed to be, is in fact."); *Loewi v. Ryan*, 229 F.2d 627, 629 (2d Cir. 1956) ("It is so abundantly settled in decisions of the Supreme Court that a taxpayer's motive is irrelevant in determining his liability that we need not cite the very numerous decisions of the lower courts.").  *See also ACM P'ship v. Comm'r*, 157 F.3d 231, 248 n.31 (3d Cir. 1998) (citing the Second Circuit's decision in *Kraft Foods* for the proposition that it is "well established that where a transaction objectively affects the taxpayer's

17

net economic position, legal relations, or non-tax business interests, it will not be disregarded merely because it was motivated by tax considerations"). The government is simply wrong, therefore, in asserting that AIG must show both (i) that its transactions were expected to be profitable and (ii) that it had a non-tax purpose for engaging in them.

Second, even assuming that a taxpayer were required to independently demonstrate a business purpose for engaging in profitable transactions, the government's argument proceeds on the wholly illogical premise that profit is not a sufficient business purpose. Where, as here, the objective facts show that a transaction is likely to result in millions of dollars of profits before taxes, it is nonsensical to say that the transaction entered into by a for-profit company lacks a business purpose. Profit is the business purpose. As the court in *Compaq* put it: "In light of what we have said about the nature of Compaq's profit, both pre-tax and post-tax, we conclude that the transaction had a sufficient business purpose independent of tax considerations." *Compaq*, 277 F.3d at 787. Neither the Second Circuit, nor any other court, has ever found a transaction that was expected to result in substantial pre-tax profits lacking in economic substance on the theory that such a profitable transaction lacked a sufficient business purpose.

Third and finally, the government's arguments on subjective business purpose fundamentally confuse the "tax motive" for a particular transactional structure with the "business purpose" of the underlying transaction. The government expressly admitted in its response to AIG's statement of facts that AIG-FP was in the business of borrowing funds cheaply and investing the proceeds at higher rates. (Gov't Fact Resp., ¶ 5.) The government nonetheless asserts that, if AIG wanted to borrow and invest abroad, it was required to do so "directly" by using a structure that generated more U.S. tax (*see* Dkt. No. 78 at 7). That position cannot be reconciled with decades of case law that expressly recognizes the right of a taxpayer to structure

its business activities in the manner that produces the least amount of tax.  The law clearly permits taxpayers to structure their business transactions in the most tax efficient manner possible, even when a particular alternative is chosen specifically for tax reasons.  *See, e.g., United Parcel Serv. of Am. v. Comm'r*, 254 F.3d 1014, 1019 (11th Cir. 2001) ("There may be no tax-independent reason for a taxpayer to choose between these different ways of financing the business, but it does not mean that the taxpayer lacks a 'business purpose.'  To conclude otherwise would prohibit tax-planning."); *Northern Ind. Pub. Serv. Co. v. Comm'r*, 115 F.3d 506, 508 (7th Cir. 1997) (upholding a borrowing structure that was utilized solely "to obtain tax advantages not available through direct borrowing"); *Countryside Ltd. P'ship v. Comm'r*, 95 T.C.M. 1006 (2008 WL 41414, at *19) (2008) (rejecting the government's economic substance argument because "[the government], in finding a lack of economic substance, has erroneously focused on the tax-motivated means instead of the business-oriented end").

That, of course, is precisely what occurred in this case.  AIG permissibly structured its borrowings to generate the least amount of worldwide tax.  The repurchase structure allowed the transactions to be treated as loans for U.S. purposes (thus giving rise to a U.S. interest deduction) and an equity investment for foreign-law purposes (thus allowing the foreign counterparty to receive dividends tax-free).  The government's claim that the same borrowings might have been effectuated more "directly" by structuring the transaction as a direct loan -- thus subjecting the foreign counterparty to tax in its home country -- has no bearing for economic substance purposes.  As Judge Learned Hand stated for the Court in *Helvering v. Gregory*, 69 F.2d 809, 810 (2d Cir. 1934):  "Any one may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose that pattern which will best pay the Treasury; there is not even a patriotic duty to increase one's taxes."

**IV.**    **Conclusion**

For these reasons and those set out in AIG's initial briefs in support of this motion, AIG requests that the Court grant its motion for partial summary judgment.

Respectfully submitted,


By:  s/ Thomas A. Cullinan
       Thomas A. Cullinan
       SUTHERLAND ASBILL & BRENNAN LLP
       999 Peachtree Street, N.E.
       Atlanta, Georgia 30309
       Phone:  (404) 853-8000
       Fax:     (404) 853-8806
       thomas.cullinan@sutherland.com

       Kent L. Jones
       Jerome B. Libin
       Daniel H. Schlueter
       Jeffrey N. Starkey
       SUTHERLAND ASBILL & BRENNAN LLP
       1275 Pennsylvania Avenue, N.W.
       Washington, DC 20004
       Phone:  (202) 383-0100
       Fax:     (202) 637-3593
       kent.jones@sutherland.com
       jerome.libin@sutherland.com
       dan.schlueter@sutherland.com
       jeffrey.starkey@sutherland.com

       *Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

IT IS HEREBY CERTIFIED that service of the foregoing *Plaintiff's Memorandum of Law in Support of Its Renewed Motion for Partial Summary Judgment* has been made on August 1, 2012 via the Court's CM/ECF system:

> Preet Bharara
> United States Attorney for the
> Southern District of New York
> c/o:  Pierre G. Armand
> Assistant U.S. Attorney
> 86 Chambers Street, 3rd Floor
> New York, NY 10007
> Phone: (212) 637-2724
> Fax :   (212) 637-0033

> _s/ Thomas A. Cullinan_____
> Thomas A. Cullinan
> SUTHERLAND ASBILL & BRENNAN LLP
> 999 Peachtree Street, N.E.
> Atlanta, Georgia 30309
> Phone:  (404) 853-8000
> Fax:     (404) 853-8806
> thomas.cullinan@sutherland.com