UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - X
AMERICAN INTERNATIONAL GROUP, INC.,
and its subsidiaries,

                    Plaintiff,

                                                               09 Civ. 1871 (LLS)
    - against -

                                                               OPINION AND ORDER

UNITED STATES OF AMERICA,

                    Defendant.
- - - - - - - - - - - - - - - - - - - - X

    Plaintiff American International Group, Inc., ("AIG") renews its July 30, 2010 motion for partial summary judgment that it is entitled to credits for foreign taxes paid by affiliates ("Special Purpose Vehicles" or "SPVs") it used to effect six transactions between AIG Financial Products Corp. ("AIG-FP," a wholly-owned subsidiary of AIG) and certain overseas financial institutions.[1]  The Internal Revenue Service ("IRS") disallowed the credits on AIG's 1997 tax return and claimed additional amounts due in taxes, interest and penalties

---

[1] In a March 29, 2011 Memorandum Endorsement (Dkt. No. 85) and in response to the Government's request for additional discovery, I denied AIG's earlier motion "without prejudice and with leave to renew, on these or other papers, following the completion of discovery concerning the domestic transactions," i.e., a series of transactions AIG claimed to be the same, in all material respects, to the six at issue on this motion but for their use of domestic rather than foreign affiliates of AIG.  It eventually became clear that resolution of the disputes concerning the domestic transactions would not provide a ground for decision of this motion and would necessitate a complete analysis and ruling on the appropriate tax treatment of the domestic transactions.  Thus, with the consent of AIG and over an objection by the Government, I directed the parties to limit their discussion in the renewed motion papers to the foreign transactions only.  See Tr. of July 20, 2012 Conf. (Dkt. No. 112).

in a March 20, 2008 notice of deficiency. AIG paid those amounts and now seeks an appropriate refund.

The Government claims the disallowance was proper because the transactions lack economic substance. For the reasons which follow, the motion is denied.

## BACKGROUND

From 1993 to 1997, AIG-FP entered into six transactions[2] structured to take "advantage of the mismatch between U.S." and foreign tax law governing agreements to sell and repurchase preferred stock. Reply at 7. AIG describes the transactions as loans; the Government as foreign tax credit generators. Both agree that each proceeded as follows, with variations in structure immaterial for resolution of this motion.

In each transaction, AIG-FP sold a foreign lender bank preferred shares in a foreign AIG-FP affiliate (the "Special Purpose Vehicle" or "SPV") and committed to repurchase those shares after a term of years for the original price paid by the lender bank.

Capitalized primarily from the sale of shares, the SPV purchased investments which generated a steady income. It paid

---

[2] The names and dates of, and counterparties to, the disputed transactions are as follows:

"Laperouse," entered on or about September 30, 1993 with Credit Agricole.
"Vespucci," on or about December 18, 1995 with Banca Commerciale Italiana.
"NZ Issuer" or "New Zealand," December 11-19, 1996, with Bank of New Zealand.
"Maitengrove," on or about February 28, 1997, with Bank of Ireland.
"Lumagrove," on or about August 27, 1997, with Bank of Ireland.
"Palmgrove," on or about October 20, 1997, with Irish Permanent.

2

taxes on the investment income to its overseas tax authority and distributed much of the net proceeds to the lender.

The lender paid little, if any, tax on the distribution ("dividend"). Its tax authority considered the lender's purchase of preferred stock to be an equity investment in the SPV, despite AIG-FP's obligation to repurchase the shares, and therefore treated the SPV as the lender's corporate subsidiary, and the dividend as a tax-exempt distribution from subsidiary to parent.

On its 1997 U.S. tax return, AIG claimed foreign tax credits for the full amount of foreign tax paid by the SPV, which exceeded AIG's U.S. tax owed on the transactions, allowing it to apply portions of the credits to its tax liability on income from other transactions. AIG claims that under U.S. tax law, the lender's purchase of preferred stock was a loan to the SPV, and the SPV remained AIG's corporate subsidiary, because of the repurchase obligation. Thus, AIG reported all of the SPV's investment income, but deducted as an interest expense the dividend paid to the lender. The table below summarizes the U.S. tax reported on AIG's 1997 return as a result of the transactions.

