MANDATE

FOR THE

SECOND CIRCUIT

N.Y.S.D. Case #
09-cv-1871(LLS)

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the
Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 9th
day of September, two thousand and fifteen.

Before:        José A. Cabranes,
               Reena Raggi,
               Denny Chin,
                      *Circuit Judge*s.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: March 14, 2016

Bank of New York Mellon Corporation, as
Successor in Interest to The Bank of New York Company, Inc.,

    Petitioner - Appellant - Cross - Appellee,

v.

Commissioner of Internal Revenue,

    Respondent - Appellee - Cross - Appellant.

**JUDGMENT**
Docket Nos. 14-704(L)
               14-1394(XAP)

American International Group, Inc.,

    Plaintiff - Appellant,

v.

United States of America,

    Defendant - Appellee.

Docket No. 14-765

The appeals and cross-appeal in the above captioned cases from a judgment of the United
States Tax Court and an opinion and order of the United States District Court for the Southern
District of New York were argued on the district court's record and the parties' briefs. Upon
consideration thereof,

    IT IS HEREBY ORDERED, ADJUDGED and DECREED that the decisions of the
district court and Tax Court are AFFIRMED.

A True Copy
Catherine O'Hagan Wolfe - Clerk
United States Court of Appeals, Second Circuit

For The Court:

Catherine O'Hagan Wolfe,
Clerk of Court

MANDATE ISSUED ON 03/08/2016

14-704-ag(L), 14-765-cv
*Bank of N.Y. Mellon v. Comm'r; Am. Int'l Grp., Inc. v. United States*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

————————————————

August Term 2014

(Argued:     May 18, 2015        Decided:     September 9, 2015)

Docket Nos. 14-704-ag(L), 14-1394-ag(XAP), 14-765-cv

————————————————

THE BANK OF NEW YORK MELLON CORPORATION, as Successor in Interest to
THE BANK OF NEW YORK COMPANY, INC.,

*Petitioner-Appellant-Cross-Appellee,*

v.

COMMISSIONER OF INTERNAL REVENUE,

*Respondent-Appellee-Cross-Appellant.*

————————————————

AMERICAN INTERNATIONAL GROUP, INC.,

*Plaintiff-Appellant,*

v.

UNITED STATES OF AMERICA,

*Defendant-Appellee.*

————————————————

ON APPEAL FROM THE UNITED STATES TAX COURT
AND THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

––––––––––––––––

Before:

CABRANES, RAGGI, and CHIN, *Circuit Judges*.

––––––––––––––––

Appeals and cross-appeal heard in tandem from a judgment of the United States Tax Court (Kroupa, *J.*) and an opinion and order of the United States District Court for the Southern District of New York (Stanton, *J.*) applying the "economic substance doctrine" to transactions involving foreign tax credits. The Tax Court considered the effect of foreign taxes in its pre-tax analysis and denied the claimed foreign tax credits as lacking economic substance, but allowed interest expense deductions for the loan associated with the transactions. The district court held that the economic substance doctrine applies to transactions involving foreign tax credits generally and that foreign taxes are to be included in calculating pre-tax profit.

AFFIRMED.

––––––––––––––––

SETH P. WAXMAN (Catherine M.A. Carroll, Weili J.
        Shaw, Jonathan A. Bressler, William J. Perlstein,
        Alan E. Schoenfeld, Roger M. Ritt, Richard W.
        Giuliani, *on the brief*), Wilmer Cutler Pickering
        Hale and Dorr LLP, Washington, DC, New York,
        New York, *and* Boston, Massachusetts, *for
        Petitioner-Appellant-Cross-Appellee Bank of New
        York Mellon Corporation.*

JUDITH A. HAGLEY, Tax Division, Department of Justice
        (Gilbert S. Rothenberg, Richard Farber, Tax
        Division, Department of Justice, *on the brief*), for
        Tamara W. Ashford, Acting Assistant Attorney
        General, Washington, DC, *for Respondent-Appellee-
        Cross-Appellant Commissioner of Internal Revenue.*

DAVID BOIES (Robin A. Henry, Edward J. Normand, *on
        the brief*), Boies, Schiller & Flexner LLP, Armonk,
        New York, *and* Thomas A. Cullinan, Jerome B.
        Libin, Daniel H. Schlueter, Sutherland Asbill &
        Brennan LLP, Atlanta, Georgia, *and* Washington,
        DC, *for Plaintiff-Appellant American International
        Group, Inc.*

JOSEPH N. CORDARO, Assistant United States Attorney
        (James Nicholas Boeving, Benjamin H. Torrance,
        Assistant United States Attorneys, *on the brief*), for
        Preet Bharara, United States Attorney for the
        Southern District of New York, New York, New
        York, *for Defendant-Appellee United States of
        America.*

Scott P. Martin, Geoffrey C. Weien, Gibson, Dunn &
        Crutcher LLP, Washington, DC, *and* Kate
        Comerford Todd, Steven P. Lehotsky, U.S.
        Chamber Litigation Center, Inc., Washington, DC,

*for Amicus Curiae United States Chamber of Commerce.*

Martin S. Kaufman, Larchmont, New York, *for Amicus Curiae Atlantic Legal Foundation.*

───────────────

CHIN, *Circuit Judge*:

These appeals and cross-appeal, heard in tandem, challenge an opinion and order of the United States District Court for the Southern District of New York (Stanton, *J.*) and a judgment of the United States Tax Court (Kroupa, *J.*) applying the "economic substance doctrine" to transactions involving foreign tax credits. In both cases, the taxpayers claim they are entitled to tax credits associated with foreign transactions that the government disallowed because it contends the transactions lacked economic substance.

In *American International Group., Inc. v. United States*, in which American International Group ("AIG") seeks a tax refund of $306.1 million, the district court held that: 1) the economic substance doctrine applies to the foreign tax credit regime; and 2) the pre-tax benefit that AIG gained from its "cross-border" transactions is to be calculated by taking into account foreign taxes. Accordingly, the district court denied AIG's motion for partial summary judgment. It certified the matter for interlocutory appeal.

In *Bank of New York Mellon Corp. v. Commissioner*, which involves alleged tax deficiencies of some $215 million, the Tax Court held a three-week bench trial on the economic substance of the Structured Trust Advantaged Repackaged Securities loan product ("STARS") purchased by Bank of New York Mellon ("BNY"). The Tax Court held: 1) the effect of foreign taxes is to be considered in the pre-tax analysis of economic substance; and 2) STARS lacked economic substance, and thus BNY could not claim foreign tax credits associated with STARS. The Tax Court further held that certain income from STARS was includible in BNY's taxable income and BNY was not entitled to deduct interest expenses associated with STARS, but reversed both rulings on reconsideration.

We hold that the economic substance doctrine applies to the foreign tax credit regime generally, and that both the district court and Tax Court properly determined the tax implications of the cross-border and STARS transactions. Accordingly, we affirm.

*STATEMENT OF THE CASE*

**A.** *The Foreign Tax Credit Regime*

Various provisions of the Internal Revenue Code (the "Code") seek "to mitigate the evil of double taxation." *Burnet v. Chi. Portrait Co.*, 285 U.S. 1, 7

(1932).  The Code taxes all income of U.S. taxpayers earned worldwide.  26 U.S.C. § 61(a).  Because this can result in double taxation of a U.S. taxpayer's income earned abroad -- by the country in which it was earned as well as the United States -- Congress crafted the "foreign tax credit" regime.

First established by the Revenue Act of 1918, the foreign tax credit regime was intended to facilitate business abroad and foreign trade.  *See* 56 Cong. Rec. app. 677 (1918) (statement of Rep. Kitchin) ("We would discourage men from going out after commerce and business in different countries . . . if we maintained this double taxation.").  Under the regime, when a U.S. taxpayer pays income tax to another country due to its business activities in that country, the taxpayer can claim a dollar-for-dollar credit against its U.S. tax liability for the foreign taxes paid.  26 U.S.C. §§ 901-909.  This "foreign tax credit" then mitigates double taxation by offsetting the taxpayer's U.S. taxable income and reducing its overall tax bill.  The foreign tax credit regime does not, however, require a taxpayer "to alter its form of doing business, its business conduct, or the form of any business transaction in order to reduce its liability under foreign law for tax." 26 C.F.R. § 1.901-2(e)(5)(i).

