# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

AMERICAN INTERNATIONAL GROUP, INC.,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

Case No.: 09-cv-1871 (LLS) (AJP)

# AIG'S MEMORANDUM OF LAW IN OPPOSITION TO
# THE GOVERNMENT'S MOTION *IN LIMINE*
# TO EXCLUDE EVIDENCE OF THE DOMESTIC TRANSACTIONS

BOIES SCHILLER FLEXNER LLP
David Boies
Robin A. Henry
Edward Normand
Motty Shulman
Ian M. Dumain
333 Main Street
Armonk, New York 10504
Phone: (914) 749-8200
Fax: (914) 749-8300

EVERSHEDS SUTHERLAND (US) LLP
Thomas A. Cullinan
999 Peachtree Street, N.E.
Atlanta, Georgia 30309
Phone: (404) 853-8000
Fax: (404) 853-8806

*Attorneys for Plaintiff American*
*International Group, Inc. and Subsidiaries*

Dated:        September 13, 2017
              Armonk, New York

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................... iii

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ......................................................................................................................... 3

    A.      The Foreign and Domestic Transactions Were Both Spread Banking .................. 3

    B.      The Foreign and Domestic Transactions Are Identical Except for the
             Location of the Special Purpose Vehicle ................................................................. 4

    C.      AIG's Experts Rely on the Domestic Transactions in Their Analyses of the
             Foreign Transactions ............................................................................................... 5

    D.      No Foreign Court Has Concluded That Any of the Domestic Transactions
             Violates Any Foreign Tax Law ................................................................................ 7

ARGUMENT ............................................................................................................................... 9

I.      THE DOMESTIC TRANSACTIONS ARE DIRECTLY RELEVANT UNDER THE
       ECONOMIC SUBSTANCE DOCTRINE ......................................................................... 9

    A.      The Second Circuit's Economic Substance Test ..................................................... 9

    B.      The Domestic Transactions Are Probative of AIG's Motivations in
             Entering into the Foreign Transactions ................................................................. 10

          1.      The Domestic Transactions Show That AIG Did Not Enter into the
                  Foreign Transactions to Obtain FTCs ..................................................... 10

          2.      The Government's Narrow Focus on Pre-Tax Profit Highlights the
                   Relevance of the Domestic Transactions ................................................. 12

          3.      The Government Conflates the Objective and Subjective Prongs of the
                   Economic Substance Doctrine ................................................................. 13

II.     THE PROBATIVE VALUE OF THE DOMESTIC TRANSACTIONS IS NOT
       SUBSTANTIALLY OUTWEIGHED BY ANY CHANCE OF CONFUSING THE
       ISSUES, MISLEADING THE JURY, OR WASTING TIME ....................................... 15

    A.      The Government Has Not Demonstrated Any Risk of Confusing the Jury .......... 15

    B.      The Government's Waste-of-Time Argument Does Not Withstand Scrutiny ...... 17

          1.      Amount of Evidence ................................................................................. 17

2. The Jury Will Not Need to Decide If the Domestic Transactions Are Improper Under Foreign Law .................................................................. 19

III. IF THE COURT DOES NOT DENY THE GOVERNMENT'S MOTION OUTRIGHT, IT SHOULD DEFER DECISION UNTIL AFTER THE JOINT PRETRIAL ORDER HAS BEEN SUBMITTED, AND THUS DENY THE GOVERNMENT'S REQUEST FOR A CONTINUANCE PENDING THE COURT'S DECISION ON THE MOTION .................................................................... 20

CONCLUSION ............................................................................................................. 21

# TABLE OF AUTHORITIES

**Cases**

*Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams.*,
   262 F.R.D. 293 (S.D.N.Y. 2009) ...................................................................... 15, 16

*Arlio v. Lively*,
   474 F.3d 46 (2d Cir. 2007) ................................................................................ 16

*Bank of N.Y. Mellon Corp v. Comm'r*,
   801 F.3d 104 (2d Cir. 2015) ........................................................................... 9, 10

*Barrett v. Orange Cnty. Human Rights Comm'n*,
   194 F.3d 341 (2d Cir. 1999) .............................................................................. 18

*C&E Servs., Inc. v. Ashland Inc.*,
   539 F. Supp. 2d 316 (D.D.C. 2008) ................................................................... 14

*Gerber v. Computer Assocs. Int'l, Inc.*,
   303 F.3d 126 (2d Cir. 2002) .............................................................................. 18

*Gilman v. Comm'r*,
   933 F.2d 143 (2d Cir. 1991) ................................................................................ 9

*Gucci Am., Inc. v. Guess?, Inc.*,
   858 F. Supp. 2d 250 (S.D.N.Y. 2012) ............................................................... 18

*Hart v. RCI Hospitality Holdings, Inc.*,
   90 F. Supp. 3d 250 (S.D.N.Y. 2015) ................................................................. 19

*In re Agent Orange Prod. Liab. Litig.*,
   611 F. Supp. 1223 (E.D.N.Y. 1985) .................................................................. 18

*Leopold v. Baccarat, Inc.*,
   174 F.3d 261 (2d Cir. 1999) .............................................................................. 15

*Nat'l Org. for Women v. Scheidler*,
   No. 86-c-7888, 1990 WL 103212 (N.D. Ill. July 18, 1990) ................................ 20

*U.S. v. Al-Moayad*,
   545 F.3d 139 (2d Cir. 2008) ................................................................................ 9

*U.S. v. Collorafi*,
   876 F.2d 303 (2d Cir. 1989) .............................................................................. 10

*United States v. Aguilar-Aranceta*,
   58 F.3d 796 (1st Cir.1995) ................................................................................ 15

*United States v. Paredes*,
   176 F. Supp. 2d 179 (S.D.N.Y. 2001) ..................................................... 16