**Tax Reported on These Transactions on AIG's 1997 U.S. Tax Return (in U.S. Dollars)[3]**

|              | Total Gross Income | Interest Expense | Net Taxable Income | Tax Owed   | Foreign Tax Credit |
|--------------|--------------------|------------------|--------------------|------------|--------------------|
| Laperouse    | 42,646,064         | 23,165,617       | 19,480,447         | 6,818,156  | 17,769,336         |
| Vespucci     | 15,798,043         | 8,509,043        | 7,289,000          | 2,551,150  | 6,582,571          |
| NZ Issuer    | 43,268,472         | 24,701,584       | 18,566,888         | 6,498,411  | 14,278,596         |
| Maitengrove  | 13,205,250         | 7,767,892        | 5,437,358          | 1,903,075  | 4,784,663          |
| Lumagrove    | 10,641,511         | 6,125,265        | 4,516,246          | 1,580,686  | 3,830,944          |
| Palmgrove    | 2,626,417          | 1,601,925        | 1,024,492          | 358,572    | 945,510            |
| Total        | 128,185,757        | 71,871,326       | 56,314,431         | 19,710,050 | 48,191,620         |

Thus, as a result of those tax effects, the parties' combined tax burden on the investment income was minimal. The foreign tax credits claimed by AIG offset the foreign tax obligations of the SPV; the lender's dividend was tax-exempt; and AIG paid U.S. taxes on only a portion of the investment income, having deducted much of it as an interest expense.

AIG contends the transactions were merely instances of highly profitable spread banking activity: AIG-FP borrowed funds from each lender, purchased investments, used the return on the investments to pay the lender a suitable interest, and profited

---

[3] All figures, except those appearing in column 4 ("Tax Owed"), are drawn from Figure 1 of AIG's 2010 Reply brief, at page 12. The numbers in column 4 are 35% of the corresponding Net Taxable Income amounts appearing in column 3, and are based on AIG's statement that it "was required to - and did - pay U.S. tax on that taxable income at the standard U.S. corporate income tax rate, which was 35%." Id.

4

from the difference between the interest and the return on the investments.

The Government claims tax benefits generated that spread profit. According to the Government, AIG and the lender "effectively shifted" tax liability "from the foreign bank to the SPV," Opp. at 5, which allowed the lender to receive its return as a tax-exempt dividend, and AIG to claim foreign tax credits and interest deductions to offset much of the foreign tax paid by the SPV. Those tax savings permitted AIG to negotiate a dividend rate lower than the return on the investments, creating AIG's profitable spread. Id.

Thus, the Government argues the transactions lack economic substance, i.e., they "can not with reason be said to have purpose, substance, or utility apart from their anticipated tax consequences," Lee v. Comm'r, 155 F.3d 584, 586 (2d Cir. 1998) (quotation marks omitted). AIG claims the economic substance doctrine does not apply, and that the transactions have economic substance because they were expected to generate a pre-tax profit over the life of the transactions of "at least $168.8 million." Reply at 12.

## DISCUSSION

Under Federal Rule of Civil Procedure 56(a), "the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "This standard

5

requires that courts resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (internal quotation marks omitted).

"Any one may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose that pattern which will best pay the Treasury; there is not even a patriotic duty to increase one's taxes." Helvering v. Gregory, 69 F.2d 809, 810 (2d Cir. 1934), aff'd, Gregory v. Helvering, 293 U.S. 465, 55 S. Ct. 266 (1935) ("The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted."). "However, even if a transaction's form matches 'the dictionary definitions of each term used in the statutory definition' of the tax provision, 'it does not follow that Congress meant to cover such a transaction' and allow it a tax benefit." Altria Group, Inc. v. United States, 658 F.3d 276, 284 (2d Cir. 2011), quoting Helvering, 69 F.2d at 810. Thus, "the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended." Gregory, 293 U.S. at 469, 55 S. Ct. at 267.

1.

The parties dispute how to determine whether what was done, apart from the tax motive, was what Congress intended when it established the foreign tax credit.

The Government argues AIG must prove the transactions had economic substance, because Congress did not intend to confer foreign tax credits to transactions which lack economic substance. See Ferguson v. Comm'r, 29 F.3d 98, 101 (2d Cir. 1994) ("An activity will not provide the basis for deductions if it lacks economic substance."), citing Gregory, 293 U.S. at 469, 55 S. Ct at 267.