As relevant to the instant cases, the Code deems taxes paid by foreign subsidiaries to be paid by their U.S. parent companies. 26 U.S.C. §§ 902, 960. Thus, in a given tax year, a U.S. corporation can claim a "foreign tax credit" in the same amount as the foreign taxes paid by its foreign subsidiary, reducing its total U.S. taxable income.

"Entitlement to foreign tax credits[, however,] is predicated on a valid transaction." 12 Mertens Law of Federal Income Taxation § 45D:62. To be "valid" and not just a "sham," a transaction must involve more than just tax benefits: it must have independent economic substance. *See DeMartino v. Comm'r*, 862 F.2d 400, 406 (2d Cir. 1988) ("A transaction is a sham if it is fictitious or if it has no business purpose or economic effect other than the creation of tax deductions."). Accordingly, as we discuss below, a court can hold that a taxpayer is not entitled to certain deductions or other tax benefits where it finds that the underlying transaction lacks "economic substance" beyond its tax benefits.

**B.**    *American International Group, Inc. v. United States*

**1.**    *The Facts*

As AIG acknowledges, the facts relevant to this appeal are largely undisputed.[1]  To the extent that there is dispute, we construe the facts in the light most favorable to the non-moving party, the government:

Between 1993 and 1997, AIG entered into six cross-border transactions with foreign financial institutions through its subsidiary, AIG Financial Products ("AIG-FP").[2]  Through these transactions, AIG-FP borrowed funds at economically favorable rates below LIBOR and invested the funds at rates above LIBOR, ostensibly to make a profit.[3]

---

[1]    The government never moved for summary judgment below and contends on appeal that a trial is necessary because genuine issues of material fact exist with respect to whether the cross-border transactions have economic substance.

[2]    The names of the disputed transactions and their dates and counterparties are: "Laperouse," entered September 30, 1993 with Credit Agricole; "Vespucci," entered December 18, 1995 with Banca Commerciale Italiana; "NZ Issuer" or "New Zealand," entered December 11-19, 1996 with Bank of New Zealand; "Maitengrove," entered February 28, 1997 with Bank of Ireland; "Lumagrove," entered August 27, 1997 with Bank of Ireland; and "Palmgrove," entered October 20, 1997 with Irish Permanent.

[3]    LIBOR stands for "London Interbank Offered Rate" and is the benchmark rate that many banks charge each other for short-term loans.  *See Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 229, 230 n.2 (2d Cir. 2014).

Each cross-border transaction operated as follows. First, AIG-FP created and funded a foreign affiliate -- a special purpose vehicle ("SPV") -- to hold and invest funds in a foreign country. Next, AIG-FP sold the SPV's preferred shares to a foreign lender bank and committed to repurchase the preferred shares on a specific future date at the original sale price. The SPV's capital was thus primarily comprised of the funds the foreign bank paid for the preferred stock, as well as a smaller contribution from AIG. The SPV then used this capital to purchase investments, earning income for which the SPV paid taxes to the relevant foreign authority. The SPV then paid most of the net proceeds of this investment income to the foreign bank as dividends.

For U.S. tax purposes, AIG claimed that it owned all of the shares of the SPV and thus treated the foreign bank's funds for the purchase of the preferred shares as a loan. AIG then deducted the dividends paid by the SPV to the foreign banks as interest expense. AIG also claimed foreign tax credits for the full amount of the foreign taxes paid by each SPV on the pre-dividend investment income. Accordingly, on its 1997 U.S. tax return, AIG reported total gross income from the cross-border transactions of $128.2 million from which it deducted $71.9 million in interest expenses, for a net taxable income of $56.3

million. Based on the corporate tax rate of 35%, AIG owed $19.7 million in taxes on the cross-border transactions. But AIG also claimed $48.2 million in foreign tax credits for the foreign taxes paid by the SPVs on total income, which it then used to offset U.S. tax not only on its $19.7 million U.S. tax obligation for the cross-border transaction, but also on some $28.5 million in unrelated income.

At the same time, each foreign bank reported to the relevant foreign revenue authority that it owned the preferred stock as an equity investment in the SPV. As a result, for foreign tax purposes, the SPV was treated as the foreign bank's corporate subsidiary. Accordingly, instead of treating the SPV's distribution to the foreign bank as taxable interest on a loan to AIG, the foreign bank claimed the payments as tax-exempt dividends on which it paid little, if any, tax. Instead, the SPV paid tax on the SPV's income to the relevant foreign authorities. The foreign bank then shared these tax benefits with AIG-FP by accepting a lower dividend rate than it would have otherwise demanded if its investment income were taxable

This arrangement effectively reduced AIG's total tax bill. It also allowed the foreign banks to limit their tax liability, inducing them to accept lower return rates from AIG. Thus, AIG effectively converted certain interest

expenses it otherwise would have paid to the foreign banks into foreign tax

payments for which it claimed foreign tax credits that it could use in turn to

offset unrelated income and reduce its total U.S. tax bill.

AIG claims that the cross-border transactions had economic

substance because they were expected to generate a pre-tax profit of at least

$168.8 million for AIG over the life of the transactions.  To reach this number,

AIG calculated pre-tax profit by taking the SPV's investment income and

subtracting only AIG's operating expenses and obligations to the foreign banks.

Thus, in calculating pre-tax profit, AIG ignored: 1) the foreign tax paid by the

SPV; 2) the U.S. tax paid by AIG on the SPV's investment income; and 3) the

value of the foreign tax credits claimed by AIG.

2.    *Proceedings Below*

On March 20, 2008, the Internal Revenue Service (the "IRS") sent AIG

a Statutory Notice of Deficiency for its 1997-1999 taxes.  For the 1997 taxable year,

the notice claimed an additional income tax of $110.2 million, and interest,

penalties, or additions to tax of $12.6 million.  Among other penalties and

assessments, the IRS disallowed the $48.2 million in foreign tax credits AIG

claimed in 1997.  On July 8, 2008, the IRS assessed the additional amounts, which

AIG paid on August 1, 2008.  On August 25, 2008, AIG filed a claim for refund

for the amounts paid, claiming they were erroneously assessed by the IRS.  On

February 27, 2009, because the IRS had not rendered a decision on its refund

claim, AIG filed a complaint in the district court seeking a refund of $306.1

million in federal income taxes assessed by the IRS and paid by AIG for its 1997

taxable year.

   On July 30, 2010, AIG moved for partial summary judgment,

arguing that it was entitled, as a matter of law, to foreign tax credits for the

income taxes paid to other countries by its subsidiaries.  AIG argued that: 1) the

economic substance doctrine does not apply to the foreign tax credit regime; and

2) even if the doctrine does apply, the relevant transactions had economic

substance because they resulted in $168.8 million in pre-tax profit.  On March 29,

2011, the district court denied AIG's motion without prejudice, concluding that

the government had demonstrated the need for more discovery.  After the close

of fact discovery but before the start of expert discovery, AIG renewed its motion

for partial summary judgment on August 1, 2012, limited to the six cross-border

transactions.

On March 29, 2013, the district court issued an opinion and order denying AIG's renewed motion for partial summary judgment. The district court held that: 1) the economic substance doctrine applies to the foreign tax credit regime because Congress intended foreign tax credits to facilitate only "purposive" business transactions; and 2) foreign taxes are to be included as a cost in the calculation of pre-tax benefit from the cross-border transactions. Accordingly, the district court denied AIG's motion for partial summary judgment. *Am. Int'l Grp., Inc. v. United States*, No. 09 Civ. 1871(LLS), 2013 WL 1286193 (S.D.N.Y. Mar. 29, 2013).