*United States v. Weisberg*,
   No. 07-CR-66A, 2008 WL 243786 (W.D.N.Y. Jan. 29, 2008) ................................................ 20

**Other Authorities**

22 Fed. Prac. & Pro. § 5216 (1978) .......................................................... 20

22 Fed. Prac. & Pro. § 5221 (1978) .......................................................... 15

I.R.S. P.L.R. 200335013 (May 15, 2003) ..................................................... 10

I.R.S. P.L.R. 200626037 (Mar. 24, 2006) .................................................... 10

I.R.S. P.L.R. 8929059 (Apr. 26, 1989) ....................................................... 10

I.R.S. P.L.R. 9042005 (Nov. 13, 1989) ....................................................... 10

Rev. Rul. 89-101, 1989-2 C.B. 67 ............................................................ 10

Plaintiff, American International Group, Inc. ("AIG"), respectfully submits this Memorandum of Law in Opposition to the United States of America's Motion *In Limine* to Exclude Evidence of the So-Called "Domestic Transactions" (Dkt. Nos. 168-71).

## PRELIMINARY STATEMENT

The Government's premature motion *in limine* is premised on contested expert testimony, an incorrect interpretation of the Second Circuit's opinion, and unfounded claims of jury confusion. The Domestic Transactions are highly probative of whether the six cross-border borrowing transactions (the "Foreign Transactions") have economic substance, and they will neither confuse the jury nor waste time. The Court should deny the motion.

This Court has stated that "the degree of relevance" of the Domestic Transactions "must turn almost completely on how similar the two sets of transactions are." Declaration of Ian M. Dumain dated September 13, 2017 ("Dumain Decl.") Ex. 1 at 8. They are identical for all material purposes. In addition to the testimony of AIG's fact witnesses who regarded the two types of transactions as comparable when they structured them, AIG's experts have testified that their similarity makes the Domestic Transactions the best economic "comparable" for proving that the Foreign Transactions furthered a "non-tax business purpose" under the economic substance doctrine and for disproving the government's contention that the "source of profit" in the Foreign Transactions was foreign tax credits ("FTCs"). Indeed, even the government's chief economic expert regards the two types of transactions as structurally similar.

The Domestic Transactions are critical evidence for the jury to resolve the central dispute of whether AIG entered into the Foreign Transactions for the sole purpose of obtaining FTCs. The government claims AIG lacked a non-tax business purpose for the Foreign Transactions

because the *only* reason AIG entered into them was for the FTCs.  AIG rejects this position and intends to rely on the Domestic Transactions, among other evidence, to refute it.

The only difference between the Domestic and Foreign Transactions was the domicile of the special purpose vehicle ("SPV") that earns income and pays tax.  In the Foreign Transactions, the SPV was domiciled abroad, which led to the incurrence of a foreign tax and a corresponding dollar-for-dollar FTC on AIG's U.S. tax return.  In the Domestic Transactions, the SPV was domiciled in the United States.  There was thus no foreign tax paid and no FTC claimed.  AIG's witnesses will testify that AIG preferred the Domestic Transactions, and the record will show that AIG entered into more Domestic Transactions than Foreign Transactions. The Domestic Transactions show that AIG was not attempting to obtain FTCs (let alone "solely" to obtain FTCs) because AIG entered into precisely the same transactions without seeking or obtaining any FTCs.

The Domestic Transactions also refute the government's repeated assertion that the only "source of profit" of the Foreign Transactions was FTCs.  AIG's experts refute the government's position by showing that no "profit" can result from claiming a dollar of FTC after paying a dollar of foreign tax.  The fact that the Foreign and Domestic Transactions had similar profits, where the Domestic Transactions did not utilize any FTCs, bears out this point.  The "source of profit" for the Foreign Transactions cannot be the FTCs and must thus be rooted elsewhere – namely, in the low-cost borrowing that AIG obtained from the foreign banks, which resulted from the favorable foreign tax treatment afforded the foreign banks by *their* home countries.  The Domestic Transactions will thus help the jury understand the true role of the FTCs and give the jury a complete picture of AIG's business purpose in entering into the transactions.

Finally, the Domestic Transactions will not confuse the jury or prolong the trial. The Domestic Transactions are no more complicated than the Foreign Transactions, and the parties long ago agreed on the basic facts regarding the structure and operation of the Foreign Transactions.

In addition, AIG's case does not require any showing that the Domestic Transactions satisfy foreign tax law, particularly where no foreign tax authority or court has ever invalidated any of the Foreign or Domestic Transactions and the two transactions that were audited were specifically approved by a U.K. court and the U.K. tax authority. The issues of AIG's contemporaneous business purpose and the supposed "source of profit" for the Foreign Borrowings have nothing to do with after-the-fact second-guessing of the treatment of the Domestic Transactions under foreign tax law.

## BACKGROUND

### A.     The Foreign and Domestic Transactions Were Both Spread Banking

In the 1990s, AIG's subsidiary AIG-FP was engaged in a broad range of financial services activities as part of AIG's financial services business. Dumain Decl. Ex 2 ¶ 2; Dumain Decl. Ex. 3 at 24-25. In the regular course of its business, AIG-FP sought to make a profit by borrowing funds at favorable rates and investing the funds at higher rates of return. Dumain Decl. Ex. 2 ¶ 2; Dumain Decl. Ex. 4 ¶ 2; Dumain Decl. Ex. 5 at 22-24; Dumain Decl. Ex. 3 at 30, 133. AIG-FP borrowed funds in a variety of ways including through the sale and repurchase of preferred stock issued by an AIG-FP affiliate (the "Borrowing Transactions"). Dumain Decl. Ex. 2 ¶ 3; Dumain Decl. Ex. 5 at 23-24.