AIG argues proof of economic substance is immaterial because "The purpose of the statute involved in this case is to eliminate double taxation, and there is no dispute that disallowance of the credits at issue would subject AIG to double taxation." Reply at 10.

As AIG states, "the economic substance doctrine does not apply in every context – it only applies when the requirements that it would impose can fairly be derived from the terms and purpose of the statute that is at issue." Id. (emphasis omitted). "The opinion in Gregory v. Helvering permits proper tax avoidance," and "as to many transactions Congress has clearly intended tax relief irrespective of the parties' motives," Diggs v. Comm'r, 281 F.2d 326, 329, or has "purposely skewed the neutrality of the system" to induce activity which would otherwise result in an economic loss, Sacks v. Comm'r, 69

7

F.3d 982, 991 (9th Cir. 1995). To require, as the economic substance doctrine does, a taxpayer to prove a "business purpose" and "reasonable possibility of profit" "apart from tax benefits," Nicole Rose Corp. v. Comm'r, 320 F.3d 282, 284 (2d Cir. 2003), would subvert the purpose of Congress with respect to such transactions.

But those requirements are consonant with the purpose of the foreign tax credit, because Congress intended the credit to facilitate purposive business transactions, not by subsidy, but by restoring the neutrality of the tax system.

The United States taxes the income of its citizens and residents regardless of where the income is earned. Income earned abroad is often also subject to foreign tax. Congress passed the foreign tax credit to mitigate such double taxation of foreign income by permitting the taxpayer to subtract the amount he pays or accrues in foreign tax from his U.S. tax bill. See, e.g., Kraft Gen. Foods v. Iowa Dep't of Rev. & Fin., 505 U.S. 71, 73, 112 S. Ct. 2365, 2367 (1992). Thus, the credit "was originally designed to produce uniformity of tax burden among United States taxpayers, irrespective of whether they were engaged in business in the United States or engaged in business abroad," H.R. Rep. No. 83-1337 at 76 (1954), i.e., to "neutralize the effect of U.S. tax on the business decision of where to conduct business activities most productively," Bank of

New York Mellon Corp. v. Comm'r, 26683-09, 2013 WL 499873, at *18 (U.S. Tax Ct. Feb. 11, 2013).

Motivating Congress to relieve the "very severe burden," H.R. Rep. No. 65-767, at 11 (1918), on foreign income was the need to facilitate "the extension by domestic corporations of their business abroad," Burnet v. Chicago Portrait Co., 285 U.S. 1, 7-10, 52 S. Ct. 275, 277-78 (1932), and to "encourage American foreign trade," Comm'r v. Am. Metal Co., 221 F.2d 134, 137 (2d Cir. 1955). As stated during debate of the Revenue Act of 1918, which first established the credit:

> Suppose we had a meat company over in Montreal and they would send to St. Louis a Canadian citizen from Montreal and pay him $50,000 a year; this Government would tax him on $50,000, although he would be a British subject - a Canadian citizen. Canada would tax him, also. Canada, no doubt, will do as we are doing by this bill - pass a law that will permit its citizen earning an income here to deduct from his tax levied by her the amount of tax paid by him to the United States. That is not only a just provision, but a very wise one. It is wise from the standpoint of the commerce of the United States, of the expansion of business of the United States. There are thousands of citizens of the United States now going to South America, and they have been going for years, and we have thousands of citizens in Canada. We would discourage men from going out after commerce and business in different countries or residing for such purposes in different countries if we maintained this double taxation. They would take their corporations that are American corporations and reorganize them, getting their charters in such foreign countries, if we did not do this, and we might not be able to tax their income and profits at all. Another thing: If we did not do that, a man would become a citizen of another country instead of retaining his citizenship here in order to escape the large and double taxation imposed.

9

56 Cong. Rec. App. 677 (1918) (statement of Rep. Kitchin).

Because Congress created the foreign tax credit for the taxpayer "who desires to engage in purposive activity," Goldstein v. Comm'r, 364 F.2d 734, 742 (2d Cir. 1966), and sought only to eliminate the disadvantage to his foreign business imposed by U.S. taxation of worldwide income, it appears not to have intended the credit be available to transactions "that have no economic utility and that would not be engaged in but for the system of taxes imposed by Congress" simply because the transactions caused the taxpayer to pay foreign tax. Id. at 741.