On November 5, 2013, the district court certified its March 29, 2013 opinion and order for interlocutory appeal under 28 U.S.C. § 1292(b). On November 15, 2013, AIG timely filed a petition in this Court for permission to appeal under Federal Rule of Appellate Procedure 5(a)(2). On March 19, 2014, we granted the petition, and this appeal followed.

C.    *Bank of New York Mellon v. Commissioner*

1.    *The Facts*

We accept the facts as found by the Tax Court at trial unless clearly erroneous.  *See Banker v. Nighswander, Martin & Mitchell*, 37 F.3d 866, 870 (2d Cir. 1994).

In 2001, Barclays Bank, PLC -- a global financial services company headquartered in London, United Kingdom -- and KPMG -- an audit, tax, and advisory firm -- started promoting a loan product they called "Structured Trust Advantaged Repackaged Securities" or "STARS" to U.S. banks.  In marketing STARS to U.S. banks, KPMG explained that a U.K. counterparty -- here Barclays -- would offer a "below market loan," the low cost of which would be achieved through the "sharing" of certain U.K. and U.S. tax benefits generated by the creation of a trust subject to U.K. taxation.  BNY entered into STARS transactions with Barclays in November 2001, and the transactions continued until 2006.

We assume familiarity with the Tax Court's opinion below, which describes the structure of STARS in detail.  The basic operation of the STARS transactions can be summarized as follows.  First, BNY created a Delaware trust

to which it contributed $7.8 billion in income-producing assets.  In exchange for this contribution, BNY received nominal shares in the trust (class A and B units). BNY agreed to install a U.K. resident as the trustee, so the trust's income would be subject to U.K. taxation.  BNY then paid tax on the trust to the United Kingdom, and, in exchange, Barclays agreed to pay BNY a monthly amount equal to half of the U.K. taxes BNY expected to pay on the trust's income -- the so-called "tax-spread."

Next, Barclays purchased shares in the trust (class C and D units) for $1.5 billion, effectively making a loan in that amount to BNY for the duration of STARS through the trust structure.  BNY agreed to repay the loan by purchasing Barclay's trust units for approximately $1.5 billion at the end of five years.  The monthly interest rate on the loan was equal to one-month LIBOR plus 30 basis points, minus the aforementioned monthly tax-spread.  Under this structure, Barclays made total net monthly payments to BNY of $82.6 million over the life of STARS.

Throughout the five-year duration of the STARS transactions, the trust made monthly distributions of income via a circular, multi-step process. First, BNY distributed funds from its income-earning assets to the trust, and the

trust set aside 22% of its income to pay U.K. taxes.  With most of the remaining income,[4] the trust made monthly class C unit distributions to a Barclays account that was "blocked," meaning Barclays could not access the funds or control the account.  Barclays immediately returned these distributions to the trust each month, and the trust then distributed the funds to BNY, beginning the cycle again.

The resulting tax benefits to both BNY and Barclays from STARS can be illustrated by tracing a hypothetical $100 of trust income through the distribution cycle (ignoring fees and the smaller class A, B, and D distributions).  *See* BNY Appellant's Br. at 14-15; *Salem Fin., Inc. v. United States*, 786 F.3d 932, 938 (Fed. Cir. 2015) (employing similar hypothetical in reviewing STARS transaction).  Under U.K. tax law, Barclays -- as owner of the class C units -- was deemed the owner of almost all of the trust income and taxed at the 30% U.K. corporate tax rate, obligating it to pay $30 in tax for every $100 of trust income ($100 x 30%).  Barclays would reduce this tax bill, however, by claiming a credit for the 22% U.K. tax on the trust, which was paid by BNY.  Barclays' tax liability

---

[4]     Small quantities of the trust income were paid to BNY on the class A units (1% of trust income) and B units, to Barclays on the class D units, and towards other expenses.

for the trust income was thus only $8 ($30 - $22). BNY, in turn, would claim a foreign tax credit in the United States for the full $22 it had paid in U.K. taxes on the trust's income.

The income distribution scheme compounded the tax benefits to both parties. Each month, for every $100 of trust income, the trust would set aside $22 to pay U.K. taxes, with $78 remaining for distribution. Because the $78 was first transferred to Barclays' blocked account and then back to the trust, Barclays could treat the re-contributed $78 as a trading loss and claim a trading loss deduction under U.K. tax law. At the 30% corporate tax rate, the deduction translated to a $23.40 reduction in Barclays' U.K. taxes ($78 x 30%). The deduction more than offset Barclay's $8 tax bill from the trust, resulting in a net tax benefit to Barclays of $15.40 ($23.40 - $8). Finally, Barclays would pay the $11 tax-spread to BNY -- half the trust's U.K. tax bill of $22. Because Barclays would deduct the cost of the tax-spread from its U.K. corporate taxes, it gained an additional $3.30 in tax benefit ($11 x 30%). In the end, this left Barclays with $7.70 in total tax benefit for each $100 of trust income ($15.40 minus the tax-spread payment of $11, plus the tax-spread deduction of $3.30).

BNY also enjoyed a net tax benefit. While it paid $22 in U.K. taxes, it was effectively reimbursed half this amount upon receipt of the $11 tax-spread from Barclays. Neverthless, it claimed the full $22 as a foreign tax credit in the United States, for a total net gain of $11.

Meanwhile the United Kingdom and United States collected little to no tax revenue on STARS. For each $100 of trust income, the United Kingdom only collected $3.30 in net taxes ($22 in tax paid by BNY minus $18.70 ($15.40 + $3.30) in tax benefits to Barclays). The United States collected no taxes from STARS. Yet, for the tax years 2001 and 2002, BNY claimed foreign tax credits of $198.9 million and interest expense deductions of $7.6 million that offset its unrelated income and reduced its overall U.S. tax bill for these years.

**2.** *Proceedings Below*

On August 14, 2009, the IRS issued a Statutory Notice of Deficiency to BNY of $100.5 million for its 2001 taxes and $115 million for its 2002 taxes, disallowing foreign tax credits and interest expense deductions it had claimed for those years. On November 10, 2009, BNY petitioned the Tax Court for a re-determination of deficiencies. BNY did not contest that the economic substance

doctrine applied to STARS but argued that STARS had economic substance, and that therefore it was entitled to the claimed credits and deductions.

The Tax Court held a three-week bench trial, and on February 11, 2013, issued an opinion holding that the STARS transactions were to be disregarded for U.S. tax purposes. *Bank of N.Y. Mellon Corp. v. Comm'r*, 140 T.C. 15 (2013). The court bifurcated its analysis of the STARS trust structure and the $1.5 billion loan and found, in relevant part: 1) foreign taxes but neither loan proceeds nor the tax-spread should be considered in the pre-tax analysis of economic substance; 2) the STARS trust transaction lacked economic substance, as BNY had no purpose in entering the transaction except tax avoidance; 3) the tax-spread should be included in BNY's taxable income rather than considered a component of loan interest, as it served as a device to monetize anticipated foreign tax credits; and 4) all expenses incurred from the STARS transactions, including interest expenses from the $1.5 billion loan, were not deductible.

On March 12, 2013, BNY moved for reconsideration of the Tax Court's rulings with respect to the tax-spread as taxable income and interest expense deductions. On September 23, 2013, the Tax Court issued a supplemental opinion granting BNY's petition on these issues and held that 1)

- 19 -

the tax-spread was not includible in BNY's income because it was part of the trust transaction that was disregarded for tax purposes for lacking economic substance; and 2) BNY was entitled to interest expense deductions because the $1.5 billion loan, bifurcated from the STARS trust transaction, had independent economic substance.

The Tax Court entered judgment on February 20, 2014. BNY appealed, and the IRS cross-appealed the Tax Court's interest expense deduction ruling on the $1.5 billion loan.

## DISCUSSION

"The general characterization of a transaction for tax purposes is a question of law subject to review." *Frank Lyon Co. v. United States*, 435 U.S. 561, 581 n.16 (1978). We thus review the lower court's characterization of a transaction *de novo*, and where the lower court has made underlying factual findings, we review those findings for clear error. *See Jacobson v. Comm'r*, 915 F.2d 832, 837 (2d Cir. 1990); *Newman v. Comm'r*, 902 F.2d 159, 162 (2d Cir. 1990).