Some of the Borrowing Transactions involved AIG-FP affiliates formed under the laws of foreign countries, and others involved AIG-FP affiliates formed under the laws of the United States. Dumain Decl. Ex. 2 ¶ 3; Dumain Decl. Ex. 6 at 66. Regardless of whether a Borrowing

Transaction involved a foreign or domestic affiliate, each transaction followed a common form (namely, the sale and repurchase of preferred stock in the affiliate) with variations attributable to relevant legal requirements and business considerations. Dumain Decl. Ex. 2 ¶ 4. Economically and in substance, the sale and repurchase of the preferred stock was a fixed-term loan from a foreign bank to AIG-FP secured by the preferred stock of the AIG-FP affiliate, and U.S. tax law treats it as such. Under the foreign law applicable to each transaction, however, the foreign bank was treated as the owner of the preferred stock. As a result, the distributions to the foreign banks on the preferred stock were treated as dividends for purposes of foreign law and were expected to be exempt from foreign tax or subject to a reduced tax rate in the foreign banks' home countries.

This anticipated favorable tax treatment for the foreign banks enabled them to lend funds to AIG-FP at a lower interest rate – through a lower dividend rate on the preferred stock – than the banks would have charged if the payments to them had been subject to full income tax in their home countries. Dumain Decl. Ex. 7 at 13. The parties thus structured the transactions for the foreign counterparty banks to achieve that favorable foreign tax treatment, and that benefit was shared by the foreign banks with AIG-FP in the pricing of both the Domestic and Foreign Transactions. Dumain Decl. Ex. 7 at 15-16.

> **B.** **The Foreign and Domestic Transactions Are Identical Except for the Location of the Special Purpose Vehicle**

Although the government now argues (at 1) that the Domestic Transactions are "entirely distinguishable" from the Foreign Transactions, the government's own experts have opined that the only relevant structural difference is the domicile of the SPV.[1] In his rebuttal report, the

---

[1] At an earlier stage of the case, the government acknowledged that the Domestic Transactions "bear on the business purpose for the transactions that are listed in the complaint" and "are very much central to this case." Dumain Decl. Ex. 9 at 7-8. The Court has also said

government's principal economic expert, Dr. Michael Cragg, "demonstrate[s] that the general structure for each of the Foreign and Domestic Transactions is comparable" except for the location of the SPV. Dumain Decl. Ex. 8 ¶ 21 (emphasis added). The Government also concedes that the Foreign and Domestic Transactions have the same pre-all-tax and post-all-tax economics. *See* Dumain Decl. Ex. 8 ¶ 25 (observing that "the net economics to AIG are the same in both the foreign and domestic transactions"); *see also id.* ¶ 28 (acknowledging that the economic features of the Foreign Transactions and the Domestic Transactions were similar).

Although the government's motion implies that there are vast differences between the Foreign and Domestic Transactions, the *only* material difference – as the government has previously explained – is the domicile of the SPV. The government then argues the difference in domicile causes a difference in what some of its experts call the "post-foreign, pre-U.S. tax profit," which the government repeats throughout its brief. To be clear, the Domestic and Foreign Transactions had the same basic structure, form, and cash flows, with the only difference being the domicile of the SPV and thus where tax was paid.

### C. AIG's Experts Rely on the Domestic Transactions in Their Analyses of the Foreign Transactions

The government and its experts (Michael Cragg, Joseph Stiglitz and Tanya Beder) take the position that the Foreign Transactions lack economic substance because the sole "source of profit" for the Foreign Borrowings was "the US Treasury" or "US tax benefits" – specifically,

---

that if the record supports AIG's arguments concerning the Domestic Transactions, it might have a "significant effect" on the determination of whether the Foreign Transactions have economic substance. Dkt. No. 85 at 2.

"foreign tax credits which provided the only profit to AIG."[2]  *See, e.g.*, Dumain Decl. Ex. 10 ¶

89, Ex. 11 ¶¶ 9(b), 12, 33, 89; Ex. 8 ¶¶ 7, 8; Ex. 12 at 87-88, 136-38, 291-92; Ex. 13 ¶¶ 37, 63;

Ex. 14 ¶¶ 2(c), 8(c); Ex. 15 at 134, 139-40, 143-45, 241-42, 254-56.  In addressing these

arguments and related points, AIG's experts rely in significant part on the Domestic

Transactions.

AIG expert Dr. Gordon Bodnar observes that if everything but the domicile of the SPV is

held equal, then the Domestic and Foreign Transactions produce similar post-tax rates of return

to both AIG-FP and the foreign counterparties and AIG-FP pays the same amount of worldwide

tax.  Dumain Decl. Ex. 16 ¶¶ 7-8 & Table 8.  This shows that the source of profit in both the

Domestic and Foreign Transactions was the spread between the preferred distribution paid by

AIG-FP to borrow the funds and AIG-FP's return on the borrowed funds.  Dumain Decl. Ex. 16

¶ 11; Dumain Decl. Ex. 17 ¶ 38 & Table 1.  In Dr. Bodnar's view, the economic substance of the

Foreign Transactions is demonstrated by comparing them to the Domestic Transactions.  Dumain

Decl. Ex. 16 ¶ 6.

AIG expert Dr. Mihir Desai opines that a complete economic analysis of the Foreign

Transactions should include the Domestic Transactions.  Dumain Decl. Ex. 18 ¶ 22.  Using a

simplified example, he shows that the cash flows of the Foreign Transactions and Domestic

Transactions are the same.  Dumain Decl. Ex. 19 at Table 2 & ¶¶ 59-63.  This demonstrates,

among other things, that both the Domestic and Foreign Transactions were profitable because

AIG-FP was able to obtain below-market funding due to the foreign banks' receipt of tax-free

---

[2]  At the summary judgment stage, the government argued that "the driver of th[ese]
transaction[s] was the FTCs."  Dkt. No. 135 at 6.  And its expert Joseph Stiglitz stated in his
Rule 26 disclosure that "AIG's excessive FTC claims . . . provide the economic incentive for
undertaking the transaction."  Dumain Decl. Ex. 13 ¶ 37.

dividends and was able to generate fees and investment returns from that funding above LIBOR, and not as a result of the FTCs. Dumain Decl. Ex. 18 ¶ 23.