Thus, in its claim to avoid double taxation, AIG cannot exclude consideration of the transactions' "economic utility" and must show that "what was done, apart from the tax benefits, is what was intended" by Congress. See Compaq Computer Corp. v. Comm'r, 277 F.3d 778 (5th Cir. 2001) (applying economic substance doctrine to claim for foreign tax credits); IES Indus. v. United States, 253 F.3d 350 (8th Cir. 2001) (same); Pritired 1, LLC v. United States, 816 F. Supp. 2d 693 (S.D. Iowa 2011) (same); Bank of New York, 2013 WL 499873, at *16-19 (U.S. Tax Ct. Feb. 11, 2013) (same).

2.

Under the economic substance doctrine, tax benefits will be disallowed if a transaction "has no business purpose or economic

10

effect other than the creation of tax" benefits. <u>Nicole Rose</u>, 320 F.3d at 284.

"The business purpose inquiry 'concerns the motives of the taxpayer in entering the transaction.'" <u>Altria Group, Inc. v. United States</u>, 694 F. Supp. 2d 259, 283 (S.D.N.Y. 2010) (quoting <u>Rice's Toyota World, Inc. v. Comm'r</u>, 752 F.2d 89, 92 (4th Cir. 1985)), <u>aff'd</u>, 658 F.3d 276, 281 (2d Cir. 2011).

"The economic effect inquiry requires an objective determination of whether a reasonable possibility of profit from the transaction existed apart from tax benefits," <u>id.</u> at 283 (internal quotation marks omitted); <u>see</u> <u>Gilman v. Comm'r</u>, 933 F.2d 143, 148 (2d Cir. 1991).

AIG claims the transactions' purpose and effect was the $168.8 million pre-tax profit they were expected to obtain through spread banking. If the computation of that figure proves correct, AIG would be entitled to judgment, because "a transaction has economic substance and will be recognized for tax purposes" if it was expected to result in a significant pre-tax profit, <u>Gilman</u>, 933 F.2d at 147, as "greater weight is given to objective facts than to the taxpayer's mere statement of intent," <u>Lee</u>, 155 F.3d at 586.

Thus, the function of the economic substance doctrine is to distinguish the transaction "which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance,"

11

Frank Lyon Co. v. U.S., 435 U.S. 561, 583-84, 98 S. Ct. 1291, 1303 (1978), from the transaction which "can not with reason be said to have purpose, substance, or utility apart from its anticipated tax consequences," United States v. Coplan, 703 F.3d 46, 91 (2d Cir. 2012), or, in this case, to determine whether AIG merely sought to minimize its tax burden on otherwise profitable spread banking activity, or whether the spread between AIG's cost of borrowing and its return on investment existed only because of the transactions' tax consequences, including its negotiated division of its inherent tax benefits.

To arrive at its $168.8 million figure, AIG modifies the computation of its expected return on the borrowed funds, as performed by the Government's expert Dr. Michael Cragg,[4] by adding toward AIG's profit the foreign tax paid by the SPV. As a result, AIG's figure takes the SPV's investment income, subtracts its obligations to the lender and its operating expenses, and disregards the following: the foreign tax paid by the SPV on its investment income, the U.S. income tax paid by AIG on the SPV's investment income, and the value of the foreign tax credits to which AIG claims it is eligible.

---

[4] The borrowed funds are the funds AIG-FP received from the lender in exchange for its preferred stock in the SPV. Those funds provided much of the SPV's capital; the rest was provided by AIG's own contribution. AIG asserts that its pre-tax profit would be greater if the return on its own contribution were included in its computation, but "has adopted for purposes of this motion the computations of the government's economist, Dr. Cragg." Reply at 3.