We review a district court's denial of a motion (or partial motion) for summary judgment *de novo*. *Doninger v. Niehoff*, 642 F.3d 334, 344 (2d Cir. 2011). "Summary judgment is proper only when, construing the evidence in the light

most favorable to the non-movant, there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* (internal quotation marks omitted).

We address (a) the applicability of the economic substance doctrine to the foreign tax credit regime generally; (b) the economic substance of the transactions at issue in the instant cases; and (c) the deductibility of the interest expenses BNY paid on the $1.5 billion loan from Barclays.

**A.**  *Applicability of the Economic Substance Doctrine to the Foreign Tax Credit Regime*

The "economic substance" doctrine is a common law rule that allows courts to question the validity of a transaction and deny taxpayers benefits to which they are technically entitled under the Code if the transaction at issue lacks "economic substance." *See Gregory v. Helvering*, 293 U.S. 465, 468-70 (1935). The doctrine applies to "sham" transactions that "can not with reason be said to have purpose, substance, or utility apart from their anticipated tax consequences." *Goldstein v. Comm'r*, 364 F.2d 734, 740 (2d Cir. 1966).

AIG argues that the economic substance doctrine cannot be applied to disallow foreign tax credits that comply with all statutory and regulatory

requirements.[5]  AIG contends that because the congressional purpose of foreign

tax credits -- to prevent double taxation -- is clear, a court should never be able to

question a taxpayer's use of the credits under the economic substance doctrine.

*See* AIG Appellant's Br. at 23-30; *cf. Estelle Morris Trs. v. Comm'r*, 51 T.C. 20, 43

(1968) (emphasizing need to limit doctrines like economic substance to

"situations which they were intended to cover").

  We disagree.  First, the Supreme Court has long held that "substance

rather than form determines tax consequences."  *Raymond v. United States*, 355

F.3d 107, 108 (2d Cir. 2004) (quoting *Cottage Sav. Ass'n v. Comm'r*, 499 U.S. 554,

570 (1991) (Blackmun, *J.*, dissenting)) (internal quotation marks omitted); *see*

*Comm'r v. Court Holding Co.*, 324 U.S. 331, 334 (1945).  As we have recognized, the

economic substance doctrine stems from the concern that "even if a transaction's

form matches the dictionary definitions of each term used in the statutory

definition of the tax provision, it does not follow that Congress meant to cover

such a transaction and allow it a tax benefit."  *Altria Grp., Inc. v. United States*, 658

F.3d 276, 284 (2d Cir. 2011) (internal quotation marks omitted).

---

[5]  BNY did not raise this argument in the tax court and does not develop it
on appeal.  To the extent BNY contests the doctrine's general applicability to foreign
tax credits, we reject the argument for the same reasons we reject AIG's argument.

Second, AIG misconstrues the purpose behind the economic substance doctrine. The economic substance doctrine exists to provide courts a "second look" to ensure that particular uses of tax benefits comply with Congress's purpose in creating that benefit. *See Gregory*, 293 U.S. at 469 (observing that, to assess economic substance, a court must look to the purpose of the statute to determine "whether what was done . . . was the thing which the statute intended"). It is entirely appropriate for a court to ask, therefore, whether a taxpayer's claim to foreign tax credits is tied to true "business abroad" resulting in actual out-of-pocket tax payments, or whether its claim to a tax credit derives from sham transactions devoid of a business purpose beyond exploiting differences among foreign tax codes. We have repeatedly acknowledged the applicability of the economic substance doctrine to various "sham" transactions. *See, e.g., Jacobson*, 915 F.2d at 837-38; *DeMartino v. Comm'r*, 862 F.2d 400, 406-07 (2d Cir. 1988); *Diggs v. Comm'r*, 281 F.2d 326, 329-30 (2d Cir. 1960). Further, under *Gregory*, "a taxpayer carr[ies] an unusually heavy burden" in seeking to show that anti-abuse doctrines like economic substance do not apply to the situation at hand. *Diggs*, 281 F.2d at 330.

Third, we find no support for the contention that foreign tax credits, by their nature, are not reviewable for economic substance. Congress's intent in creating foreign tax credits was to prevent double taxation of taxpayers conducting *business* in the United States and abroad. H.R. Rep. 83-1337, at 4103 (1954) ("The provision was originally designed to produce uniformity of tax burden among United States taxpayers, irrespective of whether they were engaged in business in the United States or engaged in business abroad."). The legislative history thus focuses on taxpayers engaged in foreign business. Nothing in the history suggests that foreign tax credits are entitled to special immunity from scrutiny under the general economic substance doctrine, which allows a court to ask if a transaction really is "business" within the meaning of the Code. As we have emphasized, the foreign tax credit is designed only for the taxpayer who "desires to engage in *purposive* activity," not sham transactions built solely around tax arbitrage. *See Goldstein*, 364 F.2d at 741 (emphasis added).

Fourth, recent amendments to the Code and its regulations -- while not applicable to the instant cases, which predate these changes -- support our interpretation of Congress's intent regarding economic substance. In 2010, Congress codified the economic substance doctrine into the Code, recognizing

that "[a] strictly rule-based tax system cannot efficiently prescribe the appropriate outcome of every conceivable transaction that might be devised and is, as a result, incapable of preventing all unintended consequences."  H.R. Rep. 111-443, pt. 1, at 295 (2010).  This provision codified the two-part economic substance test used in many Circuits, including ours, and affirmed decades of judge-made law from around the country on economic substance.  It did not create categorical exceptions to the doctrine, for foreign tax credits or otherwise.

Further, the Treasury Department issued new regulations (proposed in 2007, finalized in 2011) disallowing foreign tax credits associated with STARS and other similarly convoluted transactions designed to take advantage of foreign tax credits.  Because the regulations are not retroactive, their preamble addressed the problem of already existing STARS: "For periods prior to the effective date of final regulations, the IRS will continue to utilize all available tools under current law to challenge the U.S. tax results claimed in connection with such arrangements, including . . . the economic substance doctrine . . . ."  Determining the Amount of Taxes Paid for Purposes of Section 901, 72 Fed. Reg. 15,081, 15,084 (Mar. 30, 2007).  These amendments reflect both Congress's

recognition of the economic substance doctrine generally and its concern for potential abuse of foreign tax credits.

We thus hold that the economic substance doctrine can, as a general matter, be applied to disallow foreign tax credits.

**B.     *Economic Substance Analysis***

We turn to the transactions at issue in AIG and BNY and evaluate them under our Circuit's test for economic substance.

**1.     *Applicable Law***

In determining whether a transaction lacks "economic substance," we consider: 1) whether the taxpayer had an objectively reasonable expectation of profit, apart from tax benefits, from the transaction; and 2) whether the taxpayer had a subjective non-tax business purpose in entering the transaction. *See Gilman v. Comm'r*, 933 F.2d 143, 147-48 (2d Cir. 1991).  In our Circuit the test is not a rigid two-step process with discrete prongs; rather, we employ a "flexible" analysis where both prongs are factors to consider in the overall inquiry into a transaction's practical economic effects.  *See id.* at 148; *Altria Grp., Inc. v. United States*, 694 F. Supp. 2d 259, 282 (S.D.N.Y. 2010), *aff'd*, 658 F.3d 276; *Long Term Capital Holdings v. United States*, 330 F. Supp. 2d 122, 171 (D. Conn. 2004), *aff'd*,

150 F. App'x 40 (2d Cir. 2005) (summary order).[6] "[A] finding of either a lack of a business purpose other than tax avoidance or an absence of economic substance beyond the creation of tax benefits can be but is not necessarily sufficient to conclude the transaction a sham." *Long Term Capital Holdings*, 330 F. Supp. 2d at 171.[7]

The preliminary step of the economic substance inquiry is to identify the transaction to be analyzed. Even if the transaction at issue is part of a larger series of steps, "[t]he relevant inquiry is whether the transaction that generated the claimed deductions . . . had economic substance." *Nicole Rose Corp. v. Comm'r*, 320 F.3d 282, 284 (2d Cir. 2003); *see Long Term Capital Holdings*, 330 F.

---

[6]     It has been suggested that there is some confusion in our Circuit regarding whether our test for economic substance is a "flexible" two-part inquiry where neither factor is dispositive, or whether a taxpayer can show either an objective economic effect *or* a subjective business purpose to demonstrate economic substance. *See TIFD III-E Inc. v. United States*, 342 F. Supp. 2d 94, 108-09 (D. Conn. 2004), *rev'd on other grounds*, 459 F.3d 220 (2d Cir. 2006) (highlighting "ambiguity" that "decisions in this circuit are not perfectly explicit on the subject," but declining to decide which test applies). We have, however, consistently applied the flexible approach. *See Gilman*, 933 F.2d at 148.

[7]     Congress codified the economic substance doctrine in 2010, explicitly adopting a version of the two-part test: "In the case of any transaction to which the economic substance doctrine is relevant, such transaction shall be treated as having economic substance only if -- (A) the transaction changes in a meaningful way (apart from Federal income tax effects) the taxpayer's economic position, and (B) the taxpayer has a substantial purpose (apart from Federal income tax effects) for entering into such transaction." 26 U.S.C. § 7701(o)(1). Because the provision is not retroactive, the Code's test does not apply in these cases.

Supp. 2d at 183 (holding that a taxpayer "cannot avoid the requirements of economic substance simply by coupling a routine economic transaction generating substantial profits and with no inherent tax benefits to a unique transaction that otherwise has no hope of turning a profit").

After isolating the relevant transaction, we begin our analysis of economic substance by determining the objective economic substance of the transaction at issue. We then look to the taxpayer's subjective business purpose in entering the transaction. Finally, we consider both the objective and subjective analysis to make a final determination of economic substance. *See Gilman*, 933 F.2d at 148.

a. *Objective Economic Substance*

The focus of the objective inquiry is whether the transaction "offers a reasonable opportunity for economic profit, that is, profit exclusive of tax benefits." *Gilman*, 933 F.2d at 146 (internal quotation marks omitted). As relevant here, our Circuit has yet to determine how profit should be calculated when a transaction involves foreign tax credits. The question is whether, for purposes of the economic substance doctrine, foreign taxes should be treated as costs when calculating pre-tax profit. If the answer is yes, then a transaction will

be less likely to appear profitable under the objective prong of the economic

substance test.

Other Circuits have taken disparate approaches. In *Salem Financial,*

*Inc. v. United States*, a case involving the same STARS transactions at issue in

*BNY*, the Federal Circuit concluded that foreign taxes are economic costs that are

properly deducted in assessing profitability for the purposes of economic

substance. There, as with BNY here, the court determined that for every $100 of

trust income, the bank incurred $22 of foreign tax expense and only $11 in

income from the tax-spread, for an $11 net loss. 786 F.3d at 946-49. The court

also excluded foreign tax credits from the profit calculation, observing that "[o]ur

precedent, like that of several other courts, supports the government's approach,

i.e., to assess a transaction's economic reality, and in particular its profit

potential, independent of the expected tax benefits." *Id.* at 948. Because the

Federal Circuit included foreign tax costs -- but excluded any foreign tax benefits

-- in its calculation of pre-tax profit, the court concluded that the trust transaction

in STARS was "profitless." *Id.* at 949.

The Federal Circuit held, however, that this lack of post-foreign-tax

profit did not conclusively establish that a transaction lacks objective economic

substance.  *Id.* at 950.  The Court ultimately held that STARS lacked objective

economic substance, based on both the lack of post-foreign-tax profit and on the

circular cash flows through the trust whose only purpose was generating tax

benefits.  *Id.* at 950-51.[8]  Indeed, the court recognized that, as a result, the U.S.

taxpayer was reimbursed for half the U.K. tax it had paid by a U.K. STARS

counterparty who could claim foreign tax benefits that significantly reduced the

net revenues realized by the U.K. from STARS.  *See id.*  Thus, the scheme was not

objectively profitable and there was no real risk of *double* taxation, the purpose

for which U.S. law afforded a foreign tax credit.

        In factually different contexts, the Fifth and Eighth Circuits have

taken a different approach to assessing objective economic substance, holding

that foreign taxes are not economic costs and should not be deducted from pre-

tax profit.  *Compaq Comput. Corp. & Subsidiaries v. Comm'r*, 277 F.3d 778 (5th Cir.

2001), *rev'g*, 113 T.C. 214 (1999); *IES Indus., Inc. v. United States*, 253 F.3d 350 (8th

Cir. 2001), *rev'g*, No. C97-206, 1999 WL 973538 (N.D. Iowa Sept. 22, 1999).  In both

---

[8]        Barclays entered into STARS transactions with six U.S. banks, and two
other cases addressing the economic substance of STARS are pending.  *Santander
Holdings USA, Inc. v. United States*, 977 F. Supp. 2d 46, 53 (D. Mass. 2013) (holding that
STARS had economic substance) (other claims still pending, including the government's
alternative arguments for disallowing the tax benefits of STARS); *Wells Fargo & Co. v.
United States*, No. 09-cv-2764 (D. Minn.) (currently conducting pre-trial motions).

cases, taxpayers purchased publicly traded foreign securities known as American Depository Receipts ("ADRs") at market prices immediately before the securities were to pay out dividends. Because the securities dividends were subject to a 15% foreign tax, they were priced at the market price plus 85% of the expected dividend. The taxpayer/buyer received 85% of the dividend and quickly resold the securities for market price back to the seller, sustaining a "loss" because the post-dividend market price of the securities was lower than the original purchase price. The taxpayer then claimed capital loss deductions in the United States, as well as foreign tax credits for the 15% foreign tax paid on the dividend. *See Compaq*, 277 F.3d at 779-80; *IES*, 253 F.3d at 352.

In analyzing the profitability of these transactions, both the *Compaq* and *IES* courts declined to consider the foreign taxes paid and foreign tax credits claimed in their economic substance analysis. Rather, the courts calculated profitability based on the gross dividend, before foreign taxes were paid. *Compaq*, 277 F.3d at 785; *IES*, 253 F.3d at 353-54. Accordingly, the Eighth Circuit awarded IES summary judgment on its tax refund claim because the ADR transactions did not lack economic substance or a business purpose as a matter of law. 253 F.3d at 356. The Fifth Circuit in *Compaq* reversed the Tax Court below,

holding that it erred in ignoring Compaq's pre-tax profit on the ADRs. 277 F.3d
at 784.

The court in *Compaq* also faulted the Tax Court below for including
foreign taxes paid but not foreign tax credits claimed in its calculation of pre-tax
profit. "To be consistent, the analysis should either count all tax law effects or
not count any of them. To count them only when they subtract from cash flow is
to stack the deck against finding the transaction profitable." *Compaq*, 277 F.3d at
785; *see also IES*, 253 F.3d at 354.

The Tax Court in *BNY* acknowledged that its holding was
inconsistent with *Compaq* and *IES* but noted that it was not bound by either
decision. Emphasizing that neither the Supreme Court nor our Circuit had yet
addressed the issue, the Tax Court considered the effect of foreign taxes in its
objective economic substance analysis:

> Economically, foreign taxes are the same as any other
> transaction cost. And we cannot find any conclusive reason for
> treating them differently here, especially because substantially
> all of the foreign taxes giving rise to the foreign tax credits
> stemmed from economically meaningless activity, i.e., the pre-
> arranged circular cashflows engaged in by the trust.
>
> Additionally, excluding the economic effect of foreign
> taxes from the pre-tax analysis would fundamentally
> undermine the point of the economic substance inquiry. That

> point is to remove the challenged tax benefit and evaluate
> whether the relevant transaction makes economic sense.

140 T.C. at 35 n.9.  Similarly, the Federal Circuit in *Salem*, decided after the Tax

Court's decision in *BNY*, disagreed with the reasoning in *Compaq* and *IES*.  The

court in *Salem* concluded that the Tax Court's method of calculation reflects the

core principles of the economic substance doctrine:

> The critical question is not whether the transaction would
> produce a net gain after all tax effects are taken into
> consideration; instead, the pertinent questions are whether the
> transaction has real economic effects apart from its tax effects,
> whether the transaction was motivated only by tax
> considerations, and whether the transaction is the sort that
> Congress intended to be the beneficiary of the foreign tax
> credit provision.

786 F.3d at 948.  The court also emphasized that profit for purposes of "economic

substance" must be analyzed within the context of the tax implications: "Even if

there is some prospect of profit, that is not enough to give a transaction economic

substance if the prospect of a non-tax return is grossly disproportionate to the tax

benefits that are expected to flow from the transaction."  *Id.* at 949.

We agree with the Tax Court in *BNY* and the Federal Circuit in

*Salem*.  The purpose of calculating pre-tax profit in this context is not to perform

mere financial accounting, subtracting costs from revenue on a spreadsheet: It is

to discern, as a matter of law, whether a transaction meaningfully alters a taxpayer's economic position other than with respect to tax consequences. The motivation behind the economic substance inquiry "is to ensure that tax benefits are available only if 'there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached.'" *Id.* (quoting *Frank Lyon*, 435 U.S. at 583-84). The doctrine was born out of necessity, as "[e]ven the smartest drafters of legislation and regulation cannot be expected to anticipate every [tax avoidance] device." *ASA Investerings P'ship v. Comm'r*, 201 F.3d 505, 513 (D.C. Cir. 2000). It is therefore appropriate for a court, when assessing the objective economic substance of a transaction, to include the foreign taxes paid but to exclude the foreign tax credits claimed in calculating pre-tax profit.

We are mindful, as was the district court in certifying the *AIG* case for interlocutory appeal, *Am. Int'l Grp., Inc. v. United States*, No. 09 Civ. 1871(LLS), 2013 WL 7121184, at *3 (S.D.N.Y. Nov. 5, 2013), that some commentators have criticized this approach, accusing courts of blindly "buying into" the government's "smoke and mirrors" argument or "contorting" the

economic substance doctrine "beyond any recognizable bounds."[9]  Including

foreign taxes in calculating pre-tax profit is inappropriate, they argue, because

the transactions are motivated by foreign tax benefits to foreign lenders, not by

U.S. tax benefits for U.S. borrowers.  Further, they contend, this method of

calculation "fictionalizes" the transactions, including the costs of the transactions

but not the corresponding income.

We find these arguments unpersuasive.  The purpose of the foreign

tax credit is to facilitate global commerce by making the IRS indifferent as to

whether a business transaction occurs in this country or in another, not to

facilitate international tax arbitrage.  The transactions in both *AIG* and *BNY* were

structured to benefit foreign lenders but they were *also* structured to benefit U.S.

borrowers.  Indeed, in *BNY*, Barclays paid the tax-spread to BNY to share the

U.K. tax benefits of STARS between the parties at the same time that BNY sought

a foreign tax credit in an amount greater than that which -- after payment of the

tax-spread -- it was actually out of pocket.  In both cases, funds were treated as a

---

[9]       *See* Kevin Dolan, *The Foreign Tax Credit Diaries -- Litigation Run Amok*, 71
Tax Notes Int'l 831, 833-34, 836 (2013); Richard M. Lipton, *BNY & AIG -- Using Economic
Substance to Attack Transactions the Courts Do Not Like*, 119 J. Tax 40, 46 (2013); Jason Yen
& Patrick Sigmon, *District Court's "AIG" Ruling Expands Application of Economic
Substance Doctrine in Unexpected Ways for Transactions Generating Excess Foreign Tax
Credits*, Daily Tax Rep., May 2, 2013.  *But see* Michael S. Knoll, Compaq *Redux: Implicit
Taxes and the Question of Pre-Tax Profit*, 26 Va. Tax Rev. 821 (2007).

"loan" for U.S. tax purposes but as equity for foreign tax purposes solely to minimize tax in both countries. Hence, the transactions themselves "fictionalize" the concept of international trade. In *BNY*, for example, funds contributed to a U.S. trust that never left the United States were nonetheless subjected to U.K. taxation because BNY installed a nominal U.K. trustee. Further, the trust distributions were briefly transferred to a Barclays blocked account, then immediately transferred back to the trust simply to trigger certain tax consequences. Similarly, in *AIG*, the SPVs had no real employees or business purpose of their own beyond creating tax benefits for the both the lender and borrower.

While the transactions are certainly "real" insofar as real money changed hands, they are most appropriately characterized as "shams" under the economic substance doctrine, taken to avoid taxes. As discussed in more detail below, the trust transaction in *BNY* had little to no potential for economic return apart from the tax benefits. And when the record in *AIG* is viewed most favorably to the government, a reasonable factfinder could reach the same conclusion as to the cross-border transactions. Accordingly, we hold that foreign

taxes are economic costs for purposes of the economic substance doctrine and thus should be deducted from profit *before* calculating pre-tax profit.

The objective economic substance inquiry, however, does not end at profit, as a legitimate transaction could conceivably lack economic profit. *See Salem*, 786 F.3d at 950 ("Transactions involving nascent technologies, for instance, often do not turn a profit in the early years unless tax benefits are accounted for. To brand such transactions as a sham simply because they are unprofitable before tax benefits are taken into account would be contrary to the clear intent of Congress." (citing *Sacks v. Comm'r*, 69 F.3d 982, 990-92 (9th Cir.1995))). The Supreme Court has indeed cautioned: "There is no simple device available to peel away the form of [a] transaction and to reveal its substance." *Frank Lyon*, 435 U.S. at 576. A court should also look to the overall economic effect of the transaction in determining objective economic substance. In conducting this inquiry, we agree with the Tax Court that "[e]conomic benefits that would result independent of a transaction do not constitute a non-tax benefit for purposes of testing its economic substance." *Bank of N.Y. Mellon*, 140 T.C. at 36-37. Determining whether a given transaction has economic substance under the objective prong therefore requires *both* a calculation of pre-tax profit and a

consideration of the transaction's overall economic effect.  Accordingly, the overall determination of objective economic substance is a question of fact.

### b.    *Subjective Economic Substance*

Apart from the objective inquiry, a court must also look to the subjective business purpose of a transaction to determine whether it has economic substance.  Under the subjective inquiry, a court asks whether the taxpayer has a legitimate, non-tax business purpose for entering into the transaction.  *See id.* at 37; *Long Term Capital Holdings*, 330 F. Supp. 2d at 186.  "The business purpose inquiry 'concerns the motives of the taxpayer in entering the transaction;' it asks whether the taxpayer's 'sole motivation' for entering a transaction was to realize tax benefits."  *Altria*, 694 F. Supp. 2d at 281 (quoting *Rice's Toyota World, Inc. v. Comm'r*, 752 F.2d 89, 92 (4th Cir. 1985)).  The focus is the reasonableness of the transaction and can be articulated as: would "a prudent investor," absent tax benefits, "have made the deal?"  *See Long Term Capital Holdings*, 330 F. Supp. 2d at 186.  This inquiry is, by nature, factual.

2.    *Application*

a.    **AIG**

AIG argues that, as a matter of law, even if the economic substance doctrine applies generally to foreign tax credits, the cross-border transactions had economic substance.  To support this argument, AIG points to its calculated $168.8 million in pre-tax profit, a calculation that ignores the foreign taxes paid by the SPV, the U.S. tax paid by AIG on the SPV's investment income, and the foreign tax credits claimed by AIG.  The district court acknowledged that "[i]f the computation of that figure proves correct, AIG would be entitled to judgment," but ultimately rejected AIG's method and accordingly found that AIG was not entitled to partial summary judgment.  *Am. Int'l Grp.*, 2013 WL 1286193, at *5.

We agree that there are disputed issues of material fact as to both the objective and subjective economic substance of the cross-border transactions. The district court therefore properly denied AIG's motion for partial summary judgment.  There is sufficient evidence in the record from which a reasonable factfinder could conclude, as the government contends, that the transactions lacked economic substance.

Under the objective prong, there are unresolved material questions of fact regarding the overall economic effect of the cross-border transactions and the reasonableness of AIG's expectation of non-tax benefits -- indeed, expert discovery has not yet commenced in this case. The government's economist, Dr. Michael Cragg, has done preliminary analysis of the transactions, and for the purposes of its summary judgment motion, AIG did not contest his calculations. *Id.* at *6. According to Dr. Cragg, "[a]side from the tax benefits, the transactions involved little, if any, potential for economic return," as "absent the claimed tax benefits, the transactions neither generated material economic returns for AIG, nor offered the potential for such returns, after accounting for dividend payments, operating expenses, and foreign taxes." AIG App. at 2353, 2360. Dr. Cragg thus concluded that the "transaction structure inflated the foreign tax liabilities of the SPVs and generated income from tax benefits for AIG at the direct expense of the United States." *Id.* at 2356. Further, the SPVs had no substantive business activities of their own and absent capital contributions from AIG, they would not have had sufficient cash flow to cover their expenses or pay out dividends. Overall, the value of the foreign tax credits produced far exceeded any independent potential for economic return from the cross-border

transactions.  Insofar as AIG contends that, in considering the transaction's profitability, the district court inappropriately deducted the foreign taxes paid by the SPV, we reject that argument in light of our holding that, as a matter of law, foreign taxes are properly deducted in assessing a transaction's pre-tax profitability.  Accordingly, a reasonable factfinder could conclude that the transactions lacked objective economic substance.

Under the subjective prong, there are also material questions of fact regarding AIG's business purpose for entering the cross-border transactions.  As the government highlights, AIG's own internal documents described the cross-border transactions as "tax driven" and "tax based deal[s]."  *Id.* at 2315, 2317. Similarly, a foreign purchaser of a cross-border transaction acknowledged "[t]he benefit to AIG comes from US tax laws whereby they can obtain a credit for the tax paid in [the foreign country] and a deduction for the . . . dividend paid.  The tax credit effectively reduces their cost of borrowing . . . ."  *Id.* at 2319.  Further, AIG-FP retained the right to terminate the transactions due to "changes in tax law" or if AIG could not "soak up the excess foreign tax credits."  *Id.* at 2320. Accordingly, a reasonable factfinder could conclude that AIG lacked a legitimate, non-tax business purpose in entering the transactions.

Thus, viewing the evidence in the light most favorable to the government, as the non-moving party, we hold that the government offered sufficient evidence to permit a reasonable factfinder to find in its favor. Hence, the district court did not err in denying partial summary judgment. *See, e.g.*, *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006) (reversing summary judgment to taxpayer where IRS presented evidence from experts showing transaction at issue lacked economic substance).

### b. BNY

Like AIG, BNY argues that as a matter of law, STARS had economic substance. BNY points to the $1.5 billion loan from Barclays as proof of economic substance, and maintains that although tax benefits were part of its motivation for entering STARS, this does not negate the transaction's economic substance. BNY contends that the Tax Court erred in calculating pre-tax profit by: 1) bifurcating its analysis of the trust transaction and the $1.5 billion loan and, as a result, excluding the amount BNY expected to earn by investing the loan proceeds; 2) counting the foreign taxes paid as a cost; and 3) disregarding the tax-spread.

We conclude that the Tax Court committed no error. First, the Tax Court appropriately bifurcated its analysis of the STARS trust transaction from the $1.5 billion loan. As we have held, "[t]he relevant inquiry is whether the transaction that generated the claimed deductions . . . had economic substance." *Nicole Rose*, 320 F.3d at 284. We agree with the Tax Court that "the requirements of the economic substance doctrine are not avoided simply by coupling a routine transaction with a transaction lacking economic substance." *Bank of N.Y. Mellon*, 140 T.C. at 34; *see Long Term Capital Holdings*, 330 F. Supp. 2d at 183 (quoting *Nicole Rose*).[10] In BNY's case, the disputed tax benefits for the trust transaction and the loan are distinct: foreign tax credits versus interest expense deductions. We thus cannot say that the Tax Court erred in analyzing the transactions separately.

Second, the Tax Court did not err in its calculation of the trust transaction's objective economic substance. Because it considered the trust

---

[10] Congress, when codifying the economic substance doctrine, further supported this interpretation by noting that under present law, courts could "bifurcate a transaction in which independent activities with non-tax objectives are combined with an unrelated item having only tax-avoidance objectives in order to disallow those tax-motivated benefits." Staff of J. Comm. on Taxation, 111th Cong., Technical Explanation of the Revenue Provisions of the "Reconciliation Act of 2010," as Amended, in Combination with the "Patient Protection and Affordable Care Act," 153 & n.352 (J. Comm. Print 2010).

transaction separately from the loan, the Tax Court properly excluded the loan proceeds BNY expected to earn by investing the loan proceeds from its calculation of the trust transaction's profit. Further, in light of our holding that, as a matter of law, foreign taxes should be deducted when calculating pre-tax profit, the Tax Court did not err in considering foreign taxes paid by BNY on behalf of the trust and in concluding that the trust did not offer a reasonable opportunity for economic profit because, as demonstrated in the hypothetical above, for every $100 in trust income, BNY incurred a $22 loss by paying foreign taxes.

Finally, in considering the overall economic effect of the transaction, the district court did not err in excluding the tax-spread that Barclays paid BNY from calculated profit. The Tax Court found that the tax-spread was a "tax effect . . . . serv[ing] as a device for monetizing and transferring the value of anticipated foreign tax credits generated from routing income through the STARS structure." *Bank of N.Y. Mellon*, 140 T.C. at 43. BNY itself referred to the tax-spread as a "rebate from Barclays" which Barclays paid to share the tax benefits of STARS with BNY. BNY App. at 1525. Moreover, as BNY concedes, the parties agreed that the tax-spread would be half of the pre-tax value of

Barclays' expected U.K. tax benefits, which amounted to $11 for every $100 of trust income. Thus, even offsetting BNY's foreign tax payment of $22 with the tax-spread, BNY still lost $11 for every $100 of trust income. The Tax Court therefore reasonably concluded that "regardless of how the spread is characterized, the benefit of the spread was more than offset by the additional transaction costs that BNY incurred to obtain the spread." *Bank of N.Y. Mellon*, 140 T.C. at 43 n.15.

As noted above, the objective economic substance analysis does not end at profit, and the Tax Court here appropriately considered other aspects of the trust transaction to assess economic substance. Notably, the Tax Court found that the transaction's circular cash flow strongly indicated that its main purpose was to generate tax benefits for BNY and Barclays. *See Altria*, 658 F.3d at 289; *see also Salem*, 786 F.3d at 950 (affirming trial court's conclusion that STARS transaction "lacked economic reality" in part because the transaction "consisted of 'three principal circular cash flows,' which, apart from their intended tax consequences, had no real economic effect.").

Indeed, this circular cash flow demonstrates that BNY, far from risking double taxation, used an extremely convoluted transaction structure to

take maximum advantage of U.S. and U.K. tax benefits. BNY was reimbursed for half of its U.K. tax payments and simultaneously claimed a foreign tax credit in the United States for the full payment amounts. Toward this end, BNY created a trust in the United States whose funds never left the United States; yet BNY installed a nominal U.K. trustee precisely so the trust would be subject to U.K. taxation. The trust's distribution structure makes little sense except in light of the tax implications: each month funds were briefly sent to a blocked Barclays account then immediately returned to the trust. The purpose of this two-step process was to allow Barclays to claim a U.K. tax loss while BNY could claim a U.S. foreign tax credit. Because this structure allowed Barclays to recover the cost of U.K. taxes paid by BNY, Barclays shared the tax benefits with BNY by paying BNY the tax-spread.

Third, the Tax Court did not err in finding that STARS lacked a subjective business purpose beyond tax avoidance. The Tax Court found that the STARS structure lacked a reasonable relationship to BNY's claimed business purposes and BNY's interest in STARS was entirely predicated on the tax benefits it involved. *Bank of N.Y. Mellon*, 140 T.C. at 38-40. BNY asserted that the business purpose for entering into the STARS transaction was to obtain a low-

cost loan from Barclays. *Id.* at 40. The loan, however, was only "low-cost" if the tax-spread was considered a component of the loan interest. The Tax Court reasonably concluded that the tax-spread should not be so considered because, although the tax-spread was netted against the interest BNY owed on the loan, there was no real relationship between the two. *Id.* at 42. Rather, the tax-spread was a way for Barclays to share half of the pre-tax value of its expected U.K. tax benefits with BNY, and thus allow BNY to obtain $2 of foreign tax credit for each $1 of expenditure. *Bank of N.Y. Mellon*, 140 T.C. at 41-43. Absent this sharing of tax benefits, BNY's loan -- with a monthly interest of one-month LIBOR plus 30 basis points -- was not "low cost" because BNY could otherwise have borrowed money at or below LIBOR. Further support for the Tax Court's determination that BNY's singular motivation was the two-for-one tax benefit is evident in BNY's global tax director's acknowledgment that KPMG "knew that if I wasn't comfortable with our overall tax position and our ability to use those [foreign tax] credits, then the transaction wouldn't get off the ground." BNY App. at 363.

Accordingly, considering the objective and subjective prongs of our Circuit's flexible economic substance test together, we hold that the Tax Court correctly concluded that the STARS trust transaction lacked economic substance.

C.    *Deductibility of Interest Expenses*

1.    *Applicable Law*

The Code permits the deduction of "all interest paid or accrued within the taxable year on indebtedness."  26 U.S.C. § 163(a).  Thus, a taxpayer is ordinarily entitled to deduct interest paid on indebtedness, reducing its taxable income for a given year.  *See Lee v. Comm'r*, 155 F.3d 584, 586 (2d Cir. 1998).  "Interest payments are not deductible[, however,] if they arise from transactions that can not with reason be said to have purpose, substance, or utility apart from their anticipated tax consequences.  Such transactions are said to lack economic substance."  *Id.* (citation omitted) (internal quotation marks omitted).  We have repeatedly held that an interest deduction is not allowed if the interest payment arises from a transaction that is economically empty, e.g., a loan whose sole purpose is to generate interest deductions.  *See id.*; *Goldstein*, 364 F.2d at 740.

The Federal Circuit in *Salem* -- again analyzing a STARS transaction under a bifurcated analysis -- held that, unlike *Lee* and *Goldstein*, "there is no evidence that [the taxpayer bank] designed the Loan solely to claim the interest deductions."  786 F.3d at 957.  "While it may be true that the Loan operated partly to camouflage the [tax-spread] payment, it also resulted in a substantive change

in [the taxpayer bank's] economic position.  As a result of the Loan transaction,

[the taxpayer bank] obtained unrestricted access to $1.5 billion in loan proceeds."

*Id.*

> ## 2.    *Application*

The Commissioner contends that BNY's loan lacked economic

substance because it was overpriced and motivated by tax avoidance, and that

therefore BNY should not be able to deduct associated interest expenses.  *See*

*Kerman v. Comm'r*, 713 F.3d 849, 865 (6th Cir. 2013) (concluding that loan

transaction lacked economic substance, in part because of its "absurdly high

interest rate" (internal quotation marks omitted)).  We agree with the Tax Court

that the $1.5 billion loan from Barclays had independent economic substance.

Thus, BNY was entitled to deduct the interest expenses it paid on this loan.

First, as discussed above, the Tax Court correctly bifurcated the

STARS trust transaction from the $1.5 billion loan.

Second, we conclude that the $1.5 billion loan had independent

economic substance.  In *Lee* and *Goldstein*, we held that interest expenses were

not deductible because the relevant loan arrangements could "not with reason be

said to have purpose, substance, or utility apart from their anticipated tax

consequences." *Goldstein*, 364 F.2d at 740; *see Lee*, 155 F.3d at 586-87.  As the Tax

Court observed, however, BNY "did not use the loan proceeds to finance, secure

or carry out the STARS structure.  The loan was not necessary for the STARS

structure to produce the disallowed foreign tax credits.  Rather, the loan

proceeds were available for petitioner to use in its banking business throughout

the STARS transaction." *Bank of N.Y. Mellon Corp. v. Comm'r*, 106 T.C.M. (CCH)

367 (T.C. 2013).  Under both the objective and subjective prongs of the economic

substance doctrine, the loan was no sham: It constituted $1.5 billion in cash that

was available for BNY to utilize in any way it saw fit throughout the duration of

STARS.

        The Commissioner argues that because the loan was "overpriced" --

as BNY could have obtained a similar loan at a lower cost in the marketplace --

we should still disallow the interest expense deductions.  We have held,

however, that "[e]ven if the motive for a transaction is to avoid taxes, interest

incurred therein may still be deductible if it relates to economically substantive

indebtedness." *Lee*, 155 F.3d at 586 (quoting *Jacobson*, 915 F.2d at 840) (internal

quotation marks omitted).  Again, here, the $1.5 billion loan was economically

substantive.  We thus decline to disallow the deductions on the theory that BNY's loan lacked economic substance because it was overpriced.

Accordingly, we conclude that the Tax Court did not err, on reconsideration, in allowing BNY to deduct interest expenses on the $1.5 billion loan.

## CONCLUSION

Accordingly, the decisions of the district court and Tax Court are AFFIRMED.  To summarize:

(1)     We reject AIG's contention that foreign tax credits, by their nature, are not reviewable for economic substance.  The purpose of the "economic substance" doctrine is to ensure that a taxpayer's use of a tax benefit complies with Congress's purpose in creating that benefit.  Accordingly, we hold that the "economic substance" doctrine can be applied to disallow a claim for foreign tax credits.

(2)     In determining whether a transaction lacks economic substance, we consider: (a) whether the taxpayer had an objectively reasonable expectation of profit, apart from tax benefits, from the transaction; and (b) whether the taxpayer had a subjective non-tax business purpose in entering the

transaction. *Gilman*, 933 F.2d at 147-48. In our Circuit, we employ a "flexible" analysis where both prongs are factors to consider in the overall inquiry into a transaction's economic substance.

(3)    The focus of the objective inquiry is whether the transaction "offers a reasonable opportunity for economic profit, that is, profit exclusive of tax benefits." *Gilman*, 933 F.2d at 146 (internal quotation marks omitted). We conclude, as a matter of first impression in this Circuit, that foreign taxes are economic costs and should thus be deducted when calculating pre-tax profit. We also conclude that it is appropriate, in calculating pre-tax profit, for a court both to include the foreign taxes paid and to exclude the foreign tax credits claimed. In so holding, we agree with the Federal Circuit in *Salem* and disagree with decisions of the Fifth and Eighth Circuits (*Compaq* and *IES*, respectively).

(4)    Under the subjective prong, a court asks whether the taxpayer has a legitimate, non-tax business purpose for entering into the transaction.

(5)    As to AIG's transactions, we hold that there are unresolved material questions of fact regarding the *objective* factors -- i.e., the economic effects of the cross-border transactions and the reasonableness of AIG's expectation of non-tax benefits. There are also material questions of fact

regarding AIG's *subjective* business purpose for entering the cross-border transactions. Because a reasonable factfinder could resolve these questions in favor of the government and conclude therefrom that the cross-border transactions lacked economic substance, the district court did not err in denying AIG's motion for partial summary judgment.

(6) As to BNY's transactions, we hold that the Tax Court correctly concluded that the STARS trust transaction lacked economic substance. We also hold that the Tax Court did not err in concluding that the $1.5 billion loan from Barclays had independent economic substance, and that BNY was therefore entitled to deduct the associated interest expenses. Accordingly, we affirm the Tax Court's judgment in its entirety.