AIG expert Phil Morrison concludes from his review of the relevant documentation, and based on his expertise with respect to the nature and operation of the FTC and hybrid tax treatment, that the foreign banks in both the Domestic and Foreign Transactions provided a reduced interest rate to AIG because of the foreign tax exemption on the dividends received, Dumain Decl. Ex. 20 ¶¶ 9-11, 25, and that the FTC played no part in this feature, *id.* ¶ 11. He concludes that these facts support the conclusion that a rational investor would enter into the Foreign Transactions regardless of U.S. tax allowances (*i.e.*, as a Domestic Transaction), including the FTC, because it would be motivated by a low interest rate. *Id.* ¶¶ 9-10. He further concludes that the similar structure between the Domestic and Foreign Transactions is relevant to show that the purpose of the structure was not the generation of FTCs, which were not available in the Domestic Transactions, *id.* ¶¶ 22-23, and that the purpose of the Foreign Transactions could not be the fact that AIG could claim FTCs, since it could not claim FTCs in the Domestic Transactions, *id.* ¶ 24.

### D. No Foreign Court Has Concluded That Any of the Domestic Transactions Violates Any Foreign Tax Law

The government asserts (at 4) that "the Domestic Transactions are simply foreign tax shelters that foreign jurisdictions deemed abusive." This assertion is wrong, and the government cites no evidence that supports it. (Any such evidence, moreover, would have nothing to do with whether any of the Foreign Transactions possessed economic substance.).

The record reflects that foreign tax authorities did not even audit six of the eight Domestic Transactions. Inland Revenue of the United Kingdom did audit the Sherwood transaction (the largest of the Domestic Transactions), and upheld it as appropriate under U.K.

tax law.  *See* Dumain Decl. Ex. 21.  Inland Revenue also audited and challenged another

domestic transaction that AIG-FP and Lloyds Bank entered into in 2000, but the U.K. courts

overturned the challenge in favor of Lloyds.  *See* Dumain Decl. Ex. 22.  Moreover, none of the

government's own experts in foreign tax law have categorically opined that the Domestic

Transactions would have failed if any foreign taxing authority had challenged them as being

"abusive" at the time the parties entered into them.

The government instead relies (at 15) on legislation enacted in the U.K. and Australia

after the parties entered into certain of the Domestic Transactions.  For example, the

government's expert in U.K. tax law, Philip Baker, opined that U.K. legislation enacted *in 2005*

would have prevented the U.K. banks in four of the Domestic Transactions that AIG entered into

*between 1995 and 2000* from achieving the anticipated U.K. tax savings.  Dumain Decl. Ex. 23.

Contrary to the government's position, however, this is evidence that the transactions complied

with foreign tax laws in existence at the time the transactions were consummated.  The

government goes on to cite New Zealand case law for the proposition that transactions it alleges

were similar to the Domestic Transactions were held to be abusive under New Zealand's tax

laws.  But the only New Zealand transaction in this case is a Foreign Transaction, and New

Zealand's Inland Revenue issued a private binding ruling approving the specific transaction with

AIG.[3]  Dumain Decl. Ex. 24.

---

[3] In addition, as the government's expert in New Zealand tax law testified during his deposition, his law firm obtained a letter ruling from the New Zealand taxing authorities approving a domestic transaction entered into by parties unrelated to AIG, which refutes the government's suggested implication that all such transactions would necessarily be found abusive in New Zealand.  Dumain Decl. Ex. 26 at 70-71, 85.

The government then resorts to the merely hypothetical, contending (at 16) that "the countries where the Foreign Transactions occurred likely would have prohibited or did prohibit the Domestic Transactions." Once again, however, the government's proffered "evidence" is not what it appears. The government suggests (at 14) that Ireland would have "prohibited" a Domestic Transaction on the basis of *Bank of Ireland's* alleged concerns about doing a Domestic Transaction (*i.e.*, where the SPV would be domiciled in the United States instead of in Ireland). Whatever Bank of Ireland's concerns, the government ignores the fact that AIG actually did a Domestic Transaction with an Irish bank, as one of the foreign banks in the domestic Glenwood transaction was an Irish subsidiary of National Westminster Bank. Dumain Decl. Ex. 25 ¶ 35. The Irish taxing authorities never questioned the Irish subsidiary's Irish tax savings, let alone prohibited the transaction.

## ARGUMENT

## I.    THE DOMESTIC TRANSACTIONS ARE DIRECTLY RELEVANT UNDER THE ECONOMIC SUBSTANCE DOCTRINE

Although the Domestic Transactions are central to AIG's case, as shown below, it bears noting at the outset that a "very low" standard of relevance governs a motion *in limine* asserting irrelevance. *United States v. Al-Moayad*, 545 F.3d 139, 176 (2d Cir. 2008).

### A.    The Second Circuit's Economic Substance Test

Under the Second Circuit's decision in this case, the jury will consider (i) whether AIG had an objectively reasonable expectation of profit, apart from tax benefits, from the transactions; and (ii) whether AIG had a subjective non-tax business purpose in entering into the transactions. *Bank of N.Y. Mellon Corp v. Comm'r,* 801 F.3d 104, 115 (2d Cir. 2015) (*citing Gilman v. Comm'r*, 933 F.2d 143, 147-48 (2d Cir. 1991)). Contrary to the government's assertion (at 2) that AIG must prevail on both questions, the test "is not a rigid two-step process

with discrete prongs."  It is instead a "'flexible' analysis where both prongs are factors to consider in the overall inquiry into a transaction's 'practical economic effects.'"  *Id.*

## B. The Domestic Transactions Are Probative of AIG's Motivations in Entering into the Foreign Transactions

Addressing the subjective prong, the jury must assess whether AIG's sole motivation for entering the Foreign Transactions was to claim FTCs – the US "tax benefit" at the center of this case.  *BONY*, 801 F.3d at 119.  The Domestic Transactions are highly probative of that inquiry. *Cf. United States v. Collorafi,* 876 F.2d 303, 305 (2d Cir. 1989) ("[T]rial courts should follow a liberal policy in admitting evidence directed towards establishing the defendant's state of mind" because proof of intent "usually must be accomplished by means of circumstantial evidence.").[4]

### 1. The Domestic Transactions Show That AIG Did Not Enter into the Foreign Transactions to Obtain FTCs

AIG will show that the purpose of the borrowing transactions – both foreign and domestic – was to borrow money at low rates.  AIG was able to obtain these low-rate borrowings by structuring the transactions in a way that provided the foreign banks with foreign tax savings,

---

[4] In both types of transactions, AIG secured favorable borrowing rates from taking advantage of its counterparties' foreign tax savings, which is substantive, profit-seeking, purposive activity.  The IRS itself has repeatedly acknowledged, for example, that the "business purpose" requirement for corporate reorganizations and spinoffs is satisfied even when such transactions are undertaken *solely* to achieve foreign tax savings or obtain foreign tax benefits for a U.S. taxpayer.  *See, e.g.*, Rev. Rul. 89-101, 1989-2 C.B. 67 (spin-off transaction undertaken solely to reduce foreign tax on repatriations had valid business purpose); I.R.S. P.L.R. 200626037 (Mar. 24, 2006) (corporate reorganization to achieve foreign tax savings); I.R.S. P.L.R. 200335013 (May 15, 2003) (reorganization and spin-off to take advantage of foreign tax incentives).  IRS rulings in the corporate-reorganization context make clear that foreign tax reduction qualifies as a valid business purpose because the lower taxes result in increased profits for the taxpayer.  *See, e.g.*, I.R.S. P.L.R. 9042005 (Nov. 13, 1989) ("These savings in foreign taxes represent actual net dollar savings which will not be offset by increases in United States income taxes."); I.R.S. P.L.R. 8929059 (Apr. 26, 1989) ("Since Parent expects to have significant excess foreign tax credits, these savings in foreign taxes represent actual net dollar savings.").

which incentivized those banks to charge AIG below-LIBOR rates on the borrowed money. The government, on the other hand, has argued that AIG's sole motive for engaging in the Foreign Transactions was to generate FTCs. *See, e.g.*, Dkt. No. 78 at 1, 20-21; Dkt. No. 135 at 15-17; Dumain Decl. Ex. 10 ¶ 16.

The government, however, has never been able to reconcile its claim that AIG engaged in the Foreign Transactions to generate FTCs with the undisputed fact that AIG engaged in the same type of transactions – the Domestic Transactions – *without* claiming any FTC. Indeed, the record is undisputed that AIG preferred the Domestic Transactions over the Foreign Transactions because AIG had to pay foreign taxes and claim offsetting FTCs in the Foreign Transactions, a process which AIG saw as burdensome and potentially costly. Dumain Decl. Ex. 27 at 72-73, 145-47. The government's own brief makes this clear, noting (at 14) that AIG initially proposed structuring as a Domestic Transaction what later became the Foreign Transaction called Maitengrove. This evidence shows that AIG sought to *avoid* paying foreign tax and claiming FTCs when structuring these transactions, directly contrary to the government's contention that AIG engaged in such transactions with the sole purpose of claiming FTCs.

The government further argues that the sole source of profit *to AIG* in the Foreign Transactions was the FTC. *See, e.g.*, Dkt. No. 135 at 4 ("[T]he driver of th[ese] transaction[s] w[ere] the FTCs."); Dumain Decl. Ex. 13 ¶ 37 ("AIG's excessive FTC claims . . . provide the economic incentive for undertaking the transaction."). But the government has never been able to reconcile that position with its admission (at 4) that the Domestic Transactions were structured to provide the *foreign banks* with the same foreign tax savings in both the Domestic and Foreign Transactions – even going so far as to call the Domestic Transactions "foreign tax shelters."

AIG is entitled to present evidence that the driver of both the Foreign and Domestic Transactions was thus the foreign banks' foreign tax savings and not the FTCs or the tax position of AIG.

2. **The Government's Narrow Focus on Pre-Tax Profit Highlights the Relevance of the Domestic Transactions**

The government (at 3, 7-12) principally bases its position that the Domestic Transactions are irrelevant to AIG's purpose for engaging in the Foreign Transactions on the fact that the Domestic and Foreign Transactions "do not have the same pre-U.S.-tax profit" once the foreign tax that AIG paid in the Foreign Transactions is treated as a cost. This is true, and irrelevant to the subjective inquiry. The difference in "pre-U.S.-tax profit" when foreign taxes are treated as a cost does not mean the Domestic Transactions are irrelevant to assessing AIG's subjective intent. To the contrary, it highlights the relevance of the Domestic Transactions.

As an initial matter, AIG and its economic experts disagree with the government's contention (at 3) that the "Foreign Transactions have a negative return" when foreign tax is treated as a cost. It is undisputed that the Foreign Transactions were cash-flow positive even treating foreign tax as a cost. In light of that evidence, the government has deducted (at 12, Table 1) a so-called "opportunity cost" from AIG's actual profit in order to be able to assert that the Foreign Transactions were not profitable. Yet AIG's experts – as well as government experts, in prior scholarship – have explained that it is not appropriate to reduce "profit" by so-called "opportunity costs."

Accordingly, the most that can be said for the effect of foreign tax on the profitability of the Borrowing Transactions is that it caused the Foreign Transactions to be less profitable, on a post-foreign-tax-pre-U.S.-tax basis, than the Domestic Transactions. That does not make the Domestic Transactions irrelevant. Instead, the jury should be allowed to assess *why* AIG engaged in the Foreign Transactions and what role foreign taxes and the FTC played in those

decisions in light of the alternative Domestic Transactions in which no foreign tax was paid and no FTC claimed. Indeed, that the Foreign Transactions produced less "pre-U.S.-tax profit" than the Domestic Transactions for AIG is strong proof that AIG did not engage in the Foreign Transactions to generate FTCs. There is no pragmatic reason for AIG to enter into a Foreign Transaction with the sole purpose of paying foreign tax and hence "generating" an equivalent dollar amount of FTCs, as that would only put AIG in the same pre-U.S.-tax position it would have been in had it engaged in a Domestic Transaction.

### 3. The Government Conflates the Objective and Subjective Prongs of the Economic Substance Doctrine

The government's argument is also flawed because it would require the jury to ignore AIG's actual intent at the time it entered the transactions and instead assess AIG's intent against the backdrop of a court decision – the Second Circuit's *BONY* decision – that would not be issued until two decades later. Specifically, the government argues (at 22) that the Domestic Transactions and Foreign Transactions are not comparable for purposes of the subjective prong because "AIG expected completely different profits" as calculated under the Second Circuit test articulated in *BONY* in 2015. But AIG did not know in the 1990s how the Second Circuit would define profit in 2015 for the purposes of the economic substance doctrine, and AIG's contemporaneous subjective intent is plainly relevant to the economic substance inquiry.

In addition to the obvious point that the jury cannot reasonably judge AIG's subjective intent in the 1990s against events that occurred decades later, the government's position wrongly conflates the objective and subjective prongs even under the Second Circuit test. The question before the Second Circuit in *BONY* was whether foreign taxes should be treated as costs when calculating pre-tax profit for purposes of the objective prong – the only part of the Second Circuit analysis that requires a calculation of profit. *BONY*, 801 F.3d at 116 (discussing the

objective prong). In articulating its holding regarding the treatment of foreign taxes, the court limited its discussion to the objective prong. *Id.* at 118 ("when assessing the objective economic substance of a transaction"); *id.* at 124 (discussing the treatment of foreign taxes in the context of the objective inquiry). The court did not say anything about treating foreign taxes as a cost in assessing a taxpayer's contemporaneous business purpose.

The government nevertheless suggests (at 21) that the Second Circuit's pre-tax profit test must be superimposed onto the subjective prong because the Second Circuit stated that the jury must consider whether AIG would have "made the deal" "absent tax benefits." But whether the transactions offered a reasonable opportunity for pre-tax profit (as defined by the Second Circuit) and whether AIG would have "made the deal" absent tax benefits are different questions. The Domestic Transactions show that AIG would have entered materially identical borrowing transactions absent FTCs – the tax "benefit" purportedly at issue in the Foreign Transactions. They are thus, as noted, strong evidence that AIG did not enter the Foreign Transactions for the purpose of obtaining FTCs.

In this additional respect, the government's misinterpretation of the Second Circuit's opinion infects the grounds for its motion. Much of the government's brief (as at 8-12) critiques the analyses of AIG's expert witnesses. This critique is improperly predicated on the government's misunderstanding of the facts, as well AIG's expert analyses, where "a motion *in limine* should not be used to resolve factual disputes or weigh evidence." *C&E Servs., Inc. v. Ashland Inc.*, 539 F. Supp. 2d 316, 323 (D.D.C. 2008). In short, applying their expertise, AIG's experts conclude that the structure and operation of the Foreign and Domestic Transactions were comparable and identify the Domestic Transactions as demonstrating that, contrary to the government's theory of the case, FTCs were not the "source of profit" in the Foreign

Transactions and that the transactions furthered a non-tax business purpose. In their reports, in sharp contrast, the government's economic experts conclude that the FTCs were the "source of profit" for the Foreign Transactions, but decline to analyze the Domestic Transactions at all.

The government's instant argument regarding relevance thus reduces to the proposition that this Court can rule, now, as a matter of law, that important aspects of AIG's case are mistaken, that AIG's *experts* are wrong, and that the government's *lawyers* are right. This is not how motions *in limine* work, and the record does not remotely support the government's presupposition that AIG's experts – as well as its fact witnesses – are mistaken. AIG is entitled to present these issues to the jury.

## II. THE PROBATIVE VALUE OF THE DOMESTIC TRANSACTIONS IS NOT SUBSTANTIALLY OUTWEIGHED BY ANY CHANCE OF CONFUSING THE ISSUES, MISLEADING THE JURY, OR WASTING TIME

Where AIG easily meets the "very low" threshold for relevance, as shown above, "the threshold to exclude relevant evidence on Rule 403 grounds is high." *Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams.*, 262 F.R.D. 293, 298-99 (S.D.N.Y. 2009).[5]

### A. The Government Has Not Demonstrated Any Risk of Confusing the Jury

As with its argument regarding relevance, the government's argument for "confusion" is based on its misinterpretation of the economic substance doctrine. The pre-tax profitability test that treats foreign tax as an expense relates to the objective prong of the economic substance

---

[5] Under Rule 403, the discretion to exclude does not arise "when the balance between the probative worth and the countervailing factor is debatable; there must be significant tipping of the scales against the evidentiary worth of the proffered evidence." *United States v. Aguilar-Aranceta*, 58 F.3d 796, 800 (1st Cir.1995) (quoting 22 Fed. Prac. & Pro. § 5221 (1978)). Indeed, evidence can be admitted even if the danger of unfair prejudice is significant where the probative value of the evidence is also significant. *Leopold v. Baccarat, Inc.*, 174 F.3d 261, 270 (2d Cir. 1999) (affirming trial court's admission of evidence where the significant danger of unfair prejudice did not overwhelm the significant probative value of the evidence).

doctrine.  That standard does not govern the jury's assessment of AIG's contemporaneous, subjective business purpose.  The Second Circuit test for measuring pre-tax profit for purposes of the economic substance doctrine, as explained above, is not the test for assessing AIG's contemporaneous subjective business purpose.  Properly instructed, the jury will understand the test for the objective analysis, the test for the subjective analysis, and the differences between the two.

The government's argument also fails to find any support in the case law.  The only case the government has cited (at 25) concerned the admission of an arbitral decision in a related arbitration between the parties to that case.  The court reasoned that there was a danger that the jury might feel compelled to conform its verdict to the "expert" decision of the arbitration board. *Arlio v. Lively*, 474 F.3d 46, 53 (2d Cir. 2007).  No similar danger exists here.  The government has thus failed to meet its burden of showing that its perceived danger of confusion substantially outweighs the probative value of the evidence.  *Cf.* Dumain Decl. Ex. 1 at 12 (to exclude the evidence of the domestic transactions before trial "one would have to be extremely confident that it was correct because of the significance of the evidence").  The government fails to acknowledge, moreover, the well-established principle that if the Court concludes there is any danger that admission of the Domestic Transactions could confuse or mislead the jury about the governing standard, the Court can address that issue through a limiting instruction.[6]  The

---

[6] *See Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams.*, 262 F.R.D. 293, 298-99 (S.D.N.Y. 2009) (denying motion *in limine* where the Rule 403 dangers could be addressed with a limiting instruction); *United States v. Paredes*, 176 F. Supp. 2d 179, 182 (S.D.N.Y. 2001) (denying motion *in limine* and inviting counsel to submit a limiting instruction); *see also* Advisory Committee Notes to FRE 403 ("In reaching a decision whether to exclude on grounds of unfair prejudice, consideration should be given to the probable effectiveness or lack of effectiveness of a limiting instruction.").

government has not even mentioned limiting instructions, much less explained why such an instruction would not be effective.

The real risk of confusing the jury, in fact, would result from excluding the Domestic Transactions. The Foreign and Domestic Transactions were entered into at the same time and are, in many instances, inextricably intertwined. Many documents relevant to the Foreign Transactions allude to the Domestic Transactions, and in many respects AIG fact witnesses will offer testimony reflecting their view that the two types of transactions are of a piece.[7] Letting the jurors see only half the picture is more likely to confuse them than giving them the full picture.

**B.     The Government's Waste-of-Time Argument Does Not Withstand Scrutiny**

**1.     Amount of Evidence**

The government contends (at 4) that "including the Domestic Transactions would *exponentially* expand the size and complexity" of the trial. This is wrong.

The Court has noted that "what's important in the case is not solved by examining the machinery of the transactions." Dumain Decl. Ex. 9 at 3. The Court continued, "[t]hey are highly complex. And for some purposes that's all you need to know, because the question is, why were they entered into, what role do they play in the rights and wrongs of the overall situation, in the decisive parts of the situation." *Id.* With that inquiry in mind, the parties should be able to agree to most of the relevant facts regarding the Domestic Transactions. There is little

---

[7] Indeed, many documents that the government itself has relied on in earlier stages of the litigation address both the Foreign and Domestic Transactions. *See, e.g.*, Dumain Decl. Ex. 28 (referring to the potential effect of a change in Italian tax law on both a Domestic Transaction and a Foreign Transaction), cited in Dkt. No. 136 at 152.

in dispute about the structure of the Domestic Transactions, their cash flows, or the applicable tax treatment.

In addition, admitting the Domestic Transactions would expand the size of the trial by only an increment. At present, AIG's intention is to call no witnesses at trial who would testify exclusively about the Domestic Transactions. And of the combined thirty expert witnesses, only four of them addressed issues relating exclusively to the Domestic Transactions. (These four witnesses are the parties' experts on the tax laws of Australia and the UK.)

Contrary to the government's suggestion, moreover, courts permit evidence of similar transactions when it is probative of key issues like intent. Indeed, in two of the cases that the government cites (at 26) for the proposition that courts have rejected "similar" efforts to expand trials, courts permitted evidence of similar transactions. In *Gerber v. Computer Associates International, Inc.*, 303 F.3d 126 (2d Cir. 2002), the district court admitted evidence of other transactions that would shed light on the purpose of the transaction in dispute; it excluded only those that it did not deem "sufficiently similar to the circumstances of [the transaction at issue] to warrant their receipt in evidence." *Id.* at 137. In *Gucci America, Inc. v. Guess?, Inc.*, 858 F. Supp. 2d 250 (S.D.N.Y. 2012), the court admitted evidence of defendant's other trademark disputes over goods manufactured for sale in the United States because those disputes were relevant to the issue of willfulness; the court excluded only evidence of disputes relating to goods for sale in Europe, mainly because that evidence was duplicative. *Id.* at 255.[8]

---

[8] The government's other cases are no more relevant. In each case, the excluded evidence was deemed to be of minimal probative value. *See, e.g., Barrett v. Orange Cnty. Human Rights Comm'n*, 194 F.3d 341, 347 (2d Cir. 1999) (plaintiff's argument that excluded material was even relevant was "an enormous stretch"); *In re Agent Orange Prod. Liab. Litig.*, 611 F. Supp. 1223, 1256 (E.D.N.Y. 1985) (excluded expert evidence was also found to be

As in *Gucci*, the only real question about evidence regarding the Domestic Transactions is whether at some point it would become cumulative. It would be premature to exclude an entire class of relevant evidence under FRE 403 before any evidence has been offered at trial, much less before the parties have attempted to narrow the issues in a joint pretrial order. *See Hart v. RCI Hospitality Holdings, Inc.*, 90 F. Supp. 3d 250, 257-58 (S.D.N.Y. 2015) (stating that evidence should not be excluded *in limine* unless it is "clearly inadmissible on all potential grounds" and noting that courts may reserve decision on motions *in limine* until trial). If the Court concludes during trial that evidence of the Domestic Transactions has become cumulative, the parties can address the issue at that time.

### 2. The Jury Will Not Need to Decide If the Domestic Transactions Are Improper Under Foreign Law

The government further asserts (at 4, 26) that AIG will have to "demonstrate in the first instance that the Domestic Transactions are not foreign tax shelters, and that the government would have to "present weeks of testimony" to show that "AIG and its counterparties understood that the Domestic Transactions were foreign tax shelters, and explaining how Australia and the United Kingdom . . . enacted legislation specifically designed to outlaw the tax benefits generated by such 'tax avoidance schemes.'" These assertions lack any reasonable foundation.

As an initial matter, there is no evidence that any of the eight Foreign Transactions was abusive under any foreign jurisdictions' tax law. *See* Background Section E. In addition, whether the Domestic Transactions were abusive for purposes of foreign tax law is immaterial to whether AIG entered the Foreign Transactions to obtain the FTC, and to identifying the source of

_____

inadmissible under FRE 703 because the bases of the experts' opinions were not the type reasonably relied upon by experts in the field).

profit in the Foreign Transactions. And even if the jury were permitted to consider whether foreign tax authorities or legislatures took subsequent steps to "outlaw the tax benefits" associated with similar future transactions, the jury would not need to hear "weeks" of evidence on the Domestic Transactions. The choice is not between "admitting the evidence and opening the door to a tedious rebuttal." 22 Fed. Prac. & Pro. § 5216 (1978). Instead, "it may be appropriate to apply Rule 403 to portions of the proposed rebuttal rather than to the proffered evidence." *Id.*

## III. IF THE COURT DOES NOT DENY THE GOVERNMENT'S MOTION OUTRIGHT, IT SHOULD DEFER DECISION UNTIL AFTER THE JOINT PRETRIAL ORDER HAS BEEN SUBMITTED, AND THUS DENY THE GOVERNMENT'S REQUEST FOR A CONTINUANCE PENDING THE COURT'S DECISION ON THE MOTION

The Court should also deny the government's request for an extension of time to respond to AIG's draft joint pretrial order until after the Court adjudicates this motion. *Cf. United States v. Weisberg*, No. 07-CR-66A, 2008 WL 243786, at *2 (W.D.N.Y. Jan. 29, 2008) (deferring adjudication of motion *in limine* until after parties had filed pretrial memorandums and exhibits lists).

The government seeks (at 26) the exclusion of "all evidence of the domestic transactions" because, among other things, the government claims admission of any evidence at all of the Domestic Transactions will necessitate that AIG "present weeks of testimony about the Domestic Transactions" and that the United States "spend an equal amount of time disputing AIG's evidence." This assertion, as shown, lacks any reasonable basis. If the Court is to give it any serious consideration, moreover, it should reserve decision until at least after the joint pretrial order has been submitted. Only at that point – if then – will the Court be able to assess the role of the Domestic Transactions in the case, what aspects of the transactions the parties agree on and what they dispute. *Cf. Nat'l Org. for Women v. Scheidler*, No. 86-c-7888, 1990 WL 103212,

at *1 (N.D. Ill. July 18, 1990) (deferring adjudication of motion *in limine* until after filing of pretrial order where court could not assess danger of prejudice on existing record).

The government's rationale for an extension is to save resources preparing "extensive rebuttals" to evidence that the Court may determine is inadmissible. This only highlights the rationale for deferring resolution of the motion *in limine* until at least after the joint pretrial order has been filed. The record now is only the government's broad-brush claims about how it thinks it will need to respond to the evidence it thinks AIG will offer and the arguments it thinks AIG will make. This is not the record on which the Court should exclude an entire category of evidence. *Cf.* Dumain Decl. Ex. 1 at 12 (to exclude the evidence of the domestic transactions before trial "one would have to be extremely confident that it was correct because of the significance of the evidence"). Granting the government's request would elevate the government's convenience over AIG's interest in having a complete, non-speculative record for the Court's consideration of this motion. If the Court believes that the government's waste-of-time argument merits serious consideration before trial, then the government's convenience must yield to the integrity of the decision-making process.

## CONCLUSION

For the reasons set out above, the Court should deny the United States of America's Motion *In Limine* to Exclude Evidence of the So-Called "Domestic Transactions."


Dated:          September 13, 2017
               Armonk, New York

                              BOIES SCHILLER FLEXNER LLP

                              By: /s/ Robin A. Henry_____
                                  David Boies
                                  Robin A. Henry
                                  Edward Normand
                                  Motty Shulman
                                  Ian M. Dumain

333 Main Street
Armonk, New York 10504
Phone: (914) 749-8200
Fax: (914) 749-8300

Thomas A. Cullinan
EVERSHEDS SUTHERLAND (US) LLP
999 Peachtree Street, N.E.
Atlanta, Georgia 30309
Phone: (404) 853-8000
Fax: (404) 853-8806

*Attorneys for Plaintiff American*
*International Group, Inc. and Subsidiaries*