AIG's calculation does not, however, exclude the effects of the tax-exempt status of the lender's dividend. Because (until AIG-FP repurchased the shares) the lender bank was considered the parent of the SPV, the SPV's transfer of funds to the bank was tax-exempt (see p. 3 above). The lender bank shared this benefit with AIG-FP by giving AIG-FP a more favorable dividend rate. As Mauro Gabriele, then-chief executive of AIG affiliate Banque AIG testified regarding Vespucci (involving foreign lender BCI) and Laperouse (involving foreign lender Credit Agricole):

> Q: Fair enough. So to what extent did the fact that BCI was receiving a dividend tax-free impact the price that FP was going to pay?
>
> A: Which price? The price – what do you mean by price we were willing to pay?
>
> Q: The dividend.
>
> A: Well, again, that was the benefit in the transaction that allowed us to raise money at a very significant sub-LIBOR spread, because by BCI effectively receiving what were interest flows on a tax-free basis created value and that's what we were splitting between us, ourselves.
>
> Q: Splitting what, I'm sorry?
>
> A: That value that was being generated by the fact that they were getting tax-exempt income for what is normally taxable income, that was the value of the transaction.
>
> Q: So you would talk about this tax value presumably?
>
> A: Yes, definitely.
>
> Q: Okay. How would those discussions go in terms of how you determine how to split it up?

13

> A: Well, what we would say is, "Okay, you're going to get tax-exempt income. So if you keep all of the value, this is going to be the return for you in pre-tax equivalent terms." Pre-tax equivalent terms. "However, we want to get benefit in this transaction, we want to be borrowing at an attractive level so you're not going to get to keep all of that value, we're going to keep some of it." That is what the discussion was about.
>
> Q: All right. So how much of the benefit did you get?
>
> A: It varied from transaction to transaction.
>
> Q: Start with Laperouse.
>
> A: Laperouse, I actually don't remember the actual split, to be honest. I know that I think for us it was LIBOR minus certainly in excess of 100 basis points. I don't remember the actual number.
>
> Q: How about - sorry, I didn't mean to cut you off.
>
> A: I don't remember what Credit Agricole's equivalent return was. I don't know the split. In the case of Vespucci, I remember because it was one that I did myself, BCI's return was in excess of 'LIBOR plus 500' and for us the borrowing was in excess of 'LIBOR minus 300.'

Gabriele Dep. Tr. at 98-102, attached as Ex. 22 of Decl. of John D. Clopper.

His testimony corroborates Dr. Cragg's analysis that "AIG-FP's ability to 'borrow' at sub-market rates" was the result of "transaction terms which included AIG-FP paying the counterparties a tax-affected dividend rate." Cragg Decl. of Oct. 25, 2010 at ¶ 44. Dr. Cragg concludes that AIG-FP's cost of borrowing would have roughly equaled its return on the

14

investment income if the SPV's distribution had been taxable, "netting no gain" for AIG. Id. at ¶ 45.

For the purpose of this motion only, AIG does not contest Dr. Cragg's calculation. It asserts that as a matter of law, the tax-exempt status of the lender's dividend is not a tax effect to be isolated and removed from the transactions in order to determine the extent of their non-tax purpose and effect:

> The "solution," according to the Government, is to rewrite the terms of the transaction to "remov[e] the effect of taxes on the terms and structure of the transaction." The Government's expert, Dr. Cragg, is even more explicit. He says: "An economically correct profitability analysis absent taxes adjusts all the transaction terms and returns for the impact of baked-in tax benefits." The Government cites no case to support this entirely novel method of determining pre-tax profit, which would be based not on the actual terms of the transactions but instead on a fictionalized version where "all the transaction terms and returns" have been "adjusted" supposedly to remove the latent effects of taxes.
>
> This position incorrectly assumes that the point of the pre-tax profit analysis is to create a fictionalized "world without taxes." That is simply not correct.

2010 Reply at 26 (citations omitted) (alterations in original).

In other cases, removal of the tax impacts on a transaction might "fictionalize" it beyond useful analysis. But in this case, the SPV's distribution to the bank being tax-exempt was not a trivial or speculative factor: it shaped the transactions. AIG and its lenders considered the tax savings on the "dividend" to be "the benefit in the transaction" (Gabriele, p. 13 above), structured the transactions to get those savings,

and negotiated how to divide them. According to Dr. Cragg (and disregarding AIG's own contribution to the SPV) AIG-FP and AIG would have enjoyed no profit from the transactions if the SPV distributions had been taxable.

Accordingly, AIG's motion for summary judgment in its favor cannot be granted on this record.

## CONCLUSION

AIG's motion for partial summary judgment, Dkt. No. 109, is therefore denied.

So ordered.

Dated: New York, NY
       March 29, 2013

*/s/ Louis L. Stanton*
Louis L. Stanton
U.S.D.